| | |
|---|---|
| THE UNITED STATES OF AMERICA for the use and benefit of J. SCADUTO & SON, INC., <br><br> Plaintiff, <br><br> v. <br><br> LIBERTY MUTUAL INSURANCE CO. and AGENCY CONSTRUCTION CORP., <br> Defendants. | UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK <br><br> Civil Action No. 08 CV 01885 (GEL) "ECF Case" <br><br> Declaration in Support of Plaintiff's Rule 12 Motion |

## Declaration of Paul A. Montuori, Esq.

1. I am counsel for plaintiff J. Saduto & Son. Inc. ("J. Scaduto") in the above-referenced matter. As such, I am fully familiar with the facts and circumstances recited herein. Kevin C. Palmeri, Esq. and William G. Kelly, Esq. are co-counsels in this matter.

2. Attached hereto as Exhibit "A" is a true and correct copy of Plaintiff's First Amended Complaint, dated May 10, 2008.

3. A true and correct copy of the Prime Contract between defendant Agency Construction Corp. ("Agency") and the United States Post Office (the "Post Office") is attached to Plaintiff's First Amended Complaint as exhibit "a" and made part thereof.

4. A true and correct copy of the Subcontract Agreement between Agency and the Post Office is attached to Plaintiff's First Amended Complaint as exhibit "b" and made part thereof.

5. A true and correct copy of the May 22, 2007 termination fax sent from Agency to J. Scaduto is attached to Plaintiff's First Amended Complaint as exhibit "c" and made part thereof.

6. A true and correct copy of the May 18, 2007 Post Office Meeting Minutes, dated May 22, 2007, is attached to Plaintiff's First Amended Complaint as exhibit "d" and made part thereof.

7. True and correct copies of correspondence from J. Scaduto to Agency, dated respectively May 16th and 17th 2007, are attached to Plaintiff's First Amended Complaint as exhibit "e" and made part thereof.

8. Attached hereto as Exhibit "B" is a true and correct copy of Defendant Agency's Verified Answer and Counterclaims, dated June 12, 2008.

9. Attached hereto as Exhibit "C" is a true and correct copy of Defendant Liberty Mutual Insurance Co.'s Answer, dated June 23, 2008.

10. Based on my personal knowledge, investigation, and upon information and belief, I believe each of these documents to be accurate and authentic representations of the documents listed herein.

11. As expanded upon in Plaintiff's Memorandum of Law in Support of Rule 12 Motion, based on the uncontroverted facts and documents established by these pleadings and their incorporated exhibits, J. Scaduto respectfully submits that it is entitled to: i) a judgment on such pleadings as to Defendant Agency's liability for failure to pay termination for convenience damages; and ii) an order dismissing Defendant Agency's two counterclaims.

12. No previous request for the relief requested in the motion has been made.

**I declare under Penalty of Perjury that the foregoing is true and correct.**

**THE LAW OFFICES OF PAUL A. MONTUORI, P.C.**

/s/ Paul A. Montuori
By: Paul A. Montuori, Esq. (PM 5787)
Attorney for Plaintiff
265 Post Ave., Suite 270
Westbury, NY 11590
(516) 338-4714
pmontuori@montuorilaw.com

Dated: June 27, 2008
       Westbury, NY

| THE UNITED STATES OF AMERICA for the use and benefit of J. SCADUTO & SON, INC., | UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK |
|---|---|
| Plaintiff, | |
| v. | Civil Action No. 08 CV 01885 (GEL) "ECF Case" |
| LIBERTY MUTUAL INSURANCE CO. and AGENCY CONSTRUCTION CORP., | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff, the United States of America for the use and benefit of J. Scaduto & Son, Inc., by its attorney, as and for its complaint against the defendants says:

## PARTIES

1. J. Scaduto & Son, Inc. (hereinafter referred to as "J. Scaduto"), is a New York corporation maintaining offices at 1536 Southern Blvd., Building # 1 Bronx, New York 10460. J. Scaduto is engaged in the roofing business and was, at the relevant times stated herein, a beneficiary of a bond issued under the Miller Act, 40 U.S.C. §3131 *et. seq.*

2. Upon information and belief, defendant, Liberty Mutual Insurance Company (hereinafter referred to as "Liberty Mutual"), is a duly licensed insurance company, maintaining offices at 450 Plymouth Road, Suite 400, Plymouth Meeting, Pennsylvania 19462, engaged in the business of issuing surety bonds in New York State.

3. Upon information and belief, defendant, Agency Construction Corp.

(hereinafter referred to as "Agency") is a New York corporation maintaining offices at 526 Fayette Ave., Mamaroneck, New York 10543, and is engaged in the construction business.

## JURISDICTION AND VENUE

4.   This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 40 U.S.C. §3131 *et. seq.* (the Miller Act).  Additionally this court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. §1367.

5.   Venue is proper pursuant to 28 U.S.C. §1391 (b)(2) and (3) since a substantial part of the events or omissions giving rise to this action took place in this district and the defendants reside in this district.

6.   Moreover, the Miller Act directs that this action be brought "in the United States District Court for any district in which the contract was to be performed and executed, regardless of the amount in controversy."  40 U.S.C. §3133 (b)(3).

## GENERAL ALLEGATIONS

7. Upon information and belief, on or about September 29, 2006, Agency, as general contractor entered into a contract (hereinafter referred to as the "prime contract") with the United States Postal Service, for work commonly known as the "Mott Haven Project," Contract No. 332495-06-A-0206 (hereinafter referred to as the "project").  A true and correct copy of the prime contract provided by the United States Postal Service is attached hereto as exhibit "A" and made part of this complaint.

2

8. In connection with the prime contract, and in accordance with the requirements of the Miller Act, 40 U.S.C. §3131 *et seq.*, Liberty Mutual issued a payment bond, number 015-025-053, in the penal sum of nine hundred fifty thousand one hundred twenty four dollars ($950,124.00) as surety for the general contractor Agency.

9. Upon information and belief, Agency entered into a written subcontract (hereinafter referred to as the "subcontract") with J. Scaduto to perform certain roofing work on the project. The subcontract amount was two hundred five thousand dollars ($205,000.00). A true and correct copy of the subcontract is attached hereto as exhibit "B" and made part of this complaint. J. Scaduto, as subcontractor, was a beneficiary of Liberty Mutual's Miller Act bond.

10. Agency, as general contractor, was responsible for site supervision on the project.

11. During the course of J. Scaduto's work on the project, Agency issued change orders in the amount of fifteen-thousand three hundred fifty dollars ($15,350.00), directing J. Scaduto to perform, *inter alia*, additional pointing work and pitch pocket installation for the project. J. Scaduto diligently completed this additional work.

12. As of May 12, 2007, J. Scaduto satisfactorily and completely performed its obligations under the subcontract, including all change orders issued by Agency, entitling it to payment for its work on the project.

13. Prior to on or about May 12, 2007, J. Scaduto sent invoices to

3

Agency for its completed work on the project.

14. Up until on or about May 12, 2007, Agency, as general contractor, paid J. Scaduto, the subcontractor, the sum of seventy thousand three hundred thirty five dollars ($70,335.00) for its already completed work on the project.

15. On or about May 12, 2007, there was an outstanding invoice in the amount of seventy eight thousand fifteen dollars ($78,015.00) representing work already preformed by J. Scaduto on the project but not yet paid by Agency. This invoice represented, *inter alia*, work, labor, supplies, and other costs incurred by J. Scaduto for its roofing work on the project.

16. On or about May 22, 2007, Agency sent J. Scaduto a facsimile (hereinafter referred to as the "May 22, 2007 fax") indicating that J. Scaduto was terminated from the contract. The termination was effective May 18, 2007. Upon information and belief, a new roofing subcontractor was sent to the project on May 18, 2007. The May 22, 2007 fax indicated that the termination was at the request of the United States Postal Service. A true and correct copy of the May 22, 2007 fax is attached hereto as exhibit "C" and made part of this complaint. A true and correct copy of the relevant portion of the United States Postal Service's May 18, 2007 meeting minutes for the project, dated May 21, 2007, referencing the fact of J. Scaduto's termination on May 18, 2007, is attached hereto as exhibit "D."

17. No other notice of termination was given to J. Scaduto.

18. Upon information and belief, prior to the May 22, 2007 fax, J.

4

Scaduto was not informed of the reason for the termination or given an opportunity to cure any claimed defect in its performance under the contract. Upon information and belief, neither Agency nor the United States Postal Service ever expressed dissatisfaction or concern with the quality and progress of J. Scaduto's work.

19. Upon information and belief, Agency and the United States Postal Service had knowledge of all roofing specifications for the project, issued such specifications, and consented to the manner in which J. Scaduto carried out the roofing portion of the project.

20. Upon information and belief, at no time prior to May 22, 2007 did Agency and/or the United States Postal Service, or any of their respective employees or offices, express concern or displeasure to J. Scaduto, or any of its employees or officers, regarding the manner in which the roofing work was being performed on the project.

21. No basis existed for the termination of the subcontract.

22. Agency has terminated the contract with unclean hands.

23. Agency did not follow the requirements for terminating a subcontractor for cause/default as contained in the subcontract either explicitly or by reference to the prime contract. (See exhibit B). J. Scaduto was wrongfully terminated from the subcontract.

24. J. Scaduto is owed one-hundred fifty thousand fifteen dollars ($150,015.00) for its work on the project, exclusive of interest, attorneys' fees, and costs of suit, resulting from its wrongful termination.

25. The last date that J. Scaduto supplied labor, material, or equipment to the project was May 12, 2007.

26. On and after May 12, 2007, J. Scaduto remained, willing, able, and eager to finish its work on the project and complete its contractual obligations. J. Scaduto communicated its desire to Agency. On or about May 16th and 17th 2007, J. Scaduto sent correspondences to Agency indicating its desire to resume and complete its contractual obligations. True and correct copies of these correspondences are attached hereto as exhibit "E."

27. Despite repeated demands, Liberty Mutual has failed and/or refused to pay J. Scaduto the amounts due. Liberty Mutual has been made aware of the facts surrounding J. Scaduto's termination, and the damages resulting from said termination. Liberty Mutual has been provided with the relevant documentation supporting J. Scaduto's claims.

28. J. Scaduto is a beneficiary of Liberty Mutual's payment bond, as J. Scaduto performed work and supplied labor, materials, and equipment in connection with the subcontract, for which J. Scaduto was not compensated.

## COUNT ONE

29. J. Scaduto repeats the parties, jurisdiction and venue, and general allegations sections of this complaint as if fully set forth at length herein.

30. J. Scaduto performed work and delivered labor, materials, and equipment as required by the subcontract. Agency is in material breach of the subcontract. Agency has failed and/or refused to pay J. Scaduto for the work, material, and equipment performed and/or furnished. J. Scaduto was

6

wrongfully terminated from the subcontract entitling it to payment in the amount of one-hundred fifty thousand fifteen dollars ($150,015.00).

31. The date on which the last labor was performed and/or materials and equipment supplied by J. Scaduto to the project was May 12, 2007.

32. A period of more than ninety days has elapsed since May 12, 2007 and J. Scaduto has not been paid in full for the labor performed and materials and equipment furnished.

32. This action is instituted within one year from May 12, 2007, the date on which the last labor was performed, and materials and equipment supplied, by J. Scaduto to the project.

33. All conditions precedent for bringing and maintaining this action have been performed and/or have occurred. Although J. Scaduto demanded payment from Liberty Mutual for the amount due J. Scaduto in connection with the project, Liberty Mutual has refused to make payment to J. Scaduto.

34. Accordingly, Liberty Mutual is liable to J. Scaduto in accordance with Liberty Mutual's payment bond, and the Miller Act.

**WHEREFORE**, the United States of America, for the use and benefit of J. Scaduto, demands judgment against Liberty Mutual for damages, interest, attorneys' fees, costs of suit, and such other relief as this Court deems just and proper.

## COUNT TWO

35. J. Scaduto repeats each and every allegation as contained in the

parties, jurisdiction and venue, and general allegations sections of this complaint as if fully set forth at length herein.

36. J. Scaduto performed its obligations under the subcontract and was wrongfully terminated, entitling it to payment in the amount of one-hundred fifty thousand fifteen dollars ($150,015.00).

37. Despite repeated demands, Agency has refused to pay J. Scaduto the amount due.

38. Agency is in material breach of the subcontract for its refusal to pay J. Scaduto the amount due.

39. As a direct and proximate result of Agency's material breach of the subcontract as described above, J. Scaduto has sustained injury and harm for which it is entitled to damages.

  **WHEREFORE**, J. Scaduto demands judgment against Agency for damages, interest, attorneys' fees, cost of suit, and such other relief as this Court deems just and proper.

## COUNT THREE

40. J. Scaduto repeats the parties, jurisdiction and venue, and general allegations sections of this complaint as if fully set forth at length herein.

41. J. Scaduto sues Agency for goods sold and/or delivered and services rendered by J. Scaduto to Agency upon the promise by Agency to pay the agreed upon amounts.

42. Payment has been demanded but has not been made.

43. As a result of the above, J. Scaduto has sustained injury and harm for

8

which it is entitled to damages.

WHEREFORE, J. Scaduto demands judgment against Agency for damages, interest, attorneys' fees, cost of suit, and such other relief as this Court deems just and proper.

## COUNT FOUR

44. J. Scaduto repeats the parties, jurisdiction and venue, and general allegations sections of this complaint as if fully set forth at length herein.

45. J. Scaduto sues Agency for the reasonable value of goods sold and/or delivered and services rendered by J. Scaduto upon the reasonable expectation that Agency would pay the reasonable price or value of the goods and/or services provided.

46. Payment for such amounts has been demanded but has not been made.

47. As a result of the above, J. Scaduto has sustained injury and harm for which it is entitled to damages.

WHEREFORE, J. Scaduto demands judgment against Agency for damages, interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

## COUNT FIVE

48. J. Scaduto repeats the parties, jurisdiction and venue, and general allegations sections of this complaint as if fully set forth at length herein.

49. J. Scaduto performed roofing, construction work and/or supplied services, labor, materials, and equipment to Agency.

50. Since Agency received J. Scaduto's work, services, labor, materials, and equipment, Agency would be unjustly enriched unless it is required to pay for the reasonable value of the work, services, labor, materials, and equipment performed or provided.

51. As a direct and proximate result of the above, J. Scaduto has sustained injury and harm for which it is entitled to damages.

**WHEREFORE**, J. Scaduto demands judgment against Agency for damages, interest, attorneys' fees, cost of suit, and such other and further relief as this Court deems just and proper.

### COUNT SIX

52. J. Scaduto repeats the parties, jurisdiction and venue, and general allegations sections of this complaint as if fully set forth at length herein.

53. J. Scaduto performed the work and delivered the labor, materials, and equipment required pursuant to the subcontract, but Agency has refused to pay J. Scaduto the amount due.  J. Scaduto was wrongfully terminated from the subcontract.

54. Accordingly, J. Scaduto is a beneficiary of Agency's payment bond referenced above.

55. All conditions precedent for bringing and maintaining this action have been performed or have occurred.

56. Although J. Scaduto demanded payment from Liberty Mutual for the amount due J. Scaduto in connection with the project, Liberty Mutual has refused to make payment to J. Scaduto.

57. Accordingly, Liberty Mutual is liable to J. Scaduto in accordance with Liberty Mutual's payment bond referenced above.

**WHEREFORE**, The United States of America, for the use and benefit of J. Scaduto, demands judgment against Liberty Mutual and Agency, jointly and severally, for damages, interest, attorneys' fees, cost of suit and such other relief as this Court deems just and proper.

### COUNT SEVEN

58. J. Scaduto repeats the parties, jurisdiction and venue, and general allegations sections of this complaint as if fully set forth at length herein.

59. Liberty Mutual, in bad faith, and without factual or legal basis, has refused to make payment to J. Scaduto as required by the terms of Liberty Mutual's payment bond.

60. Upon information and belief, Liberty Mutual has conducted an inadequate investigation and has improperly assessed Agency's defenses to J. Scaduto's claim.

61. Liberty Mutual has been repeatedly made aware of the facts of J. Scaduto's claim and, without factual or legal basis, has repeatedly and willfully disregarded said facts for the purpose of avoiding paying a claim on its bond.

62. Despite being made repeatedly aware of the unambiguous and explicit facts concerning J. Scaduto's termination, and after claiming it thoroughly and completely investigated the facts of the termination, Liberty Mutual persisted in misstating, misinterpreting, and distorting the true facts. This repeated and willful disregard of the facts was present in, but not limited to, correspondences

11

sent from Liberty Mutual on or about September 6, 2007, October 16, 2007, November 12, 2007, February 1, 2008 and February 6, 2008.

63. Upon information and belief, Liberty Mutual's persistent and willful disregard and distortion of the facts is morally culpable and borne out of improper motives.

64. In its letter of February 1, 2008, reiterating its denial of J. Scaduto's claim, Liberty Mutual stated "... [agency] has filed a claim against Scaduto's liability carrier. Agency believes that its damages are in excess of the claim filed...and, therefore, subject to setoff." Upon information and belief, as of February 1, 2008, neither Agency, nor any of its representatives, have pursued a claim for monetary damages or losses against J. Scaduto's liability carrier, or against J. Scaduto directly.

65. Liberty Mutual has not provided any evidence of Agency's alleged losses, or substantiation for Agency's alleged right to a setoff.

66. Upon information and belief, in light of Liberty Mutual's alleged through investigation, the statements in Liberty Mutual's letters represent a knowing distortion of the facts of this claim. Upon information and belief, Liberty Mutual knew or should have known that its statement were false and misleading.

67. Upon information and belief, the motive behind Liberty Mutual's knowing misstatements and mischaracterizations was to, *inter alia*, discourage J. Scaduto from pursing its claim in a judicial forum, and cast doubt on the merits of such claim.

68. As a direct and proximate result of Liberty Mutual's bad faith refusal to

pay J. Scaduto, as required by the terms and conditions of Agency's payment bond, J. Scaduto has sustained injury and harm for which it is entitled to damages.

WHEREFORE, J. Scaduto demands judgment against Liberty Mutual for all damages, including compensatory and punitive damages, interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, as amended, J. Scaduto hereby requests each and every issue raised in this compliant be tried by Jury.

THE LAW OFFICES OF PAUL A. MONTUORI, P.C.

/s/ Paul A. Montuori

By: Paul A. Montuori, Esq. (PM 5787)
Attorney for Plaintiff
U.S. ex. Rel. J. Scaduto & Sons, Inc.
265 Post Ave., Suite 270
Westbury, NY 11590
(516) 338-4714
pmontuori@montuorilaw.com

Dated: May 10, 2008

13

Exhibit A


**UNITED STATES**
**POSTAL SERVICE**

Facilities Department

---

## U.S. POSTAL SERVICE
## CONSTRUCTION FIRM-FIXED-PRICE
## CONTRACT

### TABLE OF CONTENTS

Solicitation Title Page and Notes to Offerors

Solicitation Table of Contents

**U. S. POSTAL SERVICE OFFER AND AWARD PAGE**.................................................................................1

**SECTION A:  INSTRUCTIONS TO OFFERORS AND SOLICITATION**...............................................2

**A.100    GENERAL INFORMATION**...........................................................................................................2

A.101    EXPLANATION TO PROSPECTIVE OFFERORS (PROVISION A-6) (JANUARY 1997)....................................2
A.102    LABOR INFORMATION (PROVISION A-13) (JANUARY 1997)..............................................................2
A.103    PROTESTS (PROVISION A-15) (JANUARY 1997).............................................................................2
A.104    CONTRACTOR SCREENING REQUIREMENTS (CONSTRUCTION) (PROVISION 1-3) ALTERNATE 1 (AUGUST 2001).....2
A.105    PROHIBITION AGAINST CONTRACTING WITH FORMER OFFICERS OR PCES EXECUTIVES (PROVISION 1-6) (JANUARY 1997)............2
A.106    PERFORMANCE AND PAYMENT BOND REQUIREMENTS  (CONSTRUCTION) (PROVISION 7-1) (FEBRUARY 2001).......2
A.107    DEPOSIT OF ASSETS REQUIREMENTS (PROVISION 7-4) (MAY 2000)....................................................2
A.108    *APPLICABLE IF CONTRACT EXCEEDS  $25,000 BUT IS NOT GREATER THAN  $100,000.*
         ALTERNATE PAYMENT PROVISIONS (PROVISION 7-5) (MARCH 2001).....................................................2
A.109    POSTAL FURNISHED PROPERTY OR SERVICES (PROVISION A-12) (JANUARY 1997)................................3
A.110    *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1*
         PREPROPOSAL CONFERENCE (PROVISION 4-8) (JANUARY 1997)..........................................................3
A.111    NOTICE OF REQUIREMENT FOR EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION (PROVISION 9-5) (JANUARY 1997)......3
A.112    DIRECT VENDOR / PRE-SELECTED SOURCES (PROVISION OA-38) (JUNE 2000).......................................3
A.113    PRE-CONSTRUCTION MEETING (CONSTRUCTION) (PROVISION OA-5) ALTERNATE II (AUGUST 2000).............3
A.114    TYPE OF CONTRACT (PROVISION 2-6) (JANUARY 1997).....................................................................3
A.115    APPLICABILITY OF PROVISIONS (PROVISION OA-39) (MARCH 1999).....................................................4
A.116    PROPOSED USE OF FORMER POSTAL SERVICE EMPLOYEES (PROVISION 1-7) (OCTOBER 2001)..................4

**A.200    PREPARATION, SUBMISSION, MODIFICATION AND WITHDRAWAL OF PROPOSALS**...........................4

A.201    PREPARATION, SUBMISSION, MODIFICATION AND WITHDRAWAL OF PROPOSALS (CONSTRUCTION) (PROVISION 4-9) (JUNE 1999).........4
A.202    *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1*
         ELECTRONIC PROPOSALS (PROVISION A-17) (JUNE 2000)..................................................................4
A.203    LATE SUBMISSIONS AND MODIFICATIONS OF PROPOSALS (PROVISION A-4) (JANUARY 1997).....................4
A.204    ACKNOWLEDGMENT OF SOLICITATION AMENDMENTS (PROVISION A-5) (JANUARY 1997)............................4
A.205    PREQUALIFIED/NON-PREQUALIFIED CONTRACTORS (PROVISION OA-301) (AUGUST 2000).........................4
A.206    SUBMISSION OF FINANCIAL STATEMENTS (PROVISION OA-27) (FEBRUARY 2001)....................................5
A.207    *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1* KEY PERSONNEL (PROVISION OB-165) (JUNE 2000)...............5
A.208    CONSTRUCTION COST BREAKDOWN (PROVISION OA-40) (AUGUST 2000)...............................................5

 **UNITED STATES POSTAL SERVICE.**                    Facilities Department

A.209  *APPLICABLE IF CONTRACT EXCEEDS $1,000,000* ............................................................................................ 5
       NOTICE OF SMALL, MINORITY, AND WOMAN-OWNED BUSINESS SUBCONTRACTING REQUIREMENTS (PROVISION 3-1) (MAY 2001) ............... 5
A.210  ACCESS TO POSTAL SERVICE BUILDINGS (PROVISION OA-12) (MARCH 1989) .......................................................... 5
A.211  INFORMATION ON "EQUAL" PRODUCTS (PROVISION OA-1) (JUNE 1988) .................................................................. 5
A.212  BRAND NAME OR EQUAL (PROVISION 2-8) (JANUARY 1997) .............................................................................. 6
A.213  RESTRICTION ON THE DISCLOSURE AND USE OF DATA (PROVISION A-7) (JANUARY 1997) .......................................... 6

A. 300  EVALUATION AND AWARD ........................................................................................................................ 6

A.301  NOTICE OF PREAWARD SURVEY (PROVISION OA-34) (JUNE 1998) ...................................................................... 6
A.302  AWARD WITHOUT DISCUSSIONS (PROVISION A-9) (JANUARY 1997) .................................................................... 6
A.303  CONTRACT AWARD (PROVISION A-8) (MARCH 2001) ........................................................................................ 6
A.304  *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1* .................................................................................................. 6
       CONTRACT AWARD AND PROPOSAL EVALUATION (PROVISION OA-16) (MARCH 2001) ............................................ 7
A.305  EVALUATION OF PROPOSALS FOR MULTIPLE AWARDS (PROVISION OA-17) (JUNE 1998) ........................................ 8

A. 400  REPRESENTATIONS AND CERTIFICATIONS .......................................................................................... 8

A.401  TYPE OF BUSINESS ORGANIZATION (PROVISION A-20) (MARCH 1999) ................................................................ 8
A.402  PARENT COMPANY AND TAXPAYER IDENTIFICATION NUMBER (PROVISION A-21) (JANUARY 1997) ......................... 8
A.403  AUTHORIZED NEGOTIATORS (PROVISION A-22) (JANUARY 1997) ...................................................................... 8
A.404  PLACE OF PERFORMANCE (PROVISION A-23) (JANUARY 1997) ........................................................................ 8
A.405  CERTIFICATE OF INDEPENDENT PRICE DETERMINATION (PROVISION 1-1) (JANUARY 1997) .................................... 9
A.406  BUY AMERICAN CERTIFICATE - CONSTRUCTION MATERIALS (PROVISION 1-5) (JANUARY 1997) .............................. 9
A.407  REPRESENTATION OF RIGHTS IN DATA (PROVISION 8-2) (JANUARY 1997) ........................................................... 9
A.408  CERTIFICATE OF NONSEGREGATED FACILITIES (PROVISION 9-2) (JANUARY 1997) .............................................. 9
A.409  *APPLICABLE WHEN OFFEROR HAS 50 OR MORE EMPLOYEES AND PROPOSAL IS EXPECTED TO EXCEED $50,000* ........ 9
       EQUAL OPPORTUNITY AFFIRMATIVE ACTION PROGRAM (PROVISION 9-3) (JANUARY 1997) .................................... 9
A.410  *APPLICABLE WHEN CONTRACT EXCEEDS $10,000,000* .................................................................................. 10
       PREAWARD EQUAL OPPORTUNITY COMPLIANCE REVIEW (PROVISION 9-4) (JANUARY 1998) .................................. 10

SECTION B - THE CONTRACT ........................................................................................................................ 11

B. 100  THE WORK .............................................................................................................................................. 11

B.101  STATEMENT OF WORK/SPECIFICATIONS (CLAUSE OB-7) (MARCH 1999) ............................................................ 11
B.102  CONDITIONS AFFECTING THE WORK (CLAUSE B-41) (MARCH 1999) .................................................................. 11
B.103  ORDER OF PRECEDENCE (CONSTRUCTION) (CLAUSE B-29) ALTERNATE I (FEBRUARY 2001) ................................ 11
B.104  CONTRACTOR SCREENING REQUIREMENTS (CLAUSE 1-4) (AUGUST 2001) ........................................................ 11
B.105  SAMPLES (CLAUSE B-62) (JANUARY 1997) ................................................................................................... 11
B.106  REQUIREMENTS FOR VERIFICATION OF MEASUREMENTS/ON SITE DOCUMENTS (CLAUSE B-35) (FEBRUARY 2001) ..... 12
B.107  SHOP DRAWINGS, COORDINATION DRAWINGS, AND SCHEDULES (CLAUSE B-56) (MARCH 1999) ........................... 12
B.108  RECORD "AS BUILT" DRAWINGS (CLAUSE B-57) (MARCH 1999) ...................................................................... 12
B.109  SPARE PARTS DATA (CLAUSE B-58) (JANUARY 1997) .................................................................................... 12
B.110  WARRANTY (CONSTRUCTION) (CLAUSE B-61) (FEBRUARY 2001) ................................................................... 13



Facilities Department

| | | |
|---|---|---|
| B.111 | *Applicable if Listed in Block 9, Page 1* ........................................................................ | |
| | Fuel Storage Tanks (Construction) (Clause FB-241) (March 2001) ................................... | 13 |
| B.112 | Mechanization (Clause FB-242) (June 1988) ................................................................. | 13 |
| **B. 200** | **Insurance, Bonds and Risk** ................................................................................ | **13** |
| B.201 | *Applicable if contract exceeds $25,000* Additional Bond Security (Clause 7-2) (January 1997) ....... | 13 |
| B.202 | Insurance (Construction) (Clause 7-4) Alternate I (March 1999) ...................................... | 13 |
| B.203 | Indemnification (Clause B-39) (January 1997) ............................................................. | 14 |
| B.204 | *Applicable if contract exceeds $25,000* | |
| | Deposit of Assets Instead of Surety Bonds (Clause 7-3) (January 1997) .......................... | 14 |
| **B. 300** | **Commencement and Completion** ........................................................................ | **14** |
| B.301 | Notice to Proceed and Commencement, Prosecution, and Completion of Work (Clause B-34) (January 1997) ...... | 14 |
| B.302 | Notice of Delay (Clause B-15) (March 1999) ................................................................. | 14 |
| B.303 | Liquidated Damages (Construction) (Clause 2-10) Alternate I (March 1999) ..................... | 14 |
| B.304 | Suspensions and Delays (Clause B-16) (January 1997) ................................................. | 14 |
| B.305 | Excusable Delays (Clause B-19) (January 1997) .......................................................... | 14 |
| B.306 | *Applicable if Listed in Block 9, Page 1* | |
| | Construction Progress Chart (Clause B-59) (March 1999) .............................................. | 15 |
| B.307 | *Applicable if Listed in Block 9, Page 1* | |
| | Network Analysis System and Update (Clause FB-246) (March 1999) .............................. | 15 |
| B.308 | Exception to Completion Schedule and Liquidated Damages (Clause FB-245) (March 1999) ...... | 15 |
| **B. 400** | **Contractor Responsibilities** ............................................................................. | **15** |
| B.401 | Performance and Superintendence of Work By Contractor (Clause B-42) (September 2003) ...... | 15 |
| B.402 | Materials and Workmanship (Clause B-63) (January 1997) ............................................. | 16 |
| B.403 | Use of Premises (Clause B-44) (August 2000) ............................................................. | 16 |
| B.404 | Permits and Responsibilities (Clause B-47) (March 1999) .............................................. | 16 |
| B.405 | Building Codes, Fees, and Charges (Clause B-49) (January 1997) .................................... | 16 |
| B.406 | Federal, State, and Local Taxes (Construction) (Clause 7-6) Alternate I (March 1999) ......... | 16 |
| B.407 | Identification of Contract Deliverables (Clause OB-19) (June 1988) ................................. | 17 |
| B.408 | Authorization and Consent (Clause 8-2) (January 1997) ................................................ | 17 |
| B.409 | Notice and Assistance Regarding Patent and Copyright Infringement (Clause 8-3) (January 1997) ...... | 17 |
| B.410 | Patent Indemnity (Clause 8-4) (January 1997) ............................................................. | 17 |
| B.411 | Debris and Cleanup (Clause B-52) (September 1998) .................................................... | 17 |
| B.412 | Heat (Clause B-51) (January 1997) ........................................................................... | 17 |
| B.413 | English Language Requirement of On-Site Superintendent (Clause OB-38) (June 1988) ........ | 17 |
| B.414 | Optional Materials or Methods (Construction) (Clause FB-244) (June 1988) ...................... | 17 |
| B.415 | Advertising of Contract Awards (Clause B-25) (January 1997) ........................................ | 18 |
| B.416 | Ground Breaking Ceremonies (Clause FB-238) (June 1988) ........................................... | 18 |
| B.417 | Preference for Domestic Construction Materials (Clause 1-10) (January 1997) ................... | 18 |
| **B. 500** | **Postal Service Rights and Responsibilities** ..................................................... | **18** |



## Facilities Department

| | | |
|---|---|---|
| B.501 | CONTRACTING OFFICER'S REPRESENTATIVE (COR) (CLAUSE OB-21) (MARCH 1999) | 18 |
| B.502 | SITE VISITS (CONSTRUCTION) (CLAUSE FB-240) (MARCH 1999) | 18 |
| B.503 | POSTAL SERVICE DIRECTED STAFFING CHANGES (CLAUSE FB-217) (MARCH 1999) | 18 |
| B.504 | EXAMINATION OF RECORDS (CLAUSE B-14) (JANUARY 1997) | 18 |
| B.505 | RIGHTS IN TECHNICAL DATA (CLAUSE 8-6) (JANUARY 1997) | 18 |
| B.506 | SURVEY MONUMENTS AND BENCHMARKS (CLAUSE B-53) (JANUARY 1997) | 20 |
| B.507 | POSTAL SERVICE PARTIAL OCCUPANCY (CLAUSE B-36) (JANUARY 1997) | 20 |
| B.508 | POSTAL SERVICE PROPERTY (CONSTRUCTION) (CLAUSE 2-11) ALTERNATE I (MAY 2000) | 20 |
| B.509 | OTHER CONTRACTS (CLAUSE B-45) (JANUARY 1997) | 21 |
| B.510 | POSTAL SERVICE PROPERTY FURNISHED "AS IS" (CLAUSE 2-14) (JANUARY 1997) | 21 |
| B.511 | RECORDS OWNERSHIP (CLAUSE 4-7) (JANUARY 1997) | 21 |
| B.512 | RIGHTS IN COMPUTER SOFTWARE(CLAUSE 8-9) (JANUARY 1997) | 21 |
| **B. 600** | **ADMINISTRATIVE ITEMS** | **23** |
| B.601 | DEFINITION OF TERMS USED IN CONTRACT DOCUMENTS (DESIGN & CONSTRUCTION) (CLAUSE FB-235) (MARCH 1999) | 23 |
| B.602 | STANDARD REFERENCES (CLAUSE B-55) (JANUARY 1997) | 24 |
| B.603 | GRATUITIES OR GIFTS (CLAUSE 1-5) (JANUARY 1997) | 24 |
| B.604 | CONTINGENT FEES (CLAUSE 1-6) (JANUARY 1997) | 24 |
| B.605 | ORGANIZATIONAL CONFLICTS OF INTEREST (CLAUSE 1-8) (JANUARY 1997) | 24 |
| **B. 700** | **SUBCONTRACTING** | **25** |
| B.701 | SUBCONTRACTOR COST OR PRICING DATA (CLAUSE 5-2) (JANUARY 1997) | 25 |
| B.702 | SUBCONTRACTS (CONSTRUCTION) (CLAUSE B-46) (AUGUST 2001) | 25 |
| **B. 800** | **PROTECTION OF PERSONS AND PROPERTY** | **25** |
| B.801 | ACCIDENT PREVENTION (CLAUSE B-38) (MARCH 2001) | 25 |
| B.802 | HEALTH AND SAFETY STANDARDS (CLAUSE B-28) (MARCH 2001) | 25 |
| B.803 | PROTECTION OF THE ENVIRONMENT, EXISTING VEGETATION, STRUCTURES, UTILITIES, & IMPROVEMENTS (CLAUSE B-50) (MARCH 2001) | 26 |
| B.804 | ACCESS TO SITE (CLAUSE OB-44) (MARCH 1999) | 26 |
| B.805 | USDA QUARANTINED AREAS (CONSTRUCTION) (CLAUSE FB-243) (JUNE 1988) | 26 |
| B.806 | HANDLING ASBESTOS AND OTHER HAZARDOUS MATERIALS (CLAUSE FB-273) (MARCH 2001) | 26 |
| B.807 | *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1* | |
| | ELEVATOR WORK–QUALIFICATIONS (CONSTRUCTION) (CLAUSE FB-239) (JUNE 1988) | 27 |
| **B. 900** | **PAYMENTS** | **27** |
| B.901 | INVOICES (CONSTRUCTION) (CLAUSE B-20) (AUGUST 2001) | 27 |
| B.902 | PAYMENT (CONSTRUCTION) (CLAUSE B-48) (JUNE 2001) | 27 |
| B.903 | INTEREST - CONSTRUCTION (CLAUSE B-22) (JUNE 1998) | 27 |
| B.904 | CONSTRUCTION COST BREAKDOWN (CLAUSE B-40) (AUGUST 2000) | 28 |
| **B. 1000** | **CHANGES/CLAIMS/DISPUTES** | **28** |



Facilities Department

B.1001   CHANGES (CONSTRUCTION) (CLAUSE B-37) (SEPTEMBER 2002) ........................................................ 28
B.1002   CHANGE ORDER ACCOUNTING (CLAUSE B-21) (JANUARY 1997) .................................................... 28
B.1003   PRICING OF ADJUSTMENTS (CLAUSE B-10) (JANUARY 1997) ...................................................... 28
B.1004   EQUITABLE ADJUSTMENTS (CONSTRUCTION) (CLAUSE FB-271) (MARCH 1999) .............................. 28
B.1005   PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (CLAUSE 5-1) (JANUARY 1997) .............. 29
B.1006   DIFFERING SITE CONDITIONS (CLAUSE B-32) (MARCH 1999) .................................................... 29
B.1007   CLAIMS AND DISPUTES (CLAUSE B-9) (JANUARY 1997) .......................................................... 29
B.1008   ASSIGNMENT OF CLAIMS (CLAUSE B-8) (JANUARY 1997) ....................................................... 30
B.1009   *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1* ................................................................... 30
         VALUE ENGINEERING INCENTIVE (CLAUSE 2-22) (JANUARY 1997)

B. 1100   TERMINATIONS ........................................................................................... 31

B.1101   TERMINATION FOR CONVENIENCE (CLAUSE B-11) (JANUARY 1997) ........................................... 31
B.1102   TERMINATION FOR DEFAULT (CLAUSE B-13) (JANUARY 1997) ................................................ 32

B. 1200   INSPECTION AND ACCEPTANCE ............................................................................. 33

B.1201   INSPECTION AND ACCEPTANCE (CONSTRUCTION) (CLAUSE B-33) (MARCH 1999) ........................... 33
B.1202   PROJECT CLOSEOUT (CONSTRUCTION) (CLAUSE B-54) (MARCH 1999) ..................................... 33
B.1203   ASBESTOS FREE AND LEAD-BASED PAINT FREE CERTIFICATION (CLAUSE FB-315) (AUGUST 2000) ....... 33

B. 1300   LABOR POLICIES ......................................................................................... 33

B.1301   CONVICT LABOR (CLAUSE 9-1) (JANUARY 1997) ........................................................... 33
B.1302   PROHIBITION AGAINST CONTRACTING WITH FORMER OFFICERS OR PCES EXECUTIVES (CLAUSE 1-11) (JANUARY 1997) ......... 33
B.1303   DAVIS BACON ACT (CLAUSE 9-3) (JANUARY 1997) ........................................................ 35
B.1304   EQUAL OPPORTUNITY (CLAUSE 9-7) (JANUARY 1997) ..................................................... 36
B.1305   AFFIRMATIVE ACTION COMPLIANCE REQUIREMENTS FOR CONSTRUCTION (CLAUSE 9-8) (JANUARY 1997) ......... 38
B.1306   CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME COMPENSATION (CLAUSE 9-2) (JANUARY 1997) ........ 38
B.1307   EQUAL OPPORTUNITY PREAWARD COMPLIANCE OF SUBCONTRACTS (CLAUSE 9-9)(JANUARY 1998) ........... 38
B.1308   AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS (CLAUSE 9-13) (JANUARY 1997) ...................... 39
B.1309   AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (CLAUSE 9-14) (JANUARY 1997) ...... 39
B.1310   COMPLIANCE BY STATES WITH LABOR STANDARDS (CLAUSE 9-4) (JANUARY 1997) ......................... 40
B.1311   CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-SAFETY STANDARDS (CLAUSE 9-5) (JANUARY 1997) ....... 40
B.1312   USE OF FORMER POSTAL SERVICE EMPLOYEES (CLAUSE 1-14) (OCTOBER 2001) .......................... 40

B. 1400   SUPPLIER RELATIONS ...................................................................................... 40

B.1401   *APPLICABLE IF CONTRACT EXCEEDS $1,000,000* ......................................................... 40
         SMALL, MINORITY, AND WOMAN-OWNED BUSINESS SUBCONTRACTING REQUIREMENTS (CLAUSE 3-1) (MAY 2001) ....... 40
B.1402   *APPLICABLE IF CONTRACT EXCEEDS $250,000* ........................................................... 40
         PARTICIPATION OF SMALL, MINORITY, AND WOMAN-OWNED BUSINESSES (CLAUSE 3-2) (MAY 2001) ............ 40

B. 1500   ATTACHMENTS ............................................................................................ 41



**UNITED STATES**
**POSTAL SERVICE**

# Facilities Department

# SECTION A:  INSTRUCTIONS TO OFFERORS AND SOLICITATION

## A. 100   GENERAL INFORMATION

### A.101   EXPLANATION TO PROSPECTIVE OFFERORS (PROVISION A-6) (JANUARY 1997)

Any prospective offeror desiring an explanation or interpretation of the solicitation, drawings, or specifications must request it in writing soon enough to allow a reply to reach all prospective offerors before the submission of their proposals. Oral explanations or instructions will not be binding. Any information given to a prospective offeror concerning a solicitation will be furnished promptly to all other prospective offerors as an amendment of the solicitation, if that information is necessary in submitting offers or if the lack of it would be prejudicial to any other prospective offerors.

### A.102   LABOR INFORMATION (PROVISION A-13) (JANUARY 1997)

General information regarding the requirements of the Walsh–Healey Public Contracts Act (41 U.S.C. 35–45), the Contract Work Hours and Safety Standards Act (40 U.S.C. 327-333), and the Service Contract Act of 1965 (41 U.S.C. 351 et seq.) may be obtained from the

> DEPARTMENT OF LABOR
> 200 CONSTITUTION AVENUE NW
> WASHINGTON DC 20210–0999

or from any regional office of that agency.

### A.103   PROTESTS (PROVISION A-15) (JANUARY 1997)

Protests will be considered only if submitted in accordance with the time limits and procedures provided in Chapter 3 of the Postal Service Interim Purchasing Guidelines (May 2005). A copy of the protest procedures may be obtained from the office issuing the solicitation.

### A.104   CONTRACTOR SCREENING REQUIREMENTS (CONSTRUCTION) (PROVISION 1-3) ALTERNATE 1 (AUGUST 2001)

The contract resulting from this solicitation will require the contractor or its employees (including subcontractors and their employees) to have access to occupied postal facilities, and/or to postal information and resources (including postal computer systems).  This requirement pertains to employees (including subcontractors and their employees) who will work on site for a total of 61 days or more during the project. Verification of the number of days will be by certified payrolls. Clearance in accordance with Administrative Support Manual 272.3 will be required before that access will be permitted.  It is the contractor's obligation to obtain and supply to the Postal Service the forms and information required by that regulation. Offerors must familiarize themselves with the requirements of that section and Clause 1-4, if applicable, taking into account in their offices the time and paperwork associated with the screening (Attached form to be used by the contractor).

### A.105   PROHIBITION AGAINST CONTRACTING WITH FORMER OFFICERS OR PCES EXECUTIVES (PROVISION 1-6) (JANUARY 1997)

The offeror represents that former Postal Service officers or Postal Career Executive Service (PCES) executives will not be employed as key personnel, experts or consultants in the performance of the contract if such individuals, within five years of their retirement from the Postal Service, will be performing substantially the same duties as they performed during their career with the Postal Service. In addition, no contract resulting from this solicitation may be awarded to such individuals or entities in which they have a substantial interest, for five years after their retirement from the Postal Service, if the work called for in the solicitation requires such individuals to perform substantially the

same duties as they performed during their career with the Postal Service.

### A.106   PERFORMANCE AND PAYMENT BOND REQUIREMENTS (CONSTRUCTION) (PROVISION 7-1) (FEBRUARY 2001)

a.   Any offeror selected for award of a contract as a result of this solicitation which is expected to exceed $25,000 will be required to submit a performance and payment bond in the penal amount set forth below prior to contract award, and within the time required by the Contracting Officer.

1.   The penal amount of a *performance* bond must equal 100 percent of the original contract price, and, if the contract price increases, an additional amount equal to 100 percent of the increase (when construction is NOT phased), unless otherwise directed by the Contracting Officer.

2.   The penal amount of a *payment* bond must equal 100 percent of the original contract price, and, if the contract price increases, an additional amount equal to 100 percent of the increase (when construction is NOT phased), unless otherwise directed by the Contracting Officer.

3.   Bond Schedule (when construction IS phased):

Where construction is to be phased, a performance bond equal to 100 percent and a payment bond equal to 100 percent of the value of the work must be provided prior to the commencement of the work covered under that phase or upon approval of final plans and specifications for the entire project, unless otherwise directed by the Contracting Officer.

b.   The bonds must be executed on the Postal Service forms attached to this solicitation, and sureties must be acceptable to the Postal Service. Corporate sureties must appear on the list in Treasury Circular 570, and the amount of the bonds may not exceed the underwriting limit stated for the surety on that list.

c.   Contract award will not be made until the Contracting Officer receives both an executed performance and payment bond.

### A.107   DEPOSIT OF ASSETS REQUIREMENTS (PROVISION 7-4) (MAY 2000)

a.   Except for payment bonds required for construction contracts, any offeror required to submit a surety bond as a result of this solicitation may instead deposit assets in a form acceptable to the Postal Service in an amount set forth in the solicitation.

b.   When assets are deposited, the offeror must execute the Postal Service bond form made a part of this solicitation. Failure to deposit assets acceptable to the Postal Service may be cause for termination of the contract for default.

### A.108   *APPLICABLE IF CONTRACT EXCEEDS $25,000 BUT IS NOT GREATER THAN $100,000* ALTERNATE PAYMENT PROVISIONS (PROVISION 7-5) (MARCH 2001)

a.   The Supplier shall submit one of the following payment protections:

(1)   A payment bond,

(2)   An irrevocable letter of credit, or

(3)   Certificates of deposit.  The supplier deposits certificates of deposit from a federally insured financial institution with the Contracting Officer, in an expectable form, executable by the Contracting Officer.

b.   The penal sum of the payment protection shall be in the amount of 100% of the total contract amount or as otherwise directed by the Contracting Officer.

c.   The submission of the payment protection is required within ten (10) calendar days from receipt of Notice of Intent to Award from the Contracting Officer.

 **UNITED STATES POSTAL SERVICE.**

# Facilities Department

d.  The payment protection shall provide protection for the full contract performance period plus one–year period.

e.  Except for escrow agreements and payment bonds, which provide their own protection procedures, the Contracting Officer is authorized to access funds under the payment protection when it has been alleged in writing by a supplier of labor or material that a nonpayment has occurred, and to withhold such funds pending resolution by administrative judicial proceedings or mutual agreement of the parties.

f.  When a tripartite escrow agreement is used, the Supplier shall utilize only suppliers of labor and material who signed the escrow agreement.

**A.109   POSTAL FURNISHED PROPERTY OR SERVICES (PROVISION A-12) (JANUARY 1997)**

No property or services will be furnished by the Postal Service unless specifically provided for in the solicitation.

**A.110   _APPLICABLE IF LISTED IN BLOCK 9, PAGE 1_   PREPROPOSAL CONFERENCE (PROVISION 4-8) (JANUARY 1997)**

a.  The Postal Service is planning a preproposal conference during which potential offerors may obtain a better understanding of the work required.

b.  Prospective offerors are strongly urged to visit this site during the conference to inform themselves fully about the location and conditions under which the work is to be performed.

c.  Offerors are encouraged to submit all questions in writing at least five (5) calendar days before the conference. Questions will be considered at any time during the conference; however, offerors will be asked to confirm oral questions in writing. Subsequent to the conference, the Postal Service will distribute a written record of the conference to all prospective offerors that received the solicitation. If any clarifications arising from the conference constitute changes, an amendment to the solicitation will be issued.

d.  In order to facilitate conference preparations it is requested that the person named on the cover form of this solicitation be contacted and advised of the number of persons who will attend.

e.  The Postal Service assumes no responsibility for any expense incurred by an offeror prior to contract award.

f.  Offerors are cautioned that, notwithstanding any remarks or clarifications given at the conference, all terms and conditions of the solicitation remain unchanged unless changed by amendment. If the answers to the conference questions, or any solicitation amendment, create ambiguities, it is the responsibility of the offeror to seek clarification before submitting an offer.

g.  The conference will be held:

Date:

Time:

Location:

**A.111   NOTICE OF REQUIREMENT FOR EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION (PROVISION 9-5) (JANUARY 1997)**

a.  The offeror's attention is called to the Equal Opportunity clause and the Affirmative Action Compliance Requirements for Construction clause.

b.  The goals for minority and female participation, expressed in percentage terms for the supplier's aggregate workforce in each trade on all construction work in the covered area, are as follows:

Goals for minority participation for each trade: 0%

Goals for female participation for each trade: 6.9%

c.  These goals apply to all the supplier's construction work performed in the covered area. If the supplier performs construction work in a geographical area located outside the covered area, the supplier must apply the goals established for the geographical area where the work is actually performed. Goals are published periodically in the Federal Register in notice form, and these notices may be obtained from the Office of Federal Contract Compliance Programs (OFCCP).

d.  The supplier's compliance with Executive Order 11246, as amended, and the regulations in 41 CFR 60–4 must be based on (1) its implementation of the Equal Opportunity clause, (2) specific affirmative action obligations required by the Affirmative Action Compliance Requirements for Construction clause, and (3) its efforts to meet the goals. The hours of minority and female employment and training must be substantially uniform throughout the length of the contract, and in each trade. The supplier must make a good–faith effort to employ minorities and women evenly on each of its projects. The transfer of minority or female employees or trainees from supplier to supplier, or from project to project, for the sole purpose of meeting the supplier's goals will be a violation of the contract, Executive Order 11246, as amended, and the regulations in 41 CFR 60–4. Compliance with the goals will be measured against the total work hours performed.

e.  The supplier must provide written notification to the Director, OFCCP, within ten working days following award of any construction subcontract in excess of $10,000 at any tier for construction work under the contract resulting from this solicitation. The notification must list the:

(1)  Name, address, telephone number, and employer's identification number of the subcontractor;

(2)  Estimated dollar amount of the subcontract;

(3)  Estimated starting and completion dates of the subcontract; and

(4)  Geographical area in which the subcontract is to be performed.

f.  As used in this notice, and in any contract resulting from this solicitation, the covered area is Bronx County

**A.112   DIRECT VENDOR / PRE-SELECTED SOURCES (PROVISION OA-38) (AUGUST 2001)**

a.  This solicitation identifies supplies or services for which a qualified or direct vendor requirement applies. With respect to those supplies or services, the contracting officer will consider only the proposals of offerors who appear, or whose products appear, on the approved products list, qualified manufacturers list, or qualified offerors list developed for this solicitation.

b.  Unless determined by the contracting officer to be in the Postal Service's best interests, this procurement will not be delayed in order to provide an offeror the opportunity to meet standards specified for qualification.

c.  The Postal Service reserves the right to reject any offer that does not comply with these requirements.

**A.113   PRE-CONSTRUCTION MEETING (CONSTRUCTION) (PROVISION OA-5) ALTERNATE II (AUGUST 2000)**

The Postal Service may require the successful offeror to attend a pre-construction meeting. If required, it will be held prior to the start of any contract performance.

**A.114   TYPE OF CONTRACT (PROVISION 2-6) (JANUARY 1997)**

The Postal Service plans to award a firm-fixed-price type of contract under this solicitation, and all proposals must be submitted on this basis.


**UNITED STATES POSTAL SERVICE**

# Facilities Department

Alternate proposals based on other contract types be considered.

**A.115**  APPLICABILITY OF PROVISIONS (PROVISION OA-39) (MARCH 1999)

All provisions contained in Section A: Instructions to Offerors and Solicitation will become an integral part of any contract resulting from this solicitation.

**A.116**  PROPOSED USE OF FORMER POSTAL SERVICE EMPLOYEES (PROVISION 1-7) (OCTOBER 2001)

In its proposal, the supplier must identify any former Postal Service employee it proposes to engage in the performance, directly or indirectly, of the contract. The Postal Service reserves the right to require the supplier to replace the proposed individual with an equally qualified individual.

## A. 200  PREPARATION, SUBMISSION, MODIFICATION AND WITHDRAWAL OF PROPOSALS

**A.201**  PREPARATION, SUBMISSION, MODIFICATION AND WITHDRAWAL OF PROPOSALS (CONSTRUCTION) (PROVISION 4-9) (JUNE 1999)

a.  Offerors are expected to examine the drawings, specifications, and all provisions and instructions. Failure to do so is at the offeror's risk.

b.  Each offeror must furnish the information required by the solicitation. The offeror must sign the proposal and print or type its name on the proposal and each continuation sheet on which it makes an entry. Erasures or other changes must be initialed by the person signing the proposal.

c.  Proposals for supplies or services other than those specified will not be considered unless specifically authorized by the solicitation.

d.  Offerors must state a definite time for delivery of supplies or for performance of services, unless otherwise specified in the solicitation.

e.  Time, if stated as a number of days, will include Saturdays, Sundays, and federal holidays.

f.  Proposals and modifications must be packaged separately and submitted in sealed envelopes or packages in the formats and quantities specified below:

   (1)  Offer and Award Form including Representations and Certifications: One (1) original and        additional copies [Including the *Items and Prices Summary Schedule* and Construction Cost Breakdown, where appropriate].

   (2)  Technical and Management Proposal [where appropriate]: one (1) original and        additional copies.

g.  Proposals and proposal modifications must:

   (1)  Be addressed to the office specified in the solicitation; and

   (2)  Show the time specified for receipt, the solicitation number, and the name and address of the offeror.

h.  Electronic or facsimile transmitted proposals will not be considered unless authorized by the solicitation.

i.  Proposals may be modified by written notice or when authorized by the solicitation, electronic or facsimile transmission, if received at the office specified in the solicitation before the contract is awarded.

j.  Proposals may be withdrawn by written notice or electronic or facsimile transmission, if received at the office specified in the solicitation any time before contract award. Proposals may be withdrawn in person by an offeror or an authorized representative, if the representative's identity is made known and the representative signs a receipt for the proposal before contract award.

**A.202**  *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1*    ELECTRONIC PROPOSALS (PROVISION A-17) (JUNE 2000)

a.  Offerors may submit electronic or facsimile transmission responses to this solicitation. These responses must be received at the office specified in the solicitation by the time specified for receipt of proposals.

b.  Electronic or facsimile transmission responses must refer to this solicitation and include the items or sub-items, quantities, unit prices, time and place of delivery, all representations and other information required by this solicitation, and a statement specifying the extent of agreement with all the terms, conditions, and provisions of the solicitation.

c.  Offerors must promptly sign and submit complete copies of their proposals in confirmation of their electronic or facsimile transmission responses.

d.  The term "electronic responses," as used in this provision, includes telegrams.

**A.203**  LATE SUBMISSIONS AND MODIFICATIONS OF PROPOSALS (PROVISION A-4) (JANUARY 1997)

Any proposal or modification of a proposal received at the office designated in the solicitation after the exact time specified for receipt will not be considered unless it is received before award is made and:

a.  It is the only proposal received; or

b.  Consideration of the proposal is determined by the Contracting Officer to be in the Postal Service's best interest.

**A.204**  ACKNOWLEDGMENT OF SOLICITATION AMENDMENTS (PROVISION A-5) (JANUARY 1997)

a.  Offerors must acknowledge receipt of any amendment to this solicitation:

   (1)  By signing and returning the amendment;

   (2)  By identifying the amendment number and date in the space provided for this purpose on the solicitation form; or

   (3)  By letter, electronic or facsimile transmission.

b.  Acknowledgments of amendments are subject to the Late Submissions and Modifications of Proposals provision of the solicitation. Proposals lacking acknowledgment of an amendment affecting price, quantity, quality, or delivery may be disregarded.

| Amendment | Date | Amendment | Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**A.205**  PREQUALIFIED/NON-PREQUALIFIED CONTRACTORS (PROVISION OA-301) (AUGUST 2000)

a.  Prequalified Contractors: If entities or contractors have already been prequalified, the Postal Service will consider *only* proposals from those entities or contractors currently on the prequalified list as of the date of this solicitation.

b.  Prequalified or non-prequalified contractors must submit a Prequalification Package, Management or Technical Plan, or other documents requested by the Contracting Officer under this solicitation.

c.  Price Proposal: Offerors must provide firm fixed costs for construction of the facility. Costs submitted shall contain all costs required for construction, including contingencies, as well as costs



**UNITED STATES POSTAL SERVICE.**

# Facilities Department

related to supervision, overhead, home office support, and profit. A Construction Cost Breakdown (see the "Construction Cost Breakdown" provision) must be submitted with the offeror's proposal.

**A.206    SUBMISSION OF FINANCIAL STATEMENTS (PROVISION OA-27) (FEBRUARY 2001)**

If not already prequalified, or if prequalified, then at the request of the Contracting Officer, the offeror must submit the required financial statements with its Technical or Technical and Management Proposal. For the purposes of this provision, the term "required financial statement" is defined as the data which includes both the audited Balance Sheet and audited Income Statement covering each of the offeror's immediate past two fiscal years together with an interim report to as near the submission date as possible. These guidelines are to be observed:

a.   Statements shall be prepared in accordance with "Generally Accepted Accounting Principles."

b.   Statement shall include all required Notes to the Financial Statements.

c.   Fiscal Year statements must be certified by an opinion statement on the fairness of the presentation after a review by independent auditors.

d.   The most recent financial statement, if not a Fiscal Year statement, must be certified by either a company officer as to accuracy and veracity, or by an opinion statement on the fairness of the presentation after review by independent auditors.

e.   The Income Statements must incorporate or have attached "Schedule of Cost of Goods Sold." This schedule must reflect Direct Materials, Direct Labor, and Overhead used to compute the amount of cost of goods sold.

It may become necessary for the offeror to submit additional financial information prior to award.

Financial information received will be treated as confidential and will not be used for purposes other than evaluation of financial responsibility.

**A.207    APPLICABLE IF LISTED IN BLOCK 9, PAGE 1   KEY PERSONNEL (PROVISION OB-165) (JUNE 2000)**

a.   To the extent that the statement of work provides for services to be performed by key personnel, those services must be performed by the personnel identified in the contractor's proposal unless substitutes have been approved in writing by the Contracting Officer. Use of junior personnel, even under key personnel supervision (for example, associates or student workers), is not authorized unless they are identified in the contractor's proposal by name or position, with a description of their duties.

b.   This contract may be terminated if the key personnel named in the contractor's proposal become unavailable for any reason. If the unavailability of key personnel is not the fault of the contractor, the Contracting Officer may terminate the contract by giving notice of termination. The contractor will be paid for service performed up to the date of termination. If the Contracting Officer finds that the contractor is at fault for the unavailability of key personnel, the contract may be terminated for default.

c.   The contractor must assign to this contract the personnel named in the offeror's proposal for the following key positions:

| Name | Title/Position | Hourly Rate (Unburdened) |
|------|----------------|--------------------------|
| 1 |  |  |

| 2 |  |  |
|---|--|--|
| 3 |  |  |
| 4 |  |  |
| 5 |  |  |
| 6 |  |  |

d.   During the first ninety (90) days of performance, the contractor must make no substitution of key personnel unless the substitution is necessitated by illness, death, or termination of employment. The contractor must notify the Contracting Officer within 15 calendar days after the occurrence of any of these events and provide the information required by paragraph (e) below. After the initial 90 day period, the contractor must submit the information required by paragraph (e) to the Contracting Officer at least 15 days prior to making any permanent substitution.

e.   The contractor must provide a detailed explanation of the circumstances necessitating the proposed substitution(s), complete resumes for the proposed substitute(s), and any additional information requested by the Contracting Officer. Proposed substitute(s) must have qualifications greater than or equal to those of the person(s) being replaced. The Contracting Officer will notify the contractor within 15 days after receipt of all required information of the decision on the substitution(s).

**A.208    CONSTRUCTION COST BREAKDOWN (PROVISION OA-40) (AUGUST 2000)**

When required by the Contracting Officer, the offeror must submit with its proposal a construction cost breakdown using the sample forms provided in Section B-1500 - Attachments.

**A.209    APPLICABLE IF CONTRACT EXCEEDS $1,000,000   NOTICE OF SMALL, MINORITY, AND WOMAN-OWNED BUSINESS SUBCONTRACTING REQUIREMENTS (PROVISION 3-1) (MAY 2001)**

All suppliers, or unless this purchase is being made under commercial purchasing procedures, must submit with their proposals the contract-specific subcontracting plan required by Clause 3-1 Small, Minority, and Woman-owned Business Subcontracting Requirements. Generally this plan must be agreed to by both the supplier and the Postal Service before award of the contract.

**A.210    ACCESS TO POSTAL SERVICE BUILDINGS (PROVISION OA-12) (MARCH 1989)**

If the location specified on this cover sheet for the receipt of proposals is within a controlled access building and if it is intended to hand carry the proposal, prior arrangements for access should be made by contacting the individual specified on the cover sheet at least one work day prior to the date that access is required. If prior arrangements are not made, the offeror must allow at least 30 minutes to process through a security checkpoint. It is the offeror's responsibility to ensure that proposals are delivered by the due date and time specified in the solicitation.

**A.211    INFORMATION ON "EQUAL" PRODUCTS (PROVISION OA-1) (JUNE 1988)**

Offerors proposing to furnish an "equal" product, in accordance with the Brand Name or Equal provision of this solicitation, must provide the following information on the offered product:

a.   Item Number: _____

b.   Manufacturer's Name: _____

c.   Address: _____

 **UNITED STATES POSTAL SERVICE**

# Facilities Department

d. Product Name (if any): _____

e. Product Make, Model, or Catalog Description: _____

**A.212    BRAND NAME OR EQUAL (PROVISION 2-8) (JANUARY 1997)**

a. One or more items called for by this solicitation have been identified in the solicitation by a brand-name-or-equal product description. Proposals offering equal products will be considered for award if these products are clearly identified and are determined by the Postal Service to contain all of the essential characteristics of the brand-name products referenced in the solicitation.

b. Unless the offeror clearly indicates in the proposal that the proposal is for an equal product, the proposal will be considered as offering a brand-name product referenced in the solicitation.

c. If the offeror proposes to furnish an equal product, the brand name and model or catalog number, if any, of the product to be furnished must be inserted in the space provided in the solicitation. The evaluation of proposals and the determination as to equality of the product offered will be based on information furnished by the offeror or identified in the proposal, as well as other information reasonably available to the purchasing activity. The purchasing activity is not responsible for locating or obtaining any information not identified in the proposal and reasonably available to the purchasing activity. Accordingly, to ensure that sufficient information is available, the offeror must furnish as a part of the proposal:

    1. All descriptive material (such as cuts, illustrations, drawings, or other information) necessary for the purchasing activity to establish exactly what the offeror proposes to furnish and to determine whether the product offered meets the requirements of the solicitation; or

    2. Specific references to information previously furnished or to information otherwise available to the purchasing activity to permit a determination as to equality of the product offered.

d. If the offeror proposes to modify a product so as to make it conform to the requirements of the solicitation, the offeror must:

    1. Include in the proposal a clear description of the proposed modifications; and

    2. Clearly mark any descriptive material to show the proposed modifications.

**A.213    RESTRICTION ON THE DISCLOSURE AND USE OF DATA (PROVISION A-7) (JANUARY 1997)**

Offerors that include in their proposals data they do not want used or disclosed by the Postal Service for any purpose other than proposal evaluation may take the following steps:

a. "This proposal includes data that may not be duplicated, used, or disclosed outside the Postal Service — in whole or in part — for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of — or in connection with — the submission of such data, the Postal Service will have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Postal Service's right to use information contained in the data if it is obtained from another source without restriction. The data subject to this restriction are contained in sheets (offeror insert numbers or other identification of sheets)."

b. Mark each sheet of data they wish to restrict with the following legend:

"Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal."

## A. 300    EVALUATION AND AWARD

**A.301    NOTICE OF PREAWARD SURVEY (PROVISION OA-34) (JUNE 1998)**

a. Offerors are advised that the Postal Service may contact prospective offeror's references to verify previous project performance and determine the offeror's capabilities to perform the work specified in this solicitation. In addition to obtaining and evaluating performance references, financial statements, and credit rating checks, the Postal Service may visit a prospective offeror's facilities to perform reviews or may ask for additional written information. Offerors will be advised of specific areas of interest prior to any site visit.

b. Offerors are also advised that accomplishment of this survey is a part of the evaluation process and is not an indication that an offeror will receive an award.

**A.302    AWARD WITHOUT DISCUSSIONS (PROVISION A-9) (JANUARY 1997)**

The Postal Service may award a contract on the basis of initial proposals received, without discussions. Therefore, each initial proposal should contain the offeror's best terms from a cost or price and technical standpoint.

**A.303    CONTRACT AWARD (PROVISION A-8) (MARCH 2001)**

a. The Postal Service will award a contract resulting from this solicitation to the responsible offeror whose proposal conforming to the solicitation will be most advantageous to the Postal Service, cost or price and other factors specified elsewhere in this solicitation considered.

b. The Postal Service may reject any or all proposals, and may waive informalities and minor irregularities in proposals received.

c. The Postal Service may accept any item or group of items of a proposal, unless the offeror qualifies the proposal by specific limitations.

d. A written award or acceptance of proposal mailed or otherwise furnished to the successful offeror within the time for acceptance specified in the proposal will result in a binding contract without further action by either party. Before the proposal's specified expiration time, the Postal Service may accept a proposal, whether or not there are discussions or negotiations after its receipt, unless a written notice of withdrawal is received before award. Discussions or negotiations conducted after receipt of a proposal do not constitute a rejection or counteroffer by the Postal Service.

e. Neither financial data submitted with a proposal, nor representations concerning facilities or financing, will form a part of the resulting contract. However, if the resulting contract contains a clause providing for price reduction for defective cost or pricing data, the contract price will be subject to reduction if cost or pricing data furnished are incomplete, inaccurate, or not current.

**A.304    *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1* CONTRACT AWARD AND PROPOSAL EVALUATION (PROVISION OA-16) (MARCH 2001)**

a. Evaluation

    1. If required by the Contracting Officer (see Section B.1500 -- Attachments, for any requirements) all Technical, Management Plans and/or Qualification Statement Packages (QSP) will be evaluated by the Contracting Officer or his/her designated representative(s). The Technical, Management Plans and/or QSPs will be evaluated to ensure that the services and/or personnel to be provided by the offeror are adequate to ensure the proper execution of the project. In making this evaluation, the various features to be considered, and the maximum possible rating points to be assigned, are described below:


**UNITED STATES**
**POSTAL SERVICE.**

Facilities Department

2. Proposals will be evaluated using proposal-specific factors – Technical, Management Plan, and/or QSP and Cost Proposal. The cost will be evaluated to determine that it is fair and reasonable. If it is determined that the Technical, Management Plans, QSPs and/or Cost Proposals need clarification, discussions may be held with any offeror to clarify their proposal. If and when discussions are conducted with an offeror(s), they will be given the opportunity to revise their proposal, if applicable. Offeror(s) whose Technical, Management Plan, QSP and/or Cost Proposal are determined to be unacceptable (incomplete, unreasonable cost [high or low] and with no opportunity to receive contract award) may be eliminated from further consideration. Oral presentations may be required. If required, those offerors will be notified.

b. Award

1. Award will be made to the responsible offeror whose proposal contains the combination of Technical, Management Plan, and/or QSP, if required, and cost-related factors that offer the best overall value to the Postal Service. Because this project is 100% designed and a firm fixed price solicitation, primary consideration will be given to the lowest overall cost. However, an award will not necessarily be made to the lowest offeror, if their Technical and Management Plan and/or QSP, if required, are determined to be significantly lower.

2. Subcontracting plans, if required, will be reviewed for acceptability. If this solicitation results in a contract for more than $1 million, the Contracting Officer must approve the otherwise successful offeror's sub-contracting plan prior to award.

A.305 EVALUATION OF PROPOSALS FOR MULTIPLE AWARDS (PROVISION OA-17) (JUNE 1998)

In addition to other factors, proposals will be evaluated on the basis of advantages and disadvantages to the Postal Service that might result if making more than one award (multiple awards).



## Facilities Department

### A. 400   REPRESENTATIONS AND CERTIFICATIONS

**A.401    TYPE OF BUSINESS ORGANIZATION (PROVISION A-20) (MARCH 1999)**

The offeror, by checking the applicable blocks, represents that it:

a.  Operates as:

- ☐  a corporation incorporated under the laws of the State of _____

- ☐  an individual;

- ☐  a partnership;

- ☐  a joint venture of _____ and _____;

- ☐  a limited liability company under the laws of the State of _____;

- ☐  a nonprofit organization, or

- ☐  an educational institution; and

b.  Is (check all that apply):

- ☐  a small business concern;

- ☐  a minority-owned business —

  - ☐  Black American

  - ☐  Hispanic American

  - ☐  Native American

  - ☐  Asian American

- ☐  a woman-owned business,

- ☐  an educational or other nonprofit organization; or

- ☐  none of the above entities.

c.  Small Business. A small business concern for the purposes of Postal Service procurement means a business, including an affiliate, that is independently owned and operated, is not dominant in producing or performing the supplies or services being purchased, and has no more than 500 employees, unless a different size standard has been established by the Small Business Administration (see 13 CFR 121, particularly for different size standards for airline, railroad, and construction companies). For subcontracts of $50,000 or less, a subcontractor having no more than 500 employees qualifies as a small business without regard to other factors.

d.  Minority-owned Business. A minority-owned business is a concern that is at least 51 percent owned by, and whose management and daily business operations are controlled by, one or more members of a socially and economically disadvantaged minority group, namely U.S. citizens who are Black Americans, Hispanic Americans, Native Americans, or Asian-Americans (Native Americans are American Indians, Eskimos, Aleuts, and Native Hawaiians. Asian Americans are U.S. citizens whose origins are Japanese, Chinese, Filipino, Vietnamese, Korean, Samoan, Laotian, Kampuchean (Cambodian), Taiwanese, in the U.S. Trust Territories of the Pacific Islands or in the Indian subcontinent.).

e.  Woman-owned Business. A woman-owned business is a concern at least 51 percent of which is owned by a woman (or women) who is a U.S. citizen, controls the firm by exercising the power to make policy decisions, and operates the business by being actively involved in day-to-day management.

f.  Educational or Other Nonprofit Organization. Any corporation, foundation, trust, or other institution operated for scientific or educational purposes, not organized for profit, no part of the net earnings of which inures to the profits of any private shareholder or individual.

**A.402    PARENT COMPANY AND TAXPAYER IDENTIFICATION NUMBER (PROVISION A-21) (JANUARY 1997)**

a.  A parent company is one that owns or controls the basic business policies of an offeror. To own means to own more than 50 percent of the voting rights in the offeror. To control means to be able to formulate, determine, or veto basic business policy decisions of the offeror. A parent company need not own the offeror to control it; it may exercise control through the use of dominant minority voting rights, proxy voting, contractual arrangements, or otherwise.

b.  Enter the offeror's Taxpayer Identification Number (TIN) in the space provided. The TIN is the offeror's Social Security Number or other Employee Identification Number used on the offeror's Quarterly Federal Tax Return, U.S. Treasury Form 941.

Offeror's TIN: _____

c.  Check this block if the offeror is owned or controlled by a parent company: ☐

d.  If the block above is checked, provide the following information about the parent company:

Parent Company's Name: _____

Parent Company's Main Office Address:

No. and Street: _____

City _____ State _____ ZIP Code _____-_____

Parent Company's TIN _____

e.  If the offeror is a member of an affiliated group that files its federal income tax return on a consolidated basis (whether or not the offeror is owned or controlled by a parent company, as provided above) provide the name and TIN of the common parent of the affiliated group:

Name of Common Parent _____

Common Parent's TIN _____

**A.403    AUTHORIZED NEGOTIATORS (PROVISION A-22) (JANUARY 1997)**

The Offeror represents that the following persons are authorized to negotiate on its behalf with the Postal Service in connection with this solicitation/purchase of professional services (offeror list names, titles, and telephone numbers of the authorized negotiators).

| | Name | Title / Position | Telephone # |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |

**A.404    PLACE OF PERFORMANCE (PROVISION A-23) (JANUARY 1997)**

If the offeror intends, in the performance of any contract resulting from this solicitation, to use one or more facilities located at addresses different from the offeror's address as indicated in this proposal, the offeror must include in its proposal a statement referencing this provision


**UNITED STATES**
**POSTAL SERVICE**

# Facilities Department

and identifying those facilities by street address, city, county, state, and ZIP Code, and the name and address of the operators of those facilities if other than the offeror.

**A.405    CERTIFICATE OF INDEPENDENT PRICE DETERMINATION (PROVISION 1-1) (JANUARY 1997)**

a.    By submitting this proposal, the offeror certifies, and in the case of a joint proposal each party to it certifies as to its own organization, that in connection with this solicitation:

  (1)    The prices proposed have been arrived at independently, without consultation, communication, or agreement, for the purpose of restricting competition, as to any matter relating to the prices with any other offeror or with any competitor;

  (2)    Unless otherwise required by law, the prices proposed have not been and will not be knowingly disclosed by the offeror before award of a contract, directly or indirectly, to any other offeror or to any competitor; and

  (3)    No attempt has been made or will be made by the offeror to induce any other person or firm to submit or not submit a proposal for the purpose of restricting competition.

b.    Each person signing this proposal certifies that:

  (1)    He or she is the person in the offeror's organization responsible for the decision as to the prices being offered herein and that he or she has not participated, and will not participate, in any action contrary to paragraph a above; or

  (2)    He or she is not the person in the offeror's organization responsible for the decision as to the prices being offered but that he or she has been authorized in writing to act as agent for the persons responsible in certifying that they have not participated, and will not participate, in any action contrary to paragraph a above, and as their agent does hereby so certify;

  Modification or deletion of any provision in this certificate may result in the disregarding of the proposal as unacceptable. Any modification or deletion should be accompanied by a signed statement explaining the reasons and describing in detail any disclosure or communication.

**A.406    BUY AMERICAN CERTIFICATE - CONSTRUCTION MATERIALS (PROVISION 1-5) (JANUARY 1997)**

The offeror certifies that only domestic construction materials (as defined in the Preference for Domestic Construction Materials clause) will be used in the performance of this contract, except for foreign construction materials listed below:

| Material | Quantity | Estimated Cost |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**A.407    REPRESENTATION OF RIGHTS IN DATA (PROVISION 8-2) (JANUARY 1997)**

a.    By completion of the representation below, the offeror must identify in its proposal the data (including subcontractor–furnished data) it intends to identify as "limited rights data" or "restricted computer software," or that it does not intend to provide as required. Any identification of limited rights data or restricted rights computer software is not determinative of the status of such data, should a contract be awarded to the offeror.

Representation Concerning Data Rights

Offeror has reviewed the requirements for the delivery of technical data or computer software and states (offeror check appropriate block):

☐  None of the data proposed for fulfilling the requirements qualifies as limited rights data or restricted computer software.

☐  Data proposed for fulfilling the requirements qualify as limited rights data or restricted computer software and are identified as follows:

_____
_____
_____
_____
_____

b.    "Limited rights data" and "restricted computer software" are defined in the contract clauses entitled Rights in Technical Data and Rights in Computer Software.

**A.408    CERTIFICATE OF NONSEGREGATED FACILITIES (PROVISION 9-2) (JANUARY 1997)**

a.    By submitting this proposal, the offeror certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform services at any location under its control where segregated facilities are maintained. The offeror agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract.

b.    As used in this certification, segregated facilities means any waiting rooms, work areas, rest rooms or wash rooms, restaurants or other eating areas, time clocks, locker rooms or other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, or housing facilities provided for employees that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise.

c.    The offeror further agrees that (unless it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors before awarding subcontracts exceeding $10,000 that are not exempt from the provisions of the Equal Opportunity clause; that it will retain these certifications in its files; and that it will forward the following notice to these proposed subcontractors (except when they have submitted identical certifications for specific time periods):

  Notice:  A certification of nonsegregated facilities must be submitted before the award of a subcontract exceeding $10,000 that is not exempt from the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (quarterly, semiannually, or annually).

**A.409    *APPLICABLE WHEN OFFEROR HAS 50 OR MORE EMPLOYEES AND PROPOSAL IS EXPECTED TO EXCEED $50,000*    EQUAL OPPORTUNITY AFFIRMATIVE ACTION PROGRAM (PROVISION 9-3) (JANUARY 1997)**

The offeror, by checking the applicable block or blocks, represents that it (1) ☐ has developed and has on file, ☐ has not developed and does not have on file, at each establishment, affirmative action programs as required by the rules and regulations of the Secretary of Labor (41 CFR 60–1 and 60–2) and ☐ has, ☐ has not filed the required reports with the Joint Reporting Committee, or (2) ☐ has not previously had contracts subject to the written affirmative action program requirement of the rules and regulations of the Secretary of Labor.

 **UNITED STATES POSTAL SERVICE.**                    Facilities Department

A.410    *APPLICABLE WHEN CONTRACT EXCEEDS $10,000,000*
PREAWARD EQUAL OPPORTUNITY COMPLIANCE REVIEW (PROVISION 9-4)
(JANUARY 1998)

If the contract award will be $10,000,000 or more, the prospective supplier and its known first-tier subcontractors with subcontracts of $10,000,000 or more will be subject to a preaward compliance review. In order to qualify for award, the prospective supplier and first-tier subcontractors must be found in compliance pursuant to 41 CFR 60-1.20.


**UNITED STATES**
**POSTAL SERVICE**

Facilities Department

---

# SECTION B - THE CONTRACT

## B. 100   THE WORK

**B.101**   STATEMENT OF WORK/SPECIFICATIONS (CLAUSE OB-7) (MARCH 1999)

a.   The supplier must furnish the necessary personnel, material, equipment, services, and facilities (except as otherwise specified) to perform the statement of work/specifications incorporated by reference in Section B.1500.

b.   The attachments to the statement of work/specifications listed in Section B.1500 are hereby made a part of this contract.

**B.102**   CONDITIONS AFFECTING THE WORK (CLAUSE B-41) (MARCH 1999)

The contractor is responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions that can affect the work or its costs, including, but not limited to, such things as elevator size, availability and capacities, utilities location and capacities, available parking and staging areas, and existing building materials and components. Any failure by the contractor to ascertain the conditions affecting the work does not relieve the contractor from responsibility for successfully performing the work without additional expense to the Postal Service. The Postal Service assumes no responsibility for any understanding or representations concerning conditions made by any of its officers, employees or agents before execution of this contract, unless such understanding or representations by the Postal Service are expressly stated in the contract.

**B.103**   ORDER OF PRECEDENCE (CONSTRUCTION) (CLAUSE B-29) ALTERNATE I (FEBRUARY 2001)

Any inconsistency in the provisions of a solicitation, a contract awarded under a solicitation, or a contract awarded without the issuance of a written solicitation will be resolved by giving precedence in the following order:

a.   Offer and Award Page (Page 1 of this contract).

b.   The solicitation provisions and instructions (Section A of this contract).

c.   The contract clauses (Section B of this contract).

d.   Provisions contained in attachments or incorporated by reference.

e.   Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, is of like effect as if shown or mentioned in both. In case of discrepancy or conflicts between drawings and specifications, the specifications will govern.

f.   In case of difference between small and large–scale drawings, the large–scale drawings will govern. Schedules on any contract drawing take precedence over conflicting information on that or any other contract drawing. On any of the drawings in which a portion of the work is detailed or drawn out and the remainder is shown in outline, the parts detailed or drawn out will apply also to all other like portions of the work.

**B.104**   CONTRACTOR SCREENING REQUIREMENTS (CLAUSE 1-4) (AUGUST 2001)

The contractor, its employees, consultants, and subcontractors and their employees are required to have access to occupied postal facilities, and if required by this contract, to postal information and resources (including postal computer systems). This requirement pertains to any person who

will work on site for a total of 61 days or more during the project. Verification of the number of days will be by certified payrolls or other means as required. Clearance in accordance with *Administrative Support Manual* is required *before* that access will be permitted.  The contractor must maintain supporting documentation for the drug screening tests, the criminal history inquiries and the completed forms, and have them available at any time for review by the U. S. Postal Service. Sample forms may be found as an attachment.

**B.105**   SAMPLES (CLAUSE B-62) (JANUARY 1997)

a.   After contract award, the supplier must furnish samples required by the specifications or by the Contracting Officer, for the Contracting Officer's approval. They must be delivered to the Contracting Officer or to the architect as specified or as directed. The supplier must prepay all shipping charges on samples. Materials or equipment for which samples are required may not be used in the work until the Contracting Officer approves them in writing.

b.   Each sample must be labeled to show:

1.   Name of project building or facility, project title, and contract number;

2.   Name of supplier and (if appropriate) subcontractor;

3.   Identification of material or equipment, with specification requirement;

4.   Place of origin; and

5.   Name of producer and brand (if any).

c.   Samples of finish materials must have additional markings that will identify them under the finish schedules.

d.   The supplier must mail under separate cover a letter, in triplicate, submitting each shipment of samples and containing the information required in paragraphs b and c above. The supplier must also enclose a copy of that letter with the shipment and send a copy to the Postal Service representative on the project. Approval of a sample is only for the characteristics or use named in the approval and may not be construed to change or modify any contract requirement. Substitutions are not permitted unless approved in writing by the Contracting Officer.

e.   Approved samples not destroyed in testing will be sent to the Postal Service representative at the project. Approved samples of hardware in good condition will be marked for identification and may be used in the work. Materials and equipment incorporated in the work must match the approved samples. Samples not destroyed in testing and not approved will be returned at the supplier's expense if the supplier so requests at the time of submission.

f.   Failure of any material to pass the specified tests will be sufficient cause for refusal to consider, under this contract, any further samples of the same brand or make of that material. The Postal Service reserves the right to disapprove any material or equipment that has previously proved unsatisfactory in service.

g.   Samples of materials or equipment delivered on the site or in place may be taken by the Postal Service representative for testing. Failure of a sample to meet contract requirements will automatically void previous approvals of the item tested. The supplier must replace materials or equipment found not to have met contract requirements, or there will be a proper adjustment of the contract price as determined by the Contracting Officer.

h.   Except as otherwise specified, if tests are called for in the specifications, the supplier must pay all costs of these tests. When tests are not specifically called for in the specifications but are required by the Postal Service, the Postal Service will pay all costs of the tests and related engineering services unless the tests indicate that the workmanship or materials used by the supplier are


**UNITED STATES POSTAL SERVICE.**

# Facilities Department

not in conformance with drawings, specifications, approved shop drawings, or the approved materials. In this event, the supplier must pay for the tests, remove all work and material failing to conform, and replace with work and materials in full conformity. All tests pertaining to physical or chemical properties of materials must be made in a laboratory approved by the Contracting Officer.

**B.106    REQUIREMENTS FOR VERIFICATION OF MEASUREMENTS/ON SITE DOCUMENTS (CLAUSE B-35) (FEBRUARY 2001)**

a.   The contractor must keep at the site copies of all drawings and specifications related to the contract and must at all times give the Contracting Officer and designated representative access to them.

b.   When the word "similar" appears on the drawings, it has a general meaning and must not be interpreted as meaning identical, and all details must be worked out in relation to their location and connection with other parts of the work.

c.   In case of discrepancy either in figures, drawings, or specifications, the matter must be promptly submitted to the Contracting Officer, who will promptly make determination in writing. Any adjustment by the contractor without such a determination will be at the contractor's own risk and expense. The Contracting Officer must furnish from time to time such detailed drawings and other information as may be necessary.

d.   The contractor must verify all dimensions shown of existing work, and all dimensions required for work that is to connect with work now in place, by actual measurement of the existing work. Any discrepancies between the contract requirements and the existing conditions must be referred to the Contracting Officer before the contractor performs any work affected by these discrepancies.

**B.107    SHOP DRAWINGS, COORDINATION DRAWINGS, AND SCHEDULES (CLAUSE B-56) (MARCH 1999)**

a.   The contractor must submit shop drawings, coordination drawings, and schedules for approval as required by the specifications or requested by the Contracting Officer, as follows:

(1)   Shop drawings include fabrication, erection, and setting drawings, schedule drawings, manufacturer's scale drawings, wiring and control diagrams, cuts or entire catalogs, pamphlets, descriptive literature, and performance and test data.

(2)   Drawings and schedules, other than catalogs, pamphlets, and similar printed material, must be submitted in reproducible form with two prints made by a process approved by the Contracting Officer. Upon approval, the reproducible form will be returned to the contractor which must furnish the number of additional prints, not to exceed ten required by the Special Conditions of the specifications. The contractor must submit shop drawings in catalog, pamphlet, and similar printed form in a minimum of four copies plus as many additional copies as the contractor may desire or need or for use by subcontractors.

b.   Before submitting shop drawings on the mechanical and electrical work, the contractor must obtain the Contracting Officer's approval of lists of mechanical and electrical equipment and materials as required by the specifications.

c.   The contractor must check the drawings and schedules and coordinate them (by means of coordination drawings with the work of all trades involved before submission), indicating approval on them. Drawings and schedules submitted without evidence of the contractor's approval may be returned for resubmission. No extension of time in the schedule will be approved for resubmission of returned drawings.

d.   Each shop drawing or coordination drawing must have a blank area of 5 by 5 inches, located adjacent to the title block. The title block must display:

(1)   Number and title of drawing;

(2)   Date of drawing or revision;

(3)   Name of project building or facility;

(4)   Name of contractor and (if appropriate) of subcontractor submitting drawing;

(5)   Clear identity of contents and location on the work; and

(6)   Project title and contract number.

e.   Unless otherwise provided in this contract, or otherwise directed by the Contracting Officer, shop drawings, coordination drawings, and schedules must be submitted to the Contracting Officer, with a letter in triplicate, sufficiently in advance of construction requirements to permit at least 10 working days for checking and appropriate action.

f.   Except as otherwise provided in paragraph g below, approval of drawings and schedules will be general and may not be construed as:

(1)   Permitting any departure from the contract requirements;

(2)   Relieving the contractor of responsibility for any errors, including details, dimensions, and materials; or

(3)   Approving departures from full–size details furnished by the Contracting Officer.

g.   If drawings or schedules show variations from the contract requirements because of standard shop practice or for other reasons, the contractor must describe the variations in the letter of transmittal. If acceptable, the Contracting Officer may approve any or all variations and issue an appropriate change order. If the contractor fails to describe these variations, it is not relieved of responsibility for executing the work in accordance with the contract, even though the drawings or schedules have been approved.

h.   In addition to reproducible submissions, the contractor should submit a CADD system electronic file for all shop drawings, coordination drawings and schedules prepared with a CADD system compatible with the Postal Service CADD system identified by the Contracting Officer.

**B.108    RECORD "AS BUILT" DRAWINGS (CLAUSE B-57) (MARCH 1999)**

a.   Throughout the progress of the work, the contractor must keep a master set of prints on the job site, on which is kept a complete, careful and neat record of all deviations from the contract drawings made during the course of the work.

b.   Upon completion of construction, the "as built" prints must be certified as to their correctness by the signature of the contractor and turned over to the architect–engineer of record for use in preparing a permanent set of "as built" drawings within thirty (30) calendar days after completion of construction.

c.   In addition to reproducible submissions, the contractor should submit a CADD system electronic file for these "as built" documents prepared with a CADD system compatible with the Postal Service CADD system identified by the Contracting Officer.

d.   The Postal Service reserves the right to review "as built" documents at any time during the contract period.

e.   Costs associated with the preparation and completion of the "as built" drawings will not be paid from "retainage" until they are accepted by the Contracting Officer.

**B.109    SPARE PARTS DATA (CLAUSE B-58) (JANUARY 1997)**

a.   The supplier must furnish spare–parts data for each different item of equipment furnished. The data must include a complete list of parts and supplies, with current unit prices and sources of supply; a list of parts and supplies that are either normally furnished at no extra cost with the purchase of the equipment, or specified to be furnished as


**UNITED STATES POSTAL SERVICE**

# Facilities Department

part of the contract; and a list of additional items recommended by the manufacturer to ensure efficient operation for a period of 180 days at the particular installation.

b. The foregoing does not relieve the supplier of any responsibilities under the guarantees specified.

**B.110    WARRANTY (CONSTRUCTION) (CLAUSE B-61) (FEBRUARY 2001)**

a. Unless otherwise provided in the specifications, the supplier warrants that all work is in accordance with contract requirements and free from defective or inferior materials, equipment, and workmanship for one year after the date of beneficial occupancy or acceptance of the facility (whichever comes first) under this contract.

b. If, within the warranty period, the Contracting Officer finds that warranted work needs to be repaired or changed because the materials, equipment, or workmanship were inferior, defective, or not in accordance with the contract terms, the supplier must promptly and without additional expense to the Postal Service:

   1. Place in a satisfactory condition all of the warranted work;

   2. Satisfactorily correct all damage to equipment, the site, the building, or its contents that is the result of such unsatisfactory work; and

   3. Satisfactorily correct any work, materials, or equipment disturbed in fulfilling the warranty.

c. Should the supplier fail to proceed promptly in accordance with the warranty, the Postal Service may have the work performed at the supplier's expense.

d. The supplier must obtain each transferable guarantee or warranty of equipment, materials, or installation furnished by any manufacturer, supplier, or installer in the ordinary course of the business or trade. The supplier must obtain and furnish to the Postal Service all information required to make any such guarantee or warranty legally binding and effective, and must submit both the information and the guarantee or warranty to the Postal Service in sufficient time to permit the Postal Service to meet any time limit requirements specified in the guarantee or warranty or, if no time limit is specified, before completion and acceptance of all work under this contract.

**B.111    APPLICABLE IF LISTED IN BLOCK 9, PAGE 1    FUEL STORAGE TANKS (CONSTRUCTION) (CLAUSE FB-241) (MARCH 2001)**

a. The contractor must install any new or close any existing above or underground fuel storage system(s), including associated ancillary components, in compliance with applicable federal, state and local laws and regulations and in accordance with postal requirements.

b. All repairs, upgrades and installation of tank systems and ancillary components shall be compatible with existing systems and in compliance with applicable federal, state or local laws and regulations and in accordance with postal requirements.

c. The contractor is responsible to register or apply for any new or amended operations or emissions permit required for above or underground storage tank(s) that store petroleum products or other hazardous materials in accordance with applicable regulations. The contractor must furnish all labor, materials and fees to obtain the required registrations or permits. If applicable, the contractor shall provide a new or amended spill prevention, control and countermeasure (SPCC) plan in accordance to applicable regulations.

d. The contractor must provide the Contracting Officer a certification of installation demonstrating that the tank system has been properly installed, calibrated and precision tested in accordance with the manufacturer's recommendation, as well as applicable laws and regulations, as inspected and certified by a registered or licensed installer.

e. The contractor must provide the Contracting Officer, in triplicate, as-built drawings showing the exact location of the tank(s), piping and related systems, testing instructions for the system(s), test results, site photos, and equipment warranties and guarantees. The contractor shall provide training to postal personnel on the operations and maintenance of the system(s) including use and response to system alarms.

f. When removing existing systems that will not be replaced, the contractor must perform all work associated with system closure in accordance with applicable regulations. The contractor must be certified or licensed to close tank systems and shall be responsible for completing regulatory notification(s) required.

**B.112    MECHANIZATION (CLAUSE FB-242) (JUNE 1988)**

All terms and conditions of the contract shall also be applicable to Attachment 1 to Division 17-Mechanization, except that where differences occur, Provision 17-Mechanization shall govern for Mechanization only. Technical requirements of Division 17 shall govern for Division 17 only and shall not supersede technical requirements of other sections of the Specifications.

# B. 200    INSURANCE, BONDS AND RISK

**B.201    APPLICABLE IF CONTRACT EXCEEDS $25,000    ADDITIONAL BOND SECURITY (CLAUSE 7-2) (JANUARY 1997)**

If any surety furnishing a bond in connection with this contract becomes unacceptable to the Postal Service or fails to furnish reports on its financial condition as requested by the Contracting Officer, or if the contract price increases to the point where the security furnished becomes inadequate in the Contracting Officer's opinion, the supplier must promptly furnish additional security as required to protect the interests of the Postal Service and of persons supplying labor or materials in performance of this contract.

**B.202    INSURANCE (CONSTRUCTION) (CLAUSE 7-4) ALTERNATE I (MARCH 1999)**

a. During the term of this contract and any extension, the contractor must maintain at its own expense the insurance required by this clause. Insurance companies must be acceptable to the Postal Service. Policies must include all terms and provisions required by the Postal Service.

b. The contractor must maintain and furnish evidence of workers' compensation, employers' liability insurance, and the following general public liability and automobile liability insurance:

GENERAL LIABILITY:

| Bodily Injury | | Property Damage | |
|---|---|---|---|
| $1,000,000 | Per person | $500,000 | Per occurrence |
| $2,000,000 | Per accident | $1,000,000 | aggregate |

AUTOMOBILE LIABILITY:

| Bodily Injury | | Property Damage | |
|---|---|---|---|
| $1,000,000 | Per person | $500,000 | Per occurrence |
| $2,000,000 | Per accident | $1,000,000 | aggregate |

 **UNITED STATES POSTAL SERVICE.**

# Facilities Department

c. Each policy must include substantially the following provision: "It is a condition of this policy that the company furnish written notice to the U.S. Postal Service 30 days in advance of the effective date of any reduction in or cancellation of this policy."

d. The contractor must furnish a certificate of insurance or, if required by the Contracting Officer, true copies of liability policies and manually countersigned endorsements of any changes. Insurance must be effective, and evidence of acceptable insurance furnished, before beginning performance under this contract. Evidence of renewal must be furnished not later than five days before a policy expires.

e. The maintenance of insurance coverage as required by this clause is a continuing obligation, and the lapse or termination of insurance coverage without replacement coverage being obtained will be grounds for termination for default.

f. For construction contracts: The Postal Service does not carry Builder's Risk insurance coverage. A construction contractor, at its own option and expense, may elect to provide this insurance for its work under this contract.

**B.203    INDEMNIFICATION (CLAUSE B-39) (JANUARY 1997)**

The supplier must save harmless and indemnify the Postal Service and its officers, agents, representatives, and employees from all claims, losses, damage, actions, causes of action, expenses, and/or liability resulting from, brought for, or on account of any personal injury or property damage received or sustained by any person, persons or property growing out of, occurring, or attributable to any work performed under or related to this contract, resulting in whole or in part from negligent acts or omissions of the supplier, any subcontractor, or any employee, agent, or representative of the supplier or any subcontractor.

**B.204    *APPLICABLE IF CONTRACT EXCEEDS $25,000*    DEPOSIT OF ASSETS INSTEAD OF SURETY BONDS (CLAUSE 7-3) (JANUARY 1997)**

a. If the supplier has deposited assets instead of furnishing sureties for any bond required under this contract and the assets are in the form of checks, currency, or drafts, the Contracting Officer will hold the assets in an account for the supplier's benefit.

b. Upon contract completion, the supplier's funds will be returned as soon as possible, unless the Contracting Officer determines that part or all of the account is required to compensate the Postal Service for costs it incurs as a result of the supplier's delay, default, or failure to perform. In such a case, the entire account will be available to compensate the Postal Service.

## B. 300    COMMENCEMENT AND COMPLETION

**B.301    NOTICE TO PROCEED AND COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (CLAUSE B-34) (JANUARY 1997)**

No work will be performed except pursuant to a Notice to Proceed issued by the Contracting Officer.

The supplier will be required to:

a. Commence work under this contract within 10 calendar days after the date it receives the Notice to Proceed from the Contracting Officer,

b. Prosecute the work diligently, and

c. Complete the entire work not later than    365    calendar days after the Notice to Proceed.

The time stated for completion includes final cleanup of the premises.

**B.302    NOTICE OF DELAY (CLAUSE B-15) (MARCH 1999)**

Immediately upon becoming aware of any difficulties that might delay deliveries under this contract, the contractor must notify the Contracting Officer in writing of them. The notification must identify the difficulties, the reasons for them, and the estimated period of delay anticipated. Failure to give notice will preclude later consideration of any request for an extension of contract time.

**B.303    LIQUIDATED DAMAGES (CONSTRUCTION) (CLAUSE 2-10) ALTERNATE I (MARCH 1999)**

a. If the contractor fails to complete the work, deliver the supplies, or perform the services within the time specified in this contract, or any extension, the contractor must, in place of actual damages, pay to the Postal Service    $100.00    for liquidated damages as agreed for each calendar day of delay.    Liquidated damages are not a reimbursable construction cost under cost reimbursable contracts with a guaranteed maximum price, and will be deducted from any fixed fees retained or due, or shared savings due the contractor.

b. Alternatively, if completion, delivery, or performance is delayed beyond the contract dates, the Postal Service may terminate this contract in whole or in part under the *Termination for Default* clause, and the contractor will be liable for the agreed liquidated damages accruing until the time the Postal Service may reasonably obtain delivery or performance of similar facilities, supplies, or services. The liquidated damages will be in addition to excess costs of reprocurement.

c. The contractor will not be charged with liquidated damages when the delay in completion, delivery, or performance arises out of causes beyond the control and without the fault or negligence of the contractor.

**B.304    SUSPENSIONS AND DELAYS (CLAUSE B-16) (JANUARY 1997)**

a. If the performance of all or any part of the work of this contract is suspended, delayed, or interrupted by:

   1. An order or act of the Contracting Officer in administering this contract; or

   2. By a failure of the Contracting Officer to act within the time specified in this contract — or within a reasonable time if not specified — an adjustment will be made for any increase in the cost of performance of this contract caused by the delay or interruption (including the costs incurred during any suspension or interruption). An adjustment will also be made in the delivery or performance dates and any other contractual term or condition affected by the suspension, delay, or interruption. However, no adjustment may be made under this clause for any delay or interruption to the extent that performance would have been delayed or interrupted by any other cause, including the fault or negligence of the supplier, or for which an adjustment is provided or excluded under any other term or condition of this contract.

b. A claim under this clause will not be allowed:

   1. For any costs incurred more than 20 days before the supplier has notified the Contracting Officer in writing of the act or failure to act involved; and

   2. Unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the delay or interruption, but not later than the day of final payment under the contract.

**B.305    EXCUSABLE DELAYS (CLAUSE B-19) (JANUARY 1997)**

a. Except with respect to defaults of subcontractors, the supplier will not be in default by reason of any failure in performing this contract in accordance with its terms (including any failure by the supplier to


**UNITED STATES POSTAL SERVICE**

# Facilities Department

make progress in the prosecution of the work that endangers performance) if the failure arises out of causes beyond the control and without the fault or negligence of the supplier. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the government in its sovereign capacity or of the Postal Service in its contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of the supplier.

b. If failure to perform is caused by the failure of a subcontractor to perform or make progress and arises out of causes beyond the control of both the supplier and subcontractor, and without the fault or negligence of either of them, the supplier will not be deemed to be in default, unless:

 1. The supplies or services to be furnished by the subcontractor are obtainable from other sources;

 2. The Contracting Officer orders the supplier in writing to procure the supplies or services from other sources; and

 3. The supplier fails to comply reasonably with the order.

c. Upon request of the supplier, the Contracting Officer shall ascertain the facts and extent of failure, and if the Contracting Officer determines that any failure to perform was occasioned by any of the said causes, the delivery schedule shall be revised accordingly, subject to the rights of the Postal Service under any termination clause included in this contract.

d. As used in this clause, the terms "subcontractor" and "subcontractors" mean subcontractor(s) at any tier.

**B.306   APPLICABLE IF LISTED IN BLOCK 9, PAGE 1   CONSTRUCTION PROGRESS CHART (CLAUSE B-59) (MARCH 1999)**

a. Within 5 days after receiving notice to proceed, the contractor must prepare and submit to the Contracting Officer for approval six copies of a practical progress chart. The chart must show the principal categories of work, corresponding with those used in the breakdown on which progress payments are based, the order in which the contractor proposes to carry on the work, the date on which it will start each category of work, and the contemplated dates for completion. The chart must be in suitable scale to indicate graphically the total percentage of work scheduled to be in place at any time. At the end of each progress payment period, or at such intervals as directed by the Contracting Officer, the contractor must:

 (1) Adjust the chart to reflect any changes in the contract work, completion time, or both, as approved by the Contracting Officer;

 (2) Enter on the chart the total percentage of work actually in place; and

 (3) Submit three copies of the adjusted chart to the Contracting Officer.

b. If in the opinion of the Contracting Officer the work actually in place falls behind that scheduled, the contractor must take such action as necessary to improve progress. The Contracting Officer may require the contractor to submit a revised chart demonstrating its program and proposed plan to make up the lag in scheduled progress and to ensure completion of work within the contract time. If the Contracting Officer finds the proposed plan unacceptable, the contractor may be required to submit a new plan. If a satisfactory plan is not agreed upon, the Contracting Officer may require the contractor to increase the work force, accelerate the planned construction volume, increase assigned construction equipment, or the number of work shifts, without additional cost to the Postal Service.

c. Failure of the contractor to comply with these requirements will be considered grounds for a determination by the Contracting Officer that the contractor is failing to prosecute the work with such diligence as will ensure its completion within the time specified.

**B.307   APPLICABLE IF LISTED IN BLOCK 9, PAGE 1   NETWORK ANALYSIS SYSTEM AND UPDATE (CLAUSE FB-246) (MARCH 1999)**

a. The computer generated, time scaled, logic diagrams must show the order and interdependence of activities and the sequence in which the work is to be done as planned by the contractor or design/build entity. The basic concept of a network analysis diagram must be followed to show how the start of a given activity is dependent on preceding activities, and how it restricts the start of the following activities. In all cases, the project completion date must be shown on the diagram as the latest completion date of all activities.

b. Detailed project schedule requirements may be found in the "Division 1" attachment to this contract (see Section B.1500).

**B.308   EXCEPTION TO COMPLETION SCHEDULE AND LIQUIDATED DAMAGES (CLAUSE FB-245) (MARCH 1999)**

In cases where the Contracting Officer determines that sodding and/or planting and/or specified maintenance thereof is not feasible during the construction period, such work will be excepted from the completion schedule and the *Liquidated Damages* clause. The work must be accomplished or completed during the first sodding and/or planting period or the specified maintenance period following the original completion date.

## B. 400   CONTRACTOR RESPONSIBILITIES

**B.401   PERFORMANCE AND SUPERINTENDENCE OF WORK BY CONTRACTOR (CLAUSE B-42) (SEPTEMBER 2003)**

a. The contractor must perform on the site, with its own organization, work equivalent to at least   12.00   percent of the total amount of work to be performed under this contract. The percentage of work required to be performed by the contractor may be reduced with written approval of the Contracting Officer.

b. The contractor must give personal superintendence to the work either in person or by having a foreman or superintendent on the contractor's payroll, approved by the Contracting Officer, with authority to act on behalf of the contractor, on the site at all times work is in progress.

 1. If more than 50% but less than 70% of the value of the contract work is subcontracted, a minimum of one contractor's superintendent (on the contractor's payroll) must be provided on site to be responsible for coordinating, directing, inspecting, and expediting the subcontract work. The Contracting Officer may modify this requirement depending on the size and scope of the work.

 2. If 70% or more of the value of the work is subcontracted, a minimum of two contractor's superintendents (on the contractor's payroll) must be provided on site to be responsible for coordinating, directing, inspecting, and expediting the subcontract work. The Contracting Officer may modify this requirement depending on the size and scope of the work.

 3. It is contemplated that all work will be performed during normal working hours, usually 7:00 a.m. until 3:30 p.m., local time, unless otherwise specified in this contract. Work performed by the contractor at its own volition outside such normal working hours must be at no additional expense to the Postal Service.

 **UNITED STATES POSTAL SERVICE.**    Facilities Department

c. The contractor must refer requests received from occupants of buildings included in the contractor's work area to change the hours of work, including anticipated cost and schedule impact to the Contracting Officer for resolution.

d. The contractor is required to submit a daily construction report by 10:00 a.m. of the following working day on a form provided by the Contracting Officer or at the contracting officers' option, the contractor shall use the USPS designated Project Management Reporting System. If the USPS Project Management Reporting System is specified (See Division 1) the contractor shall include in their proposal all costs associated with using the system, such as; labor, equipment, training, etc. Reports must indicate the number of men by trade or craft, and the type and location of work. It will include subcontractors, minority participation, safety and quality violations observed, corrective measures taken to correct the violations and other information requested by the Contracting Officer. The Contracting Officer may modify the requirements of this report as the project progresses.

**B.402    MATERIALS AND WORKMANSHIP (CLAUSE B-63) (JANUARY 1997)**

a. Unless otherwise specifically provided, all equipment and materials incorporated in the work must be new and of the most suitable grade for the purpose intended. Unless otherwise specifically provided, reference to any equipment, material, or patented process by brand name, make, or catalog number establishes a standard of quality only. The supplier may substitute any equipment, material, or process that the Contracting Officer finds to be equal to that named. To obtain approval to use a different equipment, material, or process, the supplier must furnish the Contracting Officer the manufacturer's name, the model number, and other identifying data and information regarding the nature and performance of the proposed substitute. If requested by the Contracting Officer, samples must be submitted for approval at the supplier's expense, shipping charges prepaid. Materials or processes substituted without approval may be rejected.

b. In the event of substitution in accordance with paragraph a above, the supplier must furnish to the Contracting Officer for approval the manufacturer's name, the model number, and any other relevant information on the performance, capacity, nature, and rating of equipment or materials proposed for substitution.

c. The supplier must obtain the Contracting Officer's approval of the machinery and mechanical equipment incorporated into the work. The supplier must submit samples of all materials and equipment as directed by the Contracting Officer or as required by the specifications.

d. All work must be performed in a skillful and workmanlike manner. The Contracting Officer may, in writing, require the supplier to remove from the work any employee the Contracting Officer deems incompetent, careless, or otherwise objectionable.

**B.403    USE OF PREMISES    (CLAUSE B-44) (AUGUST 2000)**

a. If Postal Service premises are occupied, the contractor, any subcontractors, and their employees, must comply with the regulations governing access to, operation of, and conduct while on the premises and must perform the work required under this contract so as not to unreasonably interfere with the conduct of Postal Service business or use and occupancy by Postal Service tenants.

b. As permitted by the site conditions, the contractor must separate his personnel and subcontractors' personnel from postal employees, customers, mail and postal property not involved in the project. The contractor must cordon off the area using barricades or other means to achieve this separation.

c. Any requests received by the contractor from occupants to change the sequence of work must be referred to the Contracting Officer for determination.

d. The contractor, any subcontractors, and their employees will not have access to any Postal Service facility outside the scope of this contract without permission of the Contracting Officer.

e. Where available, utility services of the building will be used if the Contracting Officer/installation head determines sufficient capacity is available to support the work. Contractor or subcontractor employees, without approval of the Contracting Officer, may not use the toilet facilities unless such approval is contained in this contract. No cleaning of tools, including painting equipment/brushes, is permitted in the toilet or janitorial facilities.

f. Any use of an existing elevator must be by prior arrangement with the building manager of the building and subject to the building manager's control. The contractor must provide and maintain suitable and adequate protective coverings for the elevator machinery, the hatchway entrances, and the interior of the elevator during the period of use. Loads in excess of the rated capacity of the elevator are not permitted. The Postal Service will bear the cost of the electric current for the operation of the elevator. On completion of the work, the contractor must remove the protective coverings together with any resultant dirt and debris, and leave the equipment in a condition equal to the condition it was in at the time the contractor commenced using the elevator unless specified otherwise in this contract.

**B.404    PERMITS AND RESPONSIBILITIES (CLAUSE B-47) (MARCH 1999)**

a. The contractor is responsible, without additional expense to the Postal Service, for obtaining any necessary licenses and permits, and for complying with the applicable federal, state, and municipal laws, codes, and regulations in connection with the prosecution of the work. The contractor is responsible for all damage to persons or property that occurs as a result of its negligence. The contractor must take proper safety and health precautions to protect the work, the workers, the public, and the property of others. The contractor is responsible also for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction that may have been accepted.

b. The contractor must demonstrate compliance with all environmental permit, assessment, or impact statement requirements and regulations identified in the contract specifications, documents or drawings prior to, and during construction.

**B.405    BUILDING CODES, FEES, AND CHARGES (CLAUSE B-49) (JANUARY 1997)**

a. State and local building codes and regulations do not apply as a matter of law to work inside the property lines of Postal Service–owned properties but generally do apply to Postal Service–leased properties. In compliance with Postal Service policy, the supplier must comply with all state and local building code requirements unless otherwise specifically provided.

b. The supplier must pay all fees and charges for connections to outside services and for use of property outside the site.

**B.406    FEDERAL, STATE, AND LOCAL TAXES (CONSTRUCTION) ( CLAUSE 7-6) ALTERNATE I (MARCH 1999)**

a. Except as this contract may otherwise provide, the contract price includes all applicable federal, state, and local taxes and duties in effect on the date of contract award, but does not include any taxes from which the Postal Service, the contractor, or this transaction is exempt.



# UNITED STATES POSTAL SERVICE

# Facilities Department

B.407     IDENTIFICATION OF CONTRACT DELIVERABLES (CLAUSE OB-19) (JUNE 1988)

Unless otherwise specified, the cover page of each document prepared and submitted by the contractor to the Postal Service under this contract must include the following information:

a.   Name and business address of the contractor.

b.   Contract number.

c.   Name, position, and office location of the Postal Service's Contracting Officer's representative.

d.   Date of report.

B.408     AUTHORIZATION AND CONSENT (CLAUSE B-2) (JANUARY 1997)

a.   Research and Development Work. The Postal Service authorizes and consents to all use and manufacture of any invention covered by a U.S. patent in the performance of research, development, or experimental work called for, or performed as a necessary activity, in the performance of this contract or any subcontract, at any tier.

b.   Supplies and Construction. The Postal Service authorizes and consents to all use and manufacture of any invention covered by a U.S. patent in performing this contract or subcontract, at any tier, that is:

(1)   Embodied in the structure or composition of any article, the delivery of which is accepted by the Postal Service under this contract; or

(2)   Used in machinery, tools, or methods whose use necessarily results from compliance by the supplier or subcontractor with (a) specifications or written provisions forming a part of this contract or (b) specific written instructions given by the Contracting Officer directing the manner of performance.

c.   Determination of Liability. The liability of the Postal Service for patent infringement or for the unauthorized use of any patent will be determined by the provisions of any patent indemnity clause included in this contract or in any subcontract under this contract (at any tier) and by any indemnification or warranty (express or implied) otherwise provided by the supplier or subcontractor for similar products or services when supplied to commercial buyers.

d.   Flowdown. The supplier must include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts under this contract, at any tier, that are expected to exceed $50,000.

B.409     NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (CLAUSE B-3) (JANUARY 1997)

a.   The supplier must report to the Contracting Officer, in writing, promptly and in reasonable detail, any notice, claim, or suit regarding patent or copyright infringement (or unauthorized use of a patent or copyright) based on performance of this contract.

b.   At the Contracting Officer's request, the supplier must furnish all evidence and information in its possession pertaining to the suit or claim. The evidence and information will be furnished at the expense of the Postal Service except when the supplier has agreed to indemnify the Postal Service.

c.   This clause must be included in all subcontracts under this contract, at any tier, over $50,000.

B.410     PATENT INDEMNITY (CLAUSE B-4) (JANUARY 1997)

a.   Except as provided in paragraph d below, the supplier indemnifies the Postal Service, its employees, and its agents against liability, including costs and fees, for patent infringement (or unauthorized use) arising from the manufacture, use, or delivery of supplies, the performance of service, the construction or alteration of real property, or the disposal of property by or for the Postal Service, if the supplies, service, or property (with or without relatively minor

modifications) have been or are being offered for sale or use in the commercial marketplace by the supplier.

b.   The Postal Service must promptly notify the supplier of any claim or suit subject to the indemnity of paragraph a above alleging patent infringement or unauthorized use of a patent.

c.   To the extent allowed by law, the supplier may participate in the defense of any suit to which this clause applies.

d.   This indemnification does not apply to:

(1)   Infringements for the unauthorized use of a private patent covered by this indemnity resulting from the Contracting Officer's specific written direction, compliance with which requires an infringement; or

(2)   Infringement or unauthorized use claims that are unreasonably settled without the supplier's consent before litigation.

e.   This clause must be included in all subcontracts under this contract, at any tier, over $50,000.

B.411     DEBRIS AND CLEANUP (CLAUSE B-52) (SEPTEMBER 1998)

a.   On a daily basis during the progress of the work, the supplier must remove and dispose of the resultant dirt and debris and keep the premises clean.

b.   The supplier will, upon completion of the work, remove all construction equipment and surplus materials (except materials or equipment that are to remain Postal Service property, as provided by this contract), and leave the premises in a clean, neat, and orderly condition satisfactory to the Contracting Officer.

B.412     HEAT (CLAUSE B-51) (JANUARY 1997)

Unless otherwise specified, or unless directed otherwise by the Contracting Officer, the supplier must:

a.   Provide heat as necessary to protect all work materials and equipment against injury from dampness and cold;

b.   Protect, cover, and/or heat, as may be necessary, to produce and maintain a temperature of not less than 50 degrees Fahrenheit in the concrete during the placing, setting, and curing of concrete, and in the plaster during the application, setting, and curing of plaster; and

c.   Provide heat, as necessary, to produce in the area where the work is to be done a temperature of not less than 70 degrees Fahrenheit for the period beginning 10 days before the placing of interior finishes and finish materials and continuing until completion of beneficial occupancy of the area.

B.413     ENGLISH LANGUAGE REQUIREMENT OF ON-SITE SUPERINTENDENT (CLAUSE OB-38) (JUNE 1988)

The Contractor's on-site superintendent must be able to speak, read, and write American English to the extent necessary to permit reasonable communication with Postal Service personnel.

B.414     OPTIONAL MATERIALS OR METHODS (CONSTRUCTION) (CLAUSE FB-244) (JUNE 1988)

Where the technical provisions permit the Contractor to select optional materials, items, systems, or equipment, the selection of such options is subject to the following conditions:

a.   Once an option has been selected and approved, it must be used for the entire contract.

b.   The Contractor must coordinate its selection with the drawings and specifications and make all necessary adjustments without additional cost to the Postal Service.

 **UNITED STATES POSTAL SERVICE.**                      Facilities Department

**B.415    ADVERTISING OF CONTRACT AWARDS (CLAUSE B-25) (JANUARY 1997)**

Except with the Contracting Officer's prior approval, the supplier agrees not to refer in its commercial advertising to the fact that it was awarded a Postal Service contract or to imply in any manner that the Postal Service endorses its products.

**B.416    GROUND BREAKING CEREMONIES (CLAUSE FB-238) (JUNE 1988)**

The contractor agrees, in accordance with current Postal Service policy, not to plan, finance, participate in, or in any way be involved in ground breaking ceremonies prior to the commencement of or at anytime during the prosecution of the work within the duration of this contract.

**B.417    PREFERENCE FOR DOMESTIC CONSTRUCTION MATERIALS (CLAUSE 1-10) (JANUARY 1997)**

a.  Preference will be given to domestic construction materials in accordance with Chapter 1 of the USPS *Interim Purchasing Guidelines (May 2005)*. For the purposes of this clause:

(1)  Components. Those articles, materials, and supplies incorporated directly into construction materials;

(2)  Construction materials. Articles, materials, and supplies brought to the construction site for incorporation into the building or work; and

(3)  Domestic construction material. This is (a) an unmanufactured construction material mined or produced in the United States, or (b) a construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind as those determined to be unavailable under chapter 1, section 7 of the USPS Interim Purchasing Guidelines (May 2005) will be treated as domestic.

(4)  Foreign construction material. A construction material other than a domestic construction material.

b.  The contractor agrees that only domestic construction material will be used by the contractor, subcontractors, materialmen, and suppliers in the performance of this contract, except for foreign construction materials, if any, listed in this contract.

**B. 500    POSTAL SERVICE RIGHTS AND RESPONSIBILITIES**

**B.501    CONTRACTING OFFICER'S REPRESENTATIVE (COR) (CLAUSE OB-21) (MARCH 1999)**

The Contracting Officer may appoint a Contracting Officer's representative (COR), who may be either a Postal Service employee or a contractor. The name, address, telephone number, and specific responsibilities, authority, and limitations of the COR will be provided to the contractor in writing by the contract start date. The COR may be removed or replaced at any time without prior notice to the contractor, but notification of the change, including the name and address of any successor COR, will be provided promptly to the contractor by the Contracting Officer, in writing.

**B.502    SITE VISITS (CONSTRUCTION) (CLAUSE FB-240) (MARCH 1999)**

a.  The Postal Service from time to time during construction may desire to conduct groups of guests on visits to the site of the work. These tours will be authorized by the Contracting Officer or his appointed representative. In such event the contractor will cooperate by providing access to and posting signs to give notice of dangerous areas, providing hard hats, and making such other arrangements for the safety and convenience of the guests as may be required. If any such visit or the arrangements therefore cause an increase in the

contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any order, an equitable adjustment shall be made and the contract modified in writing. The Contracting Officer shall give the contractor as much advance notice of any such visits as is practicable, and to the maximum practicable extent shall schedule any such visits so as not to interfere with the progress of the work.

b.  The contractor's indemnification of the Postal Service contained in the "Indemnification" clause of this contract shall not apply during any such visits to guests of the Postal Service or to Postal Service officers, employees, or agents who are engaged in conducting, guiding, or accompanying any such visits, leaving the Postal Service and the contractor responsible for their own acts and omissions according to applicable law and other clauses of this contract. This special contract clause does not apply to inspections, investigations, or official site visits provided for elsewhere in this contract or conducted for the purpose of aiding in the enforcement of law.

**B.503    POSTAL SERVICE DIRECTED STAFFING CHANGES (CLAUSE FB-217) (MARCH 1999)**

a.  Should the Contracting Officer deem it to be in the best interests of the Postal Service to require the removal of any person working on or under this contract, that person must be immediately removed from the work.

b.  "Person," as used in this clause, includes persons, firms, corporations, and the like, employed by the supplier under contract or otherwise, whether a permanent part of its organization or not.

**B.504    EXAMINATION OF RECORDS (CLAUSE B-14) (JANUARY 1997)**

a.  The Postal Service and its authorized representatives will, until three years after final payment under this contract, or for any shorter period specified for particular records, have access to and the right to examine any directly pertinent books, documents, papers, or other records of the supplier involving transactions related to this contract.

b.  The supplier agrees to include in all subcontracts under this contract a provision to the effect that the Postal Service and its authorized representatives will, until three years after final payment under the subcontract, or for any shorter specified period for particular records, have access to and the right to examine any directly pertinent books, documents, papers, or other records of the subcontractor involving transactions related to the subcontract. The term subcontract as used in this clause excludes:

(1)  Purchase orders; and

(2)  Subcontracts for public utility services at rates established for uniform applicability to the general public.

**B.505    RIGHTS IN TECHNICAL DATA (CLAUSE 8-6) (JANUARY 1997)**

a.  Definitions

(1)  Data: Recorded information, regardless of the form or the medium on which it may be recorded. The term includes technical data and computer software. The term does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

(2)  Form, Fit, and Function Data: Data relating to an item or process that are sufficient to enable physical and functional interchangeability, as well as data identifying source, size, configuration, mating and attachment characteristics, functional characteristics, and performance requirements; except that for computer software, it means data identifying origin, functional characteristics, and performance requirements but specifically excludes the source code, algorithm, process, formulas, and machine-level flow charts of the computer software.


UNITED STATES
POSTAL SERVICE.

# Facilities Department

(3) Limited Rights Data: Data other than computer software developed at private expense, including minor modifications of these data.

(4) Technical Data: Data other than computer software, of a scientific or technical nature.

(5) Unlimited Rights: The rights of the Postal Service in technical data and computer software to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform and display publicly, in any manner and for any purpose, and to have or permit others to do so.

b.  Allocation of Rights

(1) Except as provided in paragraph c below regarding copyright, the Postal Service has unlimited rights in:

(a) Technical data first produced in the performance of this contract (except to the extent that they constitute minor modifications of data that are limited rights data);

(b) Form, fit, and function data delivered under this contract; except that all form, fit, and function data describing limited rights data must be delivered with unlimited rights;

(c) Technical data delivered under this contract that constitute manuals or instructional and training material for installation, operation, or routine maintenance and repair of items, components, or processes delivered or furnished for use under this contract; and

(d) All other technical data delivered under this contract, unless provided otherwise in paragraph g below.

(2) The allocation of rights in any computer programs, data bases, and documentation will be determined by the "Rights in Computer Software" clause, except that limited rights data formatted as computer data bases for delivery to the Postal Service are to be treated as limited rights data under this "Rights in Technical Data" clause.

c.  Copyright

(1) Unless provided otherwise in paragraph d below, the supplier may establish, without prior approval of the Contracting Officer, claim to copyright in scientific and technical articles based on, or containing, technical data first produced in the performance of this contract and published in academic, technical, or professional journals, symposia proceedings, or similar works. The prior, express written permission of the Contracting Officer is required to establish claim to copyright in all other technical data first produced in the performance of this contract. When making claim to copyright, the supplier must affix the applicable copyright notice of 17 U.S.C. 401 or 402. When making claim to copyright, the supplier must affix the applicable copyright notice of 17 U.S.C. 401 or 402. The supplier grants to the Postal Service and others acting on its behalf a paid–up, nonexclusive, irrevocable worldwide license in such copyright data to reproduce, prepare derivative works, distribute copies to the public, and perform and display the data publicly.

(2) The supplier may not, without prior written permission of the Contracting Officer, incorporate in technical data delivered under this contract any data not first produced in the performance of this contract containing the copyright notice of 17 U.S.C. 401 or 402, unless the supplier identifies the data and grants to the Postal Service, or acquires on its behalf at no cost to the Postal Service, a license of the same scope as set forth in subparagraph c.1 above.

(3) The Postal Service agrees not to remove any copyright notices placed on data pursuant to this paragraph c, and to include such notices on all reproductions of the data.

d.  Release, Publication, and Use of Technical Data

(1) The supplier has the right to use, release to others, reproduce, distribute, or publish any technical data first produced by the supplier in the performance of this contract, except to the extent these data may be subject to the federal export control or national security laws or regulations, or unless otherwise provided below in this paragraph d.2 following or expressly set forth in this contract.

(2) The supplier agrees that if it receives or is given access to data necessary for the performance of this contract that contain restrictive markings, the supplier will treat the data in accordance with the markings unless otherwise specifically authorized in writing by the Contracting Officer.

e.  Unauthorized Marking of Data

(1) If any technical data delivered under this contract are marked with the notice specified in paragraph g below and the use of such a notice is not authorized by this clause, or if the data bear any other unauthorized restrictive markings, the Contracting Officer may at any time either return the data or cancel the markings. The Contracting Officer must afford the supplier at least 30 days to provide a written justification to substantiate the propriety of the markings. Failure of the supplier to timely respond, or to provide written justification, may result in the cancellation of the markings. The Contracting Officer must consider any written justification by the supplier and notify the supplier if the markings are determined to be authorized.

(2) The foregoing procedures may be modified in accordance with Postal Service regulations implementing the Freedom of Information Act (5 U.S.C. 552) if necessary to respond to a request thereunder. In addition, the supplier is not precluded from bringing a claim in connection with any dispute that may arise as the result of a final disposition of the matter by a court of competent jurisdiction.

f.  Omitted or Incorrect Markings

(1) Technical data delivered to the Postal Service without limited rights notice authorized by paragraph g below, or the copyright notice required by paragraph c above, will be deemed to have been furnished with unlimited rights, and the Postal Service assumes no liability for the disclosure outside the Postal Service. The supplier may request, within six months (or a longer time approved by the Contracting Officer) after delivery of the data, permission to have notices placed on qualifying technical data at the supplier's expense, and the Contracting Officer may agree to do so if the supplier:

(a) Indemnifies the technical data to which the omitted notice is to be applied;

(b) Demonstrates that the omission of the notice was inadvertent;

(c) Establishes that the use of the proposed notice is authorized; and

(d) Acknowledges that the Postal Service has no liability with respect to the disclosure, use, or reproduction of any such data made before the addition of the notice or resulting from the omission of the notice.

(2) The Contracting Officer may also (a) permit correction at the supplier's expense of incorrect notices if the supplier identifies the technical data on which correction of the notice is to be made and demonstrates that the correct notice is authorized, or (b) correct any incorrect notices.

g.  Protection of Limited Rights Data. When technical data other than data listed in b.1(a), (b), and (c) above are specified to be delivered


UNITED STATES
POSTAL SERVICE.

# Facilities Department

under this contract and qualify as limited rights data, if the supplier desires to continue protection of such data, the supplier must affix the following "Limited Rights Notice" to the data, and the Postal Service will thereafter treat the data, subject to paragraphs e and f above, in accordance with the Notice:

"LIMITED RIGHTS NOTICE

These technical data are submitted with limited rights under Postal Service Contract No. _____ (and subcontract _____, if appropriate). These data may be reproduced and used by the Postal Service with the express limitation that they will not, without written permission of the supplier, be used for purposes of manufacture or disclosed outside the Postal Service; except that the Postal Service may disclose these data outside the Postal Service for the following purposes, provided that the Postal Service makes such disclosure subject to prohibition against further use and disclosure:

1.  Use (except for manufacture) by support service suppliers.

2.  Evaluation by Postal Service evaluators.

3.  Use (except for manufacture) by other suppliers participating in the Postal Service's program of which the specific contract is a part, for information and use in connection with the work performed under each contract.

4.  Emergency repair or overhaul work.

This Notice must be marked on any reproduction of these data, in whole or in part."

h.  Subcontracting. The supplier has the responsibility to obtain from its subcontractors all data and rights therein necessary to fulfill the supplier's obligations under the contract. If a subcontractor refuses to accept terms affording the Postal Service such rights, the supplier must promptly bring such refusal to the attention of the Contracting Officer and may not proceed with subcontract award without further authorization.

i.  Relationship to Patents. Nothing contained in this clause implies a license to the Postal Service under any patent or may be construed as affecting the scope of any license or other right otherwise granted to the Postal Service.

B.506   SURVEY MONUMENTS AND BENCHMARKS (CLAUSE B-53) (JANUARY 1997)

a.  The Postal Service has established, or will establish, such general reference points as will enable the supplier to proceed with the work. The supplier will provide new monuments where shown or specified. If the supplier finds that any previously established reference points have been destroyed or displaced, or that none has been established, the supplier must promptly notify the Contracting Officer.

b.  The supplier must protect and preserve established benchmarks and monuments and make no changes in locations without the written approval of the Contracting Officer. Established reference points that may be lost, covered, destroyed, or disturbed in the course of performance of the work under this contract, or that require shifting because of necessary changes in grades or locations, must (subject to prior approval of the Contracting Officer) be replaced and accurately located or relocated (as appropriate) at the supplier's expense, by a licensed engineer or licensed land surveyor.

c.  New monuments will be 6 inches square by 3 feet deep (unless otherwise specified), of concrete or stone, with a 3–inch copper or brass pin, 3/8–inch in diameter, in the center, and must be set flush with the ground or pavement in locations indicated on the site plan.

d.  Monuments will not be required where lines of buildings are coincident with property lines.

e.  The supplier must verify the figures shown on the survey and site plan before undertaking any construction work and will be responsible for the accuracy of the finished work.

f.  After completion of construction and before final payment, the supplier must furnish the Postal Service blueprints (in triplicate) of plans showing the exact location of construction survey monuments with reference to true property lines.

B.507   POSTAL SERVICE PARTIAL OCCUPANCY (CLAUSE B-36) (JANUARY 1997)

a.  The Contracting Officer reserves the right of partial occupancy or use of facilities, services, and utilities, before final acceptance, without implying completion or acceptance of any part of the project by the Postal Service. Before such occupancy or use, the Contracting Officer must furnish the supplier an itemized list of work remaining to be performed or corrected. Failure to list an item will not relieve the supplier of the responsibility for complying with the terms of the contract.

b.  Costs incurred as a result of such partial occupancy or use of facilities, services, and utilities are subject to equitable adjustment under the "Changes" clause.

B.508   POSTAL SERVICE PROPERTY (CONSTRUCTION) (CLAUSE 2-11) ALTERNATE I (MAY 2000)

a.  The Postal Service will deliver to the contractor, at the time and locations stated in this contract, the Postal Service property described in the specifications, or incorporated by reference on a list in Section B.1500. If that property, suitable for its intended use, is not delivered in a timely manner to the contractor, the Contracting Officer shall make an equitable adjustment in accordance with the "Changes" clause if:

(1)  The contractor submits a timely written request for an equitable adjustment; and

(2)  The facts warrant an equitable adjustment.

b.  Title to Postal Service property remains in the Postal Service even if incorporated in or affixed to property not owned by the Postal Service. The contractor may use the Postal Service property only in connection with this contract. The contractor must maintain adequate property control records in a form acceptable to the Contracting Officer and must make them available for Postal Service inspection upon request.

c.  Upon delivery of Postal Service property to the contractor, the contractor assumes the risk and responsibility for its loss or damage, except:

(1)  For reasonable wear and tear;

(2)  To the extent property is consumed in performing the contract; or

(3)  As otherwise provided in the contract.

d.  Changes in Postal Service Furnished Property

(1)  By written notice, the Contracting Officer may (a) decrease the property provided or to be provided by the Postal Service under this contract, or (b) substitute other Postal Service owned property for the property to be provided by the Postal Service, or to be acquired by the contractor for the Postal Service under this contract. The contractor must promptly take any action the Contracting Officer may direct regarding the removal and shipping of the property covered by this notice.

(2)  In the event of any decrease in or substitution of property pursuant to subparagraph d.1 above, or any withdrawal of

Exhibit B

SUB-CONTRACTOR
AGREEMENT


BETWEEN


# Agency Construction Corporation
### P.O. BOX 266
### MAMARONECK, NY 10543
Phone: (914-698-1151)
Fax:    (914-381-5996)


AND


**J. Scaduto & Son, Inc.**
**P.O. Box 1005**
**Bronx, NY 10465**
Tel. (718) 328-3126 Fax: (718) 328-3154


FOR


**Demolition and Removals, New Built-Up Bituminous Roofing,**
**Building Insulation Sheet Metal Flashing & Trim,**
**Water Repellents and Damp Proofing**


FOR


United States Postal Services
A/C Chiller Replacement
Mott Haven Post Office
517 East 139th Street
Bronx, NY 10454


DATED:  September 28, 2006


ARCHITECTS:


STV, Incorporated
225 Park Avenue South
New York, NY 10003


## Contract Amount:  $ 205,000.00


1

<u>Sub – Contractor Agreement</u>

This Agreement made the 29th day of  September   A.D.  2006,  by and between   J. Scaduto & Son, Inc  herein after called the Sub-contractor and Agency Construction Corp. herein after called the Contractor. For the consideration ehereinafter named the Sub-contractor covenants and agrees with the said Contractor as follows:

**FIRST: Per plans and specification for the Mott Haven Post Office, J. Scaduto & Son, Inc will furnish all Labor and material, including all necessary equipment, and fully construct and in a good substantial and workman like manner perform and in every respect completing roof replacement. Provide work set for in the drawings A-102, A-103 and M-102 and in specification sections:  07110 – Damp Proofing, 07190 – Water Repellents, 07210 – Building Insulation, 07510 – Built-up Bituminous Roofing, 07260 – Sheet Metal Flashing & Trim.**
**Exclusions: Mechanical Equipment removal, Removal & Installation of Satellite Dish, Replacement of exhaust fans, Cleaning of roof drains, Clamping rings and Strainer.**

 "All terms, and rights as under the prime contract are also possessed by the contractor in the relationship with sub-contractor. Payment on this job is contingent upon:
a) Calling or faxing the main office daily basis with your manpower & work performed - Fax (914) 381-5996
b) Prevailing Wage Scale is applicable and makes the payments as per the prevailing wage scale. (Attached is a full copy of prevailing wage rates). Sending original notarized weekly payrolls to the office, and proof of payments such as cancelled payroll checks.
c) Clean-Up and removal off site of debris caused by your work.
d) Provide a Certificate of Insurance per the attached limits, including the hold-harmless clause on the backside.
e) Time is of the essence for the completion of this contract.
f) Payments extended upon contractor's approval of work.
g) All materials & workmanship subject to owner's/architect approval
h) Terms of Payment: 2% net 10 days.
i) Forward submittal for approval ASAP.
For the above named structure, according to the plans and specifications by STV, Incorporated, and to the full satisfaction of said Architects.

   **SECOND:** The Sub-contractor will promptly begin work as soon as he is notified by the
Contractor that the ground is clear or the structure far enough advanced to allow the beginning of that
Portion included hereunder, and will carry forward and complete said work as rapidly as said
Contractor may judge that the progress of the structure will permit, unless detained by other Sub-
Contractors: in which event he will promptly notify the Contractor in writing, who (if satisfied that said delay is caused by others than said Sub-Contractor hereunder) will allow additional time sufficient in his judgement to make up the time so lost. This paragraph shall cover extra work done or materials under this contract.

   **THIRD:** The Sub-Contractor will furnish said materials, including all necessary scaffolding, and prosecute said work with due diligence, without delay, and will not in any manner delay or other-wise interfere with the work of the Contractor, or other Sub-contractors, and should the said Contractor conclude that the said Sub-contractor is delaying said work, he shall so notify said Contractor, who shall, within two days thereafter, furnish whatever materials are required by said contractor, and employ additional men, as required by said Contractor, and in case said Sub-contractor fails to comply with said demand, the said Contractor shall have the right to furnish said materials and employ said additional men and charge the expense thereof against the said Sub-contractor and deduct same from this contract, and should the amount or balance due on said contract be insufficient, to collect said deficiency by legal process.

   **FOURTH:** Should said Sub-contractor fail to begin, continue and complete the work as hereinbefore provided and should the Contractor suffer or permit said Sub-contractor to occupy more time than required under this agreement, in that event the said Sub-contractor hereby covenants and agrees to indemnify and save harmless the Contractor from any loss or damages which may be compelled to make good to the owner of said building, under or by virtue of the contract with the owner, for or on account of delay in the completion thereof, insofar as said delay was caused by the said Sub-contractor.

2

**FIFTH:** The Sub-contractor shall provide sufficient, safe and proper facilities at all times for the inspection of the work by the Architect, the Contractor or his authorized representatives. He shall, at once, remove all materials and take down and rebuild all portions of the work condemned by the Architect or Contractor, upon receiving notice in writing of such condemnation.

**SIXTH:** The Sub-contractor shall not employ any workmen whose employment on the building or improvement may be objected to by the Contractor, the Architect, or the Owner.

**SEVENTH:** No extra work or changes under this contract will be recognized or paid for, unless agreed to in writing before the work is done or the changes are made; in which writing shall be specified in detail the extra work or changes desired. The price to be paid or the amount to be deducted, should said changes decrease the amount to be paid here under.

**EIGHTH:** The Sub-contractor hereby covenants and agrees to indemnify and save harmless the Contractor from any and all manner of claims or suits for infringements of patents or violation of patent rights, including all costs and expenses to which the Contractor may be put in defending any actions that may arise under this clause of the contract.

**NINTH:** The Sub-contractor shall comply with all applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss.

<u>ALL SAFETY CODES</u>                    <u>ALL BUILDING CODES</u>

**TENTH:** The Sub-contractor agrees to indemnify and save harmless the Owner and General Contractor against loss or expense by reason of the liability imposed by law upon the Owner or General Contractor for damage because of bodily injuries, including death at any time resulting therefrom; accidentally sustained by any person or persons or on account of damage to property arising out of or on account of or in consequence of the performance of this contract, whether or not such injuries to persons or damage to the property are due or claimed to be due to any negligence of the Sub-contractor, his employees, his agents or servants.

**ELEVENTH.** The Sub-contractor shall protect and indemnify the said Contractor against any loss or damage suffered by any one arising through the negligence of the Sub-contractor, or those employed by him or his agent or servants; he shall bear any expense which the Contractor may have by reason thereof, or on account of being charged therewith; and if there are any such injuries to persons or property unsettled for, when the work herein provided for is finished, final settlement between the Contractor and Sub-Contractor shall be deferred until such claims are adjusted or suitable special indemnity acceptable to the Contractor is provided by the sub-Contractor.

**TWELFTH.** The Sub-contractor shall take out and pay for Employer's Liability or Workmen's Compensation insurance as required by the State in which this work is performed, also Public Liability and Property Damage insurance, in amounts to be agreed upon by the Contracting Parties. Upon signature of this contract the Sub-contractor must submit certificate of insurance to include Owner's or Contractor's Protective Liability.

**THIRTEENTH.** The Sub-contractor shall pay all Sales Taxes, Use Taxes, Excise Taxes, Old Age Benefit and Unemployment Compensation Taxes upon the material and labor furnished under this contract, as required by the Statutes of the United States Government and the State in which this work is performed.

**FOURTEENTH.** The Sub-Contractor shall not assign this contract. Any attempt to assign the contract shall operate as an instant forfeiture and repudiation thereof by the Sub-contractor.

And the right of the parties shall be determined in the same manner as though the Sub-contractor had at the time of such attempted assignment failed and refused to continue to perform the contract.

**FIFTEENTH.** It is expressly UNDERSTOOD AND AGREED by and between the parties hereto that time is and shall be considered the essence of the contract on the part of the said Sub-contractor, and in event that the said Sub-contractor shall fail in the performance of the entire work to be performed under this contract, by and at time or times herein mentioned or referred to, the said Sub-contractor shall pay unto the said Contractor, as and for liquidated damages, and not as a penalty, the sum of ONE HUNDRED _____ per day, which said sum of _$ 100.00_ per day, in view of the difficulty of estimating such damages with exactness, is hereby expressed, fixed, computed, determined and agreed upon as the damages which will be suffered by the Contractor by reason of such default; and it is understood and agreed by the parties of this contract that the liquidated damages herinbefore mentioned are in addition to the actual damages arising from such breach of this Contract, which said sum the said Contractor shall have the right to deduct from any moneys otherwise due or to become due to the said Sub-contractor or to sue for and recover compensation or damages for the non-performance of this contract at the time or times herein stipulated or provided for.

The Sub-contractor knows that the Contractor must have his contract performed on or before the (See below) day of _ASAP_____ will advise; and it is therefore understood and agreed that the work provided for herein shall be entirely completed on the given date. And to that end the Sub-contractor will perform not less than the following average amount of work:

Amount as laid out in the field with the G.C./Contractor. Completion in full within schedule as per plans & specs. No allowance for time will be made Sub-contractor for delay in preparing his drawings or in securing approval of Architect hereto when such drawings are not properly prepared for approval of architect. When extension of time for strikes or fire casualties have been granted Contractor by Architect or Owner, the same extension will be granted said Sub-contractor.

**SIXTEENTH.** The Sub-contractor further agrees that he will within ten days from date provide the Contractor with a bond in the sum of _____N/A_____ Conditioned for the faithful performance of this contract in all its particulars, duly executed with Surety Company acceptable to the Contractor, as surety, and in the form and contents acceptable to the contractor.

**IN CONSIDERATION WHEREOF,** the said Contractor agrees that he will pay to the said Sub-contractor in monthly payments, the sum of **Progress payments – Monthly** for said materials and work, said amount to be paid as follows: __Ninety__ per cent. ( __90 %__) Of all labor and materials which has been placed in position and for which payment has been made by said "Owner" to said Contractor, to be paid on or about the __tenth (10)__ of the following month, except the last payment, which the said Contractor shall pay to said Sub-Contractor immediately after said materials and labor installed by said Sub-contractor have been completed, approved by said Architect, and final payment received by the Contractor and satisfactory evidence furnished to Contractor by Sub-contractor that all labor and material accounts for use on this particular work have been paid in full.

**SEVENTEEN. Performance Agreement**
Should subcontractor at any time fail to supply a sufficient number of skilled workmen or a sufficient quantity of materials of proper quality. Or fail in any respect to persecute the work covered by this subcontract with promptness and diligence. Or fail in the performance of any of the agreements herein contained. Or should any workman performing work covered by this sub-contract engage in a strike or other stoppage of cease to work due to picketing of other such activity. The contractor may in any of such events at his option, without prejudice to any other remedies he may have, after twenty-four (24) hours written notice to the subcontractor. Provide any such labor and materials and deduct the cost thereof from any monies then due of thereafter to become due the subcontractor.

And further, in any such events, the contractor may at his option, without prejudice to any remedies he may have, terminate the employment of the subcontractor for the work under his subcontract and shall have the right to enter upon the premises and take possession for the purpose of completing the work hereunder of all the materials, tools and equipment thereon and to finish the work and provide the materials thereof either, with his own employees of other subcontractor: and in the case of such discontinuance of the employment by contractor, the sub-contractor shall not be entitled to receive any further payments under the subcontract or otherwise but shall nevertheless remain liable for any damages which contractor incurs: if the expenses incurred by the contractor in completing the work shall exceed the unpaid balance, the sub-contractor shall pay the difference to the contractor along with any other damages incurred by the contractor as a result of the contractor's default. The contractor shall have a lien upon all materials, tools and damages incurred by the contractor due to the failure of the performance by the sub-contractor to keep the progress of his work up to that of the contract of other trades of the failure to execute his work as directed by the contractor.

It is further understood and agreed that no payment on account shall operate as an approval of said work or materials, or any part thereof. This agreement does not include Arbitration as part of the agreement.

All negotiations and agreements prior to the date of this memorandum are merger herein. We have read and fully understand this agreement. The Contractor and the Sub-contractor for themselves, their successors, executors, administrators, and assigns hereby agree to the full performance of the covenants of this agreement.

IN WITNESS WHEREOF, they have executed this agreement the day and date written above
Witness:

_____

AGENCY CONSTRUCTION CORP

J. Scaduto & Son, Inc.
SUB-CONTRACTOR

By_____ Date

4

Exhibit C

# Agency Construction Corporation

P.O. Box 266 • Mamaroneck, NY 10543
Phone: 914.698.1151
**Fax: 914.381.5996**
info@AgencyConstruction.com

## FAX COVER SHEET

| To: | Joe Scaduto | Re: | Mott Haven Fire |
|---|---|---|---|
| Phone: | | Date: | 22 May 2007 |
| Fax: | | Pages: | |
| CC: | | From: | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply

Dear Joe,

It is without prejudice, and at the request of the Post Office that we must seek another roofer to finish the project. This was confirmed in Meeting minutes E mailed Tuesday evening (copy attached).

Hopefully, the reports which are not in yet from the NY Fire Dept, the investigator from 5/15/07 who went to the site, and our Insurance company investigator will exonerate us all.

Regards, ~ Greg M.M.

Sent via UPS overnight mail

**Please reply via fax to: 914.381.5996.**

Exhibit D



# STV Incorporated

May 21, 2007
Page 3 of 4

Summary of Meeting 5/18/07
Mott Haven Station
STV Project No. 20-12289

concealed structural roofing members. STV will perform visual assessments and make determinations whether steel coupons need be taken for testing or whether any structural defects are noted requiring replacement of structural members.

f.  At USPS request, ACC is engaging the services of another roofing subcontractor. The roofing subcontractor will be Johns Mansville approved in order to maintain continuance with the roofing system performed thus far. The roofing subcontractor will be at the site Friday afternoon May 18th to schedule the work to be performed

g.  ACC continues to provide interior building monitoring and clean-up after rain. This includes maintaining a fire watch.
    i.   USPS requested a copy of ACC's current agreement with the security/monitoring company being engaged by ACC.

h.  A newly installed exhaust fan damaged by the fire has been re-ordered.

i.  ACC will contact Marvin Windows, previous supplier of windows, on May 18th to order replacement windows. The current plan is to reuse the existing frames and replace sashes. Field measurements will be taken May 18th.
    i.   USPS is requesting to replace one window with a door for easier access. ACC will coordinate with USPS.
    ii.  Prior to fabrication, ACC will forward to shop drawing submissions for review

j.  ACC has met with the Mezzanine demolition subcontractor and has plans to meet again shortly which will be the basis of a work schedule. ACC's current priority is the roof rehabilitation.

k.  ACC's electrician performed circuit tests and indicated all except three circuits were operable. Wiring to these circuits will be replaced.
    i.   Existing wiring is BX cable. ACC requested whether USPS desires replacement of the three circuits with BX or use USPS current standard wiring – conduit and cable. Subject to future discussion.
    ii.  ACC will forward report of electrical testing and circuit verification report.

l.  The existing fire alarm system was totally damaged and will be completely replaced.

2.  Each item in CH2M Hill Conditions Assessment was discussed. ACC concurs with the statements and recommendations made within the report and will forward a document to USPS acknowledging this agreement.

3.  Excessive materials with associated loads on the lower roof were noted. ACC will remove the construction material and gravel during the week of May 21.

4.  ACC will contact Carrier Corp., the manufacturer of the rooftop mechanical equipment, to inspect the installed equipment for fire or smoke damage.

5.  As a result of the fire damage in the building lobby, dislodged ceilings exposed concealed abandoned electrical equipment with wiring and fixtures energized. While a previous

05/16/2007  14:42    17183283154    PAGE    02

# J. SCADUTO & SON, INC.

## ROOFING • WATERPROOFING • RESTORATION • SHEET METAL

Mailing Address: P.O. Box 1005 • Bronx, New York 10465 • www.jscadutoandson.com
Tel (718) 328-3126 • Fax (718) 328-3154

May 16, 2007

**Agency Construction Corp.**
PO Box 266
Mamaroneck, NY 10543

**Attn: Greg Sr.**

**Re: Mott Haven Roof**

**Sent Via Facsimile # (914) 381-5996 US Mail**

Dear Greg,

    We are prepared to resume work under our agreement immediately. The delay in this project is attributable to another trade and or something else, not us.

    We are of course eager to complete this project in a timely fashion along with our superior workmanship for which we pride ourselves. Should there be additional charges associated with the completion of our subcontractor obligations, the parties responsible for necessitating these changes will be invoiced accordingly.

    J.Scaduto & Son, Inc. had nothing to do with what happened on Saturday afternoon. I have sent my men in good faith to clean up, repair the roof area and cover the damaged area with tarp to avoid any more water damage.

    We at this point can not proceed with any more work other than our roofing project unless we have authorization from you in writing.

    We need to meet and work this out accordingly.

Sincerely Yours,

Joseph Scaduto

1536 Southern Blvd. Bldg. #1 • Bronx, New York 10460

1

# J. SCADUTO & SON, INC.

## ROOFING • WATERPROOFING • RESTORATION • SHEET METAL

Mailing Address: P.O. Box 1005 • Bronx, New York 10465 • www.jscadutoandson.com
Tel (718) 328-3126 • Fax (718) 328-3154

May 17, 2007

**Agency Construction Corp.**
PO Box 266
Mamaroneck, NY 10543

**Attn: Greg Sr.**

**Re: Mott Haven Roof**

**Sent Via Facsimile # (914) 381-5996 US Mail**

Dear Greg,

    Please be advised that all attempts to secure the roof at the above referenced location, have met with resistance. As you know, I advised you immediately after the incident, that the roof should be secured and made water tight. We had thunder storms last night and are expecting more severe rain tonight into Friday and most of the weekend.

    Our hands have been tied in attempting to safeguard and complete our work. While we want to cooperate and continue the project to completion, we can not be responsible for any delays and damages caused by other parties and decision makers. As noted previously, all work outside the original contract that we are requested to perform must be requested inn writing and we must be given sufficient time to proceed.

Sincerely Yours,

Joseph Scaduto

1536 Southern Blvd. Bldg. #1 • Bronx, New York 10460

1

Exhibit B

| | |
|---|---|
| UNITED STATES OF AMERICA for the use and benefit of J. SCADUTO & SON, INC., <br><br> Plaintiff, <br><br> -v- <br><br> LIBERTY MUTUAL INSURANCE COMPANY and AGENCY CONSTRUCTION CORP., <br><br> Defendants. | UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK <br><br> Civil Action No.: 08 CV 01885 "EFC Case" <br><br> **VERIFIED ANSWER & COUNTERCLAIMS** |

Defendant, Agency Construction Corp., by its attorneys, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, answering the Verified Complaint herein (the "Complaint"), alleges and responds as follows:

1.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 1 of the Complaint.

2.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 2 of the Complaint.

3.     Admits the allegations set forth in paragraph 3 of the Complaint.

4.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 4 of the Complaint.

5.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 5 of the Complaint.

6.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 6 of the Complaint.

7.      Admits the allegations set forth in paragraph 7 of the Complaint and respectfully refers this Court to the documents referenced therein for their true and complete meaning, content and intent at the time of trial of this action.

8.      Admits the allegations set forth in paragraph 8 of the Complaint and respectfully refers this Court to the documents referenced therein for their true and complete meaning, content and intent at the time of trial of this action.

9.      Admits the allegations set forth in paragraph 9 with respect to Agency entering into a written subcontract and respectfully refers this Court to the documents referenced therein for their true and complete meaning, content and intent at the time of trial of this action.

10.      Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 10 of the Complaint.

11.      Admits the allegations set forth in paragraph 11 of the Complaint with respect to submitting certain change orders and otherwise denies the allegations set forth therein.

12.      Denies the allegations set forth in paragraph 12 of the Complaint.

13.      Admits the allegations set forth in paragraph 13 with respect to receiving certain invoices and respectfully refers this Court to the documents referenced therein for their true and compete meaning, content and intent at the time of trial of this action and denies knowledge or information sufficient to form a belief as to whether the referenced work was completed.

14.      Admits the allegations set forth in paragraph 14 of the Complaint with respect to the payment in the sum of $70,335 and otherwise denies knowledge or information sufficient to form a belief as to the allegations set forth therein.

15.      Denies the allegations set forth in paragraph 15 of the Complaint.

16.     Admits the allegations set forth in paragraph 16 of the Complaint with respect to terminating the Plaintiff at the direction of the United States Post Office and respectfully refers this Court to the documents referenced therein for their true and complete meaning, content and intent at the time of trial of this action.

17.     Admits the allegations set forth in paragraph 17 of the Complaint that no other written termination notice was provided to Plaintiff and otherwise denies the allegations set forth in this paragraph.

18.     Denies the allegations set forth in paragraph 18 of the Complaint.

19.     Denies the allegations set forth in paragraph 19 of the Complaint.

20.     Denies the allegations set forth in paragraph 20 of the Complaint.

21.     Denies the allegations set forth in paragraph 21 of the Complaint.

22.     Denies the allegations set forth in paragraph 22 of the Complaint.

23.     Denies the allegations set forth in paragraph 23 of the Complaint.

24.     Denies the allegations set forth in paragraph 24 of the Complaint.

25.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 25 of the Complaint.

26.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 26 of the Complaint and respectfully refers this Court to the documents referenced therein for their true and complete content, meaning and intent the time of trial of this action.

27.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 27 of the Complaint and denies that Plaintiff is due payment.

28.     Denies the allegations set forth in paragraph 28 of the Complaint .

## COUNT ONE

29.    Defendant repeats, realleges, and reasserts the prior responses as is fully set forth at length herein.

30.    Denies allegations set forth in paragraph 30 of the Complaint.

31.    Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 31 of the Complaint with respect to plaintiff being entitled to any additional payment.

32.    Denies the allegations set forth in paragraph 32 of the Complaint that any further payment is due.

33.    Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 33 of the Complaint and otherwise denies that plaintiff is entitled to any additional payment.

34.    Denies the allegations set forth in paragraph 34 of the Complaint.

## COUNT TWO

35.    Defendant repeats, realleges, and reasserts the prior responses as is fully set forth at length herein.

36.    Denies the allegations set forth in paragraph 36 of the Complaint.

37.    Denies the allegations set forth in paragraph 37 of the Complaint to the extent that plaintiff alleges any additional payment is due.

38.    Denies the allegations set forth in paragraphs 38 of the Complaint.

39.    Denies the allegations set forth in paragraphs 39 of the Complaint.

### COUNT THREE

40.     Defendant repeats, realleges, and reasserts the prior responses as is fully set forth at length herein.

41.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 41 of the Complaint.

42.     Denies the allegations set forth in paragraph 42 of the Complaint to the extent Plaintiff alleges that it is due further payment.

43.     Denies the allegations set forth in paragraph 43 of the Complaint.

### COUNT FOUR

44.     Defendant repeats, realleges, and reasserts the prior responses as is fully set forth at length herein.

45.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 45 of the Complaint.

46.     Denies the allegations set forth in paragraph 46 of the Complaint with respect to plaintiff being entitled to any additional payment of the Complaint.

47.     Denies the allegations set forth in paragraph 47 of the Complaint.

### COUNT FIVE

48.     Defendant repeats, realleges, and reasserts the prior responses as is fully set forth at length herein.

49.     Admits the allegations set forth in paragraph 49 of the Complaint that certain work, labor and services were provided for which Plaintiff was compensated in full.

50.     Denies the allegations set forth in paragraph 50 of the Complaint.

51.     Denies the allegations set forth in paragraph 51 of the Complaint.

## COUNT SIX

52.    Defendant repeats, realleges, and reasserts the prior responses as is fully set forth at length herein.

53.    Denies the allegations set forth in paragraphs 53 of the Complaint.

54.    Denies the allegations set forth in paragraphs 54 of the Complaint.

55.    Denies the allegations set forth in paragraphs 55 of the Complaint.

56.    Denies the allegations set forth in paragraph 56 of the Complaint to the extent that Plaintiff alleges it is entitled to any additional payment.

57.    Denies the allegations set forth in paragraph 57 of the Complaint.

## COUNT SEVEN

58.    Defendant repeats, realleges, and reasserts the prior responses as is fully set forth at length herein.

59.    Denies the allegations set forth in paragraph 59 of the Complaint.

60.    Denies the allegations set forth in paragraph 60 of the Complaint.

61.    Denies the allegations set forth in paragraph 61 of the Complaint.

62.    Denies the allegations set forth in paragraph 62 of the Complaint.

63.    Denies the allegations set forth in paragraph 63 of the Complaint.

64.    Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 64 of the Complaint and respectfully refers this Court to the documents referenced therein for their true and complete content, meaning and intent at the time of trial of this action and otherwise denies that no claim has been made against Plaintiff's liability carrier.

65.    Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 65 of the Complaint.

66.     Denies the allegations set forth in paragraph 66 of the Complaint.

67.     Denies the allegations set forth in paragraph 67 of the Complaint.

68.     Denies the allegations set forth in paragraph 68 of the Complaint.

## AS AND FOR A FIRST SEPARATE
## AND DISTINCT AFFIRMATIVE DEFENSE

69.     Plaintiff's claims are subject to offset by reason of the damages caused to this answering Defendant by Plaintiff's careless, reckless and/ or negligent acts at the Mott Haven Project.

## AS AND FOR A SECOND SEPARATE
## AND DISTINCT AFFIRMATIVE DEFENSE

70.     Plaintiff's claims are barred by reason of payment of all sums due and owing pursuant to the work, labor and services provided at the Mott Haven Project.

## AS AND FOR A THIRD SEPARATE
## AND DISTINCT AFFIRMATIVE DEFENSE

71.     Plaintiff's claims are barred in whole or in part by reason of not having completed the work at the Mott Haven Project.

## AS AND FOR A FOURTH SEPARATE
## AND DISTINCT AFFIRMATIVE DEFENSE

72.     Plaintiff's claims are barred in whole or in part by reason of Plaintiff's proper termination from the Mott Haven Project as of May 18, 2007.

## AS AND FOR A FIFTH SEPARATE
## AND DISTINCT AFFIRMATIVE DEFENSE

73.     Plaintiff's claims are barred by reason of the application of the doctrine of unclean hands in that Plaintiff's culpable conduct caused Plaintiff to be terminated from the Mott Haven Project.

## AS AND FOR A SIXTH SEPARATE
## AND DISTINCT AFFIRMATIVE DEFENSE

74.    Plaintiff's claims are premature pursuant to paragraph ELEVENTH of the contract

between Plaintiff and this answering defendant that requires final settlement of financial matters

between said parties be deferred until resolution of claims arising out of Plaintiff's negligence.

## AS AND FOR AGENCY CONSTRUCTION'S COUNTERCLAIM

75.    Agency Construction Corp. ("Agency") brings these counterclaims against J.

Scaduto & Son, Inc. ("Scaduto") to recover damages incurred by Agency to remediate the

physical damage to the Mott Haven Post Office, 517 East 139th Street, Bronx, New York

resulting from a certain fire on May 12, 2007. Upon information and belief, the fire was caused

or contributed to by the careless, reckless and/or negligent acts of Scaduto.

## THE PARTIES

76.    Agency was and is at all times hereafter mentioned a corporation duly formed and

existing by virtue of the laws of the State of New York with offices located at 526 Fayette

Avenue, Mamaroneck, New York and is engaged in the commercial construction business.

77.    Upon information and belief, J. Scaduto & Son, Inc. was and is a corporation duly

formed and existing by virtue of the laws of the State of New York with offices located at 1536

Southern Boulevard, Building # 1, Bronx, New York and is engaged in the roofing business.

## JURISDICTION

78.    Jurisdiction is vested in this Court under 28 U.S.C. 1367(a) pursuant to the

Court's ancillary jurisdiction over counterclaims.

## GENERAL ALLEGATIONS

79.     On or about September 29, 2006, Agency entered into a contract with the United States Postal Service to provide general construction work, labor and services at the Mott Haven Post Office, 517 East 139th Street, Bronx, New York (the "Prime Contract").

80.     In connection with its performance under the Prime Contract, Agency entered into subcontract with Scaduto to perform certain roofing work at the subject property ("Subcontract") and pursuant to the Subcontract, all terms and conditions of the Prime Contract were deemed incorporated therein.

81.     On or about May 12, 2007, a fire occurred at the Mott Haven Post Office resulting in extensive property damage (the "fire").

82.     Pursuant to two separate incident reports issued by the Fire Department of New York, dated May 25, 2007 and June 18, 2007, respectively, the area of origin of the fire was the roof at the Mott Haven Project and equipment owned and operated by Scaduto know as a "tarpot, tar kettle."

83.     At the time of the fire, Scaduto was the only party present on the roof where the fire originated and exercised complete dominion and control over said roof at such time and on such date.

84.     Pursuant to the terms of Prime Contract, Agency, as general contractor, was required to expend work, labor and services, together with substantial financial resources to remediate the damage caused by the fire.

## AS AND FOR AGENCY CONSTRUCTION CORP.'S FIRST COUNTERCLAIM
### (Negligence)

85.     Agency repeats, reasserts and realleges the allegations set forth in paragraphs 75 through 84 hereof as if fully set forth at length herein.

86. The fire at the Mott Haven Post Office located at 517 East 139th Street, Bronx, New York was caused by or contributed to by the careless, reckless and/ or negligence acts of Scaduto its agents, servants or employees.

87. The fire resulted in extensive property damage.

88. Pursuant to the terms of the Prime Contract, Agency was obligated to remediate the property damage to the Mott Haven Post Office and was required to expend work, labor and services together with financial resources to do so.

89. By reason of the foregoing, Agency has been damaged in an amount to be determined at the time of trial of this action but in no event less than the sum of SEVEN HUNDRED THOUSAND DOLLARS ($700,000.00).

## AS AND FOR AGENCY CONSTRUCTION CORP.'S SECOND COUNTERCLAIM
### (Breach of Contract/ Indemnity)

90. Agency repeats, reasserts and realleges the allegations set forth in paragraphs 75 through 89 hereof as is fully set forth at length herein.

91. Pursuant to paragraph ELEVENTH of the Subcontract, Scaduto agreed, in relevant part, to "protect and indemnify the said Contractor [Agency] against any loss or damage suffered by any one through the negligence of the Sub-contractor [Scaduto], or those employed by him or his agent or servants; he shall bear any expense which the Contractor [Agency] may have by reason thereof, or on account of being charged therewith;..."

92. Agency has suffered loss and damage by reason of Scaduto's negligence that resulted in the May 12, 2007 fire, aforementioned, and Agency's remediation of same.

93. Agency has demanded that Scaduto honor the terms of the Subcontract and indemnify and make Agency whole, and hereby continues said demand, but Scaduto has failed and refused to do same.

94.    By reason of the foregoing, Agency has been damaged in an amount to be

determined at the time of trial of this action but in no event less than the sum of SEVEN

HUNDRED THOUSAND DOLLARS ($700,000.00).

WHEREFORE, Agency Construction Corp. demands judgment: (a) dismissing the

complaint in its entirety; (b) on the first counterclaim in a sum to be determined at the time of

trial of this action but in no event less that the sum of SEVEN HUNDRED THOUSAND

DOLLARS ($700,000.00); (c) on the second counterclaim in a sum to be determined at the time

of trial of this action but in no event less than the sum of SEVEN HUNDRED THOUSAND

DOLLARS ($700,000.00); and (d) all together with such other and further relief as to this Court

is deemed to be just and proper.

Dated: White Plains, New York
       June 12, 2008

                                    DelBello Donnellan Weingarten
                                    Wise & Wiederkehr, LLP
                                    Attorneys for Defendant
                                    Agency Construction Corp.

                                    By:_____
                                    Evan Wiederkehr (EW9488)
                                    One North Lexington Avenue
                                    White Plains, New York  10601
                                    (914)  681-0200

To:    Paul A. Montuori, Esq.
       Law Offices of Paul A. Montuori, P.C.
       Attorney for Plaintiff
       265 Post Avenue, Suite 270
       Westbury, New York 11590
       (516) 338-4714

       Liberty Mutual Insurance Company
       450 Plymouth Road, Suite 400
       Plymouth Meeting, PA 19462

## VERIFICATION

STATE OF NEW YORK          )
                           )  ss:
COUNTY OF WESTCHESTER      )

Gregory M. Masone, being duly sworn says: I am President of Agency Construction Corp., one of the named defendants in the action herein. I have read the annexed Verified Answer, know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

GREGORY M. MASONE

Sworn to before me this
_11_ day of June, 2008

NOTARY PUBLIC

NOTARY PUBLIC
Gregory Carl Masone
State of New York
County of Westchester
No. 01MA5083255
Exp. 8/11/ ⊙9

1240903
50000660-021

**Exhibit C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA  for the use
and benefit of J. SCADUTO & SON, INC.,

                      Plaintiff,

    -against-

LIBERTY MUTUAL INSURANCE CO. and
AGENCY CONSTRUCTION CORP.,

                   Defendants.
-----------------------------------------------------------------X

08 CV 01885 (EGL)


ANSWER

Defendant, Liberty Mutual Insurance Company (Liberty), by counsel, serves this Answer to the Amended Complaint (the Complaint) of plaintiff, United States of America for the use and benefit of J. Scaduto & Son, Inc. (Scaduto).

    1.     Liberty denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint.

    2.     Liberty admits the allegations in Paragraph 2 of the Complaint.

    3.     Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint.

    4.     Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations and legal conclusions in Paragraph 4 of the Complaint.

    5.     Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations and legal conclusions in Paragraph 5 of the Complaint.

    6.     Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations and legal conclusions in Paragraph 6 of the Complaint.

7.    Upon information and belief, Liberty admits the allegations in Paragraph 7 of the Complaint, except that Liberty lacks knowledge or information sufficient to form a belief as to whether the copy of the Contract between defendant, Agency Construction Corp. (Agency) and the Unite States Postal Service (the Contract) attached to the Complaint is a true and correct copy.

8.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations and in Paragraph 8 of the Complaint, except admits that it issued labor and material payment bond number 015-025-053 (the Bond), and respectfully refers the Court to the Bond for its express terms and conditions.

9.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations and legal conclusions in Paragraph 9 of the Complaint.

10.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint.

11.    Liberty lacks knowledge of information sufficient to form a belief as to the truth of the allegations in Paragraph 11 of the Complaint.

12.    Liberty denies the allegations in Paragraph 12 of the Complaint.

13.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint.

14.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 of the Complaint.

15.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint.

16.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint.

17.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint.

18.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint.

19.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint.

20.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint.

21.    Upon information and belief, Liberty denies the allegations in Paragraph 21 of the Complaint.

22.    Upon information and belief, Liberty denies the allegations in Paragraph 22 of the Complaint.

23.    Liberty lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 23 of the Complaint, and respectfully refers the Court to the subcontract and Contract for their express terms and conditions.

24.    Liberty denies the allegations in Paragraph 24 of the Complaint.

25.    Liberty lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 25 of the Complaint.

26.    Liberty lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 26 of the Complaint.

27.    Liberty denies the allegations in Paragraph 27 of the Complaint.

28.    Liberty denies the allegations in Paragraph 28 of the Complaint.

29.    In response to Paragraph 29 of the Complaint, Liberty repeats and realleges each of its responses in Paragraphs 1 through 28 of this Answer.

30.    Upon information and belief, Liberty denies the allegations in Paragraph 30 of the Complaint.

31.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint.

32.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Complaint.

32 [sic].    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 [sic] of the Complaint.

33.    Liberty denies the allegations in Paragraph 33 of the Complaint.

34.    Liberty denies the allegations in Paragraph 34 of the Complaint.

35.    In response to Paragraph 35 of the Complaint, Liberty repeats and realleges each of its responses in Paragraphs 1 through 34 of this Answer.

36.    Upon information and belief, Liberty denies the allegations in Paragraph 36 of the Complaint.

37.    Upon information and belief, Liberty denies the allegations in Paragraph 37 of the Complaint.

38.    Upon information and belief, Liberty denies the allegations in Paragraph 38 of the Complaint.

39.    Upon information and belief, Liberty denies the allegations in Paragraph 39 of the Complaint.

40.    In response to Paragraph 40 of the Complaint, Liberty repeats and realleges each of its responses in Paragraphs 1 through 39 of this Answer.

41.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 of the Complaint.

42.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Complaint.

43.    Upon information and belief, Liberty denies the allegations in Paragraph 43 of the Complaint.

44.    In response to Paragraph 44 of the Complaint, Liberty repeats and realleges each of its responses in Paragraphs 1 through 43 of this Answer.

45.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 of the Complaint.

46.    Liberty lacks knowledge of information sufficient to form a belief as to the truth of the allegations in Paragraph 46 of the Complaint.

47.    Liberty denies the allegations in Paragraph 47 of the Complaint.

48.    In response to Paragraph 48 of the Complaint, Liberty repeats and realleges each of its responses in Paragraphs 1 through 47 of this Answer.

49.    Liberty lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 of the Complaint.

50.    Upon information and belief, Liberty denies the allegations in Paragraph 50 of the Complaint.

51.    Upon information and belief, Liberty denies the allegations in Paragraph 51 of the Complaint.

52.    In response to Paragraph 52 of the Complaint, Liberty repeats and re2alleges each of its responses in Paragraphs 1 through 51 of this Answer.

53.    Upon information and belief, Liberty denies the allegations in Paragraph 53 of the Complaint.

54.    Liberty denies the allegations in Paragraph 54 of the Complaint and respectfully refers the Court to the Bond for its express terms and conditions.

55.    Liberty denies the allegations in Paragraph 55 of the Complaint.

56.    Liberty denies the allegations in Paragraph 56 of the Complaint.

57.    Liberty denies the allegations in Paragraph 57 of the Complaint.

58.    In response to Paragraph 58 of the Complaint, Liberty repeats and realleges each of its responses in Paragraphs 1 through 57 of this Answer.

59.    Liberty denies the allegations in Paragraph 59 of the Complaint.

60.    Liberty denies the allegations in Paragraph 60 of the Complaint.

61.    Liberty denies the allegations in Paragraph 61 of the Complaint.

62.    Liberty denies the allegations in Paragraph 62 of the Complaint.

63.    Liberty denies the allegations in Paragraph 63 of the Complaint.

64.    Liberty lacks knowledge of information sufficient to form a belief as to the allegations in Paragraph 64 of the Complaint.

65.    Liberty denies the allegations in Paragraph 65 of the Complaint.

66.    Liberty denies the allegations in Paragraph 66 of the Complaint.

67.    Liberty denies the allegations in Paragraph 67 of the Complaint.

68.    Liberty denies the allegations in Paragraph 68 of the Complaint.

## FIRST DEFENSE

69.    The Complaint fails to state a cause of action against Liberty upon which relief can be granted.

## SECOND DEFENSE

70.    Upon information and belief, Scaduto is estopped from asserting the claims asserted in the Complaint.

## THIRD DEFENSE

71.    Upon information and belief, Scaduto has waived the claims asserted in the Complaint, including, but not limited to, by failing to comply with conditions precedent under the Subcontract, Bond, controlling law and by its own breaches of the Subcontract.

## FOURTH DEFENSE

72.    Upon information and belief, Scaduto has not been damaged in the amount, or to the extent, alleged in the Complaint, if at all.

## FIFTH DEFENSE

73.    Upon information and belief, Scaduto has failed to mitigate its damages, if any.

## SIXTH DEFENSE

74.    Liberty asserts, on its own behalf, all of the defenses available to its principal, Agency.

### SEVENTH DEFENSE

75.    Upon information and belief, Liberty is entitled to offset against any amounts owed by Scaduto to Agency as a result of Scaduto's breach of the Subcontract, and back charges to Scaduto by Agency for costs incurred by Agency to complete and/or correct Scaduto's incomplete and/or defective work which exceed the Subcontract balance.

### EIGHTH DEFENSE

76.    Upon information and belief, Scaduto's claims are barred, in whole or in part, based on Scaduto's breach of the Subcontract.

### REQUEST FOR RELIEF

Based on the above, Liberty requests that the Complaint be dismissed in its entirety and that Liberty be awarded whatever additional relief the Court deems appropriate, including costs of court and counsel fees.

Dated:  Garden City, New York
        June 23, 2008

                          LIBERTY MUTUAL
                          INSURANCE COMPANY


                   By: _____
                          Carolyn K. Fiorello


Christopher J. Sheehy (CS-1706)
Carolyn K. Fiorello (CF-6105)

WESTERMANN HAMILTON SHEEHY
AYDELOTT & KEENAN, LLP
Garden City Center, Suite 502
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
(516) 794-7500

Counsel for defendant,
Liberty Mutual Insurance Company


TO:    Paul A. Montuori, Esq.
       THE LAW OFFICES OF PAUL A. MONTUORI, P.C.
       265 Post Avenue, Suite 270
       Westbury, New York 11590
       (516) 338-4714

       Counsel for plaintiff,
       The United States of America
       for the use and benefit of J. Scaduto & Son, Inc.

       Evan Wiederkehr, Esq. (EW-9488)
       DELBELLO DONNELLAN WEINGARTEN
         WISE & WIEDERKEHR, LLP
       One North Lexington Avenue
       White Plains, New York 10601
       (914) 681-0200

       Counsel for defendant,
       Agency Construction Corp.

ANSWER - PAGE 9



# Facilities Department

authority to use property provided under any other contract or lease, which property the Postal Service had agreed in the contract to make available for the performance of this contract, the Contracting Officer, upon the contractor's written request, or if substitution causes a decrease in the cost of performance, on the Contracting Officer's own initiative, will equitably adjust any contractual provisions affected by the decrease, substitution, or withdrawal, in accordance with the "Changes" clause.

e.  The contractor must maintain and administer a program or system acceptable to the Contracting Officer for the utilization, maintenance, repair, protection, and preservation of Postal Service property until it is disposed of in accordance with this clause.

f.  The Postal Service, and any persons designated by it, must at reasonable times have access to premises where any Postal Service property is located for the purpose of inspecting it.

g.  Within 45 days after Notice to Proceed with a construction contract, the contractor must submit a schedule to the Contracting Officer, in an acceptable format verifying quantities, if appropriate, and giving desired dates for delivery of items and property furnished by the Postal Service. Approved dates of delivery must be confirmed by the Contracting Officer in writing. Approved dates of delivery must be confirmed by the contractor thirty calendar days prior to scheduled delivery. The contractor must submit a written report to the Contracting Officer within 48 hours after receipt, noting any shortages or damage to the Postal Service furnished property.

h.  In a construction contract, if Postal Service furnished equipment is to be installed and is not on the construction site, the Postal Service will make separate arrangements to transport equipment to the site. Any costs for labor associated with loading or unloading this Postal Service furnished equipment will be negotiated.

i.  Upon completing this contract, the contractor must follow the Contracting Officer's instructions regarding the disposition of all Postal Service property not consumed in performing this contract or previously returned to the Postal Service. The contractor must prepare for shipment, deliver f.o.b. origin, or dispose of the Postal Service property, as directed or authorized by the Contracting Officer. The net proceeds of any such disposal will be credited to the contract price or will be paid to the Postal Service as directed by the Contracting Officer.

## B.509    OTHER CONTRACTS (CLAUSE B-45) (JANUARY 1997)

The Postal Service may award other contracts for additional work, and the supplier must cooperate fully with the other suppliers and Postal Service employees, and carefully fit in its own work as may be directed by the Contracting Officer. The supplier must not commit or permit any act that will interfere with the performance of work by any other supplier or by Postal Service employees.

## B.510    POSTAL SERVICE PROPERTY FURNISHED "AS IS" (CLAUSE 2-14) (JANUARY 1997)

a.  The Postal Service makes no warranty whatsoever with respect to Postal Service property furnished "as is" except that the property is in the same condition as when placed at the f.o.b. point specified in the solicitation as when inspected by the supplier pursuant to the solicitation or (if not inspected by the supplier) as when last available for inspection under the solicitation.

b.  The supplier may repair any property made available to the supplier "as is." Repair will be at the supplier's expense except as otherwise provided in this clause. Such property may be modified at the supplier's expense, but only with the written permission of the Contracting Officer. Any repair or modification of property furnished "as is" does not affect the title of the Postal Service.

c.  If there is any change (between the time inspected or last available for inspection under the solicitation to the time placed on board at the location specified in the solicitation) in the condition of Postal Service property furnished "as is" that will adversely affect the supplier, the supplier must, upon receipt of the property, notify the Contracting Officer of that fact, and (as directed by the Contracting Officer) either (1) return the property at the expense of the Postal Service or otherwise dispose of it, or (2) effect repairs to return it to the condition it was in when inspected under the solicitation, or (if not inspected) as it was when last available for inspection under the solicitation. Upon completion of (1) and (2) above, the Contracting Officer, upon written request from the supplier, will equitably adjust any contractual provisions affected by the return, disposition, or repair, in accordance with the "Changes" clause. The foregoing provisions for adjustment are exclusive, and the Postal Service is not liable for any delivery of Postal Service property furnished "as is" in a condition other than that in which it was originally offered.

d.  Except as otherwise provided in this clause, Postal Service property furnished "as is" is governed by the "Postal Service Property" clause of this contract.

## B.511    RECORDS OWNERSHIP (CLAUSE 4-7) (JANUARY 1997)

Notwithstanding any state law providing for retention of rights in the records, the supplier agrees that the Postal Service may, at its option, demand and take without additional compensation all records relating to the services provided under this agreement. The supplier must turn over all such records upon request but may retain copies of documents produced by the supplier

## B.512    RIGHTS IN COMPUTER SOFTWARE (CLAUSE 8-9) (JANUARY 1997)

a.  Definitions

(1)  Computer Software: Computer programs, computer data bases, and their documentation.

(2)  Form, Fit, and Function Data: Data identifying origin, functional characteristics, and performance requirements but specifically excludes the source code, algorithm, process, formulas, and machine-level flow charts of the computer software.

(3)  Restricted Computer Software: Computer software developed at private expense that is a trade secret, is commercial or financial and confidential or privileged, or is published copyrighted computer software, including minor modifications of this computer software.

(4)  Restricted Rights.: The rights of the Postal Service in restricted computer software, as set forth in a "Restricted Rights Notice" as provided in paragraph g below, or as otherwise may be provided in a collateral agreement incorporated in and made part of this contract.

(5)  Unlimited Rights: The rights of the Postal Service in computer software to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform and display publicly, in any manner and for any purpose, and to have or permit others to do so.

b.  Allocation of Rights. Except as provided in paragraph c below regarding copyright, the Postal Service has unlimited rights in:

(1)  Computer software first produced in the performance of this contract (except to the extent that it constitutes minor modifications of computer software that is restricted computer software);

(2)  Form, fit, and function data delivered under this contract; except that all form, fit, and function data describing limited rights data must be delivered with unlimited rights;



# UNITED STATES POSTAL SERVICE

# Facilities Department

(3) All other computer software delivered under this contract, except for restricted computer software provided in accordance with paragraph g below.

c. Copyright

(1)(a)  The prior, express written permission of the Contracting Officer is required to establish claim to copyright in all computer software or other data first produced in the performance of this contract. When making claim to copyright, the supplier must affix the applicable copyright notice of 17 U.S.C. 401. The supplier grants to the Postal Service and others acting on its behalf a paid–up, nonexclusive, irrevocable worldwide license in such copyrighted computer software to reproduce, prepare derivative works, and perform and display the computer software and other data publicly.

(b) If the Postal Service desires to obtain copyright in the computer software first produced in the performance of the contract and permission has not been granted pursuant to c.1(a) above, the Contracting Officer may direct the supplier to establish, or authorize the establishment of, claim to copyright in the computer software and to assign, or obtain the written assignment of, the copyright to the Postal Service or its designated assignee.

(2) The supplier may not, without prior written permission of the Contracting Officer, incorporate in computer software delivered under this contract any computer software not first produced in the performance of this contract containing the copyright notice of 17 U.S.C. 401, unless the supplier identifies the computer software and grants to the Postal Service, or acquires on its behalf at no cost to the Postal Service, a license of the same scope as set forth in c.1.(a) above or as otherwise may be provided in a collateral agreement incorporated in and made part of this contract.

(3) The Postal Service agrees not to remove the supplier's copyright notice placed on computer software pursuant to this paragraph c, and to include such notices on all reproduction of the computer software.

d. Release, Publication, and Use of Computer Software

(1) Unless prior written permission is obtained from the Contracting Officer, or to the extent expressly set forth in this contract, the supplier will not use, release to others, reproduce, distribute, or publish any computer software first produced by the supplier in the performance of the contract.

(2) The supplier agrees that to the extent it receives or is given access to computer software necessary for the performance of this contract that contains restrictive markings, the supplier will treat the computer software in accordance with these markings, unless otherwise specifically authorized in writing by the Contracting Officer.

e. Unauthorized Marking of Computer Software

(1) If any computer software delivered under this contract is marked with the notice specified in paragraph g below and the use of such a notice is not authorized by this clause, or if the computer software bears any other unauthorized restrictive markings, the Contracting Officer may at any time either return the computer software or cancel the markings. The Contracting Officer must afford the supplier at least 30 days to provide a written justification to substantiate the propriety of the markings. Failure of the supplier to timely respond, or to provide written justification, may result in the cancellation of the markings. The Contracting Officer must consider any written justification by the supplier and notify the supplier if the markings are determined to be authorized.

(2) The foregoing procedures may be modified in accordance with Postal Service regulations implementing the Freedom of Information Act (5 U.S.C. 552), if necessary, to respond to a request thereunder. In addition, the supplier is not precluded from bringing a claim in connection with any dispute that may arise as the result of the Postal Service's action to remove any markings on computer software, unless this action occurs as a result of a final disposition of the matter by a court of competent jurisdiction.

f. Omitted or Incorrect Markings

(1) Computer software delivered to the Postal Service without the restricted rights notice authorized by paragraph g below, or the copyright notice required by paragraph c above, will be deemed to have been furnished with unlimited rights, and the Postal Service assumes no liability for the disclosure, use or reproduction of such computer software. However, to the extent the computer software has not been disclosed outside the Postal Service, the supplier may request, within six months (or a longer time approved by the Contracting Officer) after delivery of the computer software, permission to have notices placed on qualifying computer software at the supplier's expense, and the Contracting Officer may agree to do so if the supplier:

(a) Identifies the computer software involved;

(b) Demonstrates that the omission of the notice was inadvertent;

(c) Establishes that the use of the proposed notice is authorized; and

(d) Acknowledges that the Postal Service has no liability with respect to the disclosure, use, or reproduction of any such computer software made before the addition of the notice or relisting from the omission of the notice.

(2) The Contracting Officer may also (a) permit correction, at the supplier's expense, of incorrect notices if the supplier identifies the computer software on which correction of the notice is to be made and demonstrates that the correct notice is authorized, or (b) correct any incorrect notices.

g. Protection of Restricted Computer Software

(1) When computer software other than that listed in subparagraphs b.1 and b.2 above is specified to be delivered under this contract and qualifies as restricted computer software, if the supplier desires to continue protection of such computer software, the supplier must affix the following "Restricted Rights Notice" to the computer software, subject to paragraphs e and f above, in accordance with the Notice:

"RESTRICTED RIGHTS NOTICE

a.  This computer software is submitted with restricted rights under Postal Service Contract No. _____ (and subcontract _____ if appropriate). It may not be used, reproduced, or disclosed by the Postal Service except as provided below or as otherwise stated in the contract.

b.  This computer software may be:

1.  Used or copied for use in or with the computer or computers for which it was acquired, including use at any Postal Service installation at which the computer or computers may be transferred;

*DCFXDCO5 (MAY 2005) FSMWIN 3.0*

 **UNITED STATES POSTAL SERVICE.**

# Facilities Department

2. Used or copied for use in a backup computer if any computer for which it was acquired is inoperative;

3. Reproduced for safekeeping (archives) or backup purposes;

4. Modified, adapted, or combined with other computer software, provided that the modified, adapted, or combined portions of any derivative software incorporating restricted computer software are made subject to the same restricted rights;

5. Disclosed to and reproduced for use by support service suppliers in accordance with 1 through 4 above, provided the Postal Service makes such disclosure or reproduction subject to these restricted rights; and

6. Used or copied for use in or transferred to a replacement computer.

c. Notwithstanding the foregoing, if this computer software is published copyrighted computer software, it is licensed to the Postal Service, without disclosure prohibitions, with the minimum rights set forth in the preceding paragraph.

d. Any other rights or limitations regarding the use, duplication, or disclosure of this computer software are to be expressly stated in, or incorporated in, the contract.

e. This Notice must be marked on any reproduction of this computer software, in whole or in part."

(2) When it is impracticable to include the above Notice on restricted computer software, the following short-form Notice may be used instead, on condition that the Postal Service's rights with respect to such computer software will be as specified in the above Notice unless otherwise expressly stated in the contract.

"RESTRICTED RIGHTS NOTICE
(SHORT FORM)

Use, reproduction, or disclosure is subject to restrictions set forth in Contract No. _____ (and subcontract _____, if appropriate) with _____ (name of supplier and subcontractor)."

h. Subcontracting. The supplier has the responsibility to obtain from its subcontractors all computer software and rights in it necessary to fulfill the supplier's obligations under this contract. If a subcontractor refuses to accept terms affording the Postal Service such rights, the supplier must promptly bring such refusal to the attention of the Contracting Officer and may not proceed with subcontract award without further authorization.

i. Standard Commercial License or Lease Agreements. The supplier unconditionally accepts the terms and conditions of this clause unless expressly provided otherwise in this contract or in a collateral agreement incorporated in and made part of this contract. Thus the supplier agrees that, notwithstanding any provisions to the contrary contained in the supplier's standard commercial license or lease agreement pertaining to any restricted computer software delivered under this contract, and irrespective of whether any such agreement has been proposed before or after issuance of this contract or the fact that such agreement may be affixed to or accompany the restricted computer software upon delivery, the Postal Service has

the rights set forth in this clause to use, duplicate, or disclose any restricted computer software delivered under this contract.

## B. 600   ADMINISTRATIVE ITEMS

B.601   DEFINITION OF TERMS USED IN CONTRACT DOCUMENTS (DESIGN & CONSTRUCTION) (CLAUSE FB-235) (MARCH 1999)

a. Wherever in the contract documents the words "Post Office Department," "Department," "POD," "Post Office," "PO," "US Postal Service," "USPS," or words of like import are used, it must be understood that the "United States Postal Service" is intended.

b. "Contracting Officer" means the person administering this contract on behalf of the Postal Service as defined in the "Authorities and Limitations" letter.

c. The term "Contracting Officer's Representative" (COR), except as otherwise provided in the contract, means the authorized representatives of the Contracting Officer acting within the authority delegated by the Contracting Officer.

d. Subcontracts, except as otherwise provided in this contract, include purchase orders under this contract.

e. Terminology: When used in this contract, the word "must" is the imperative and defines a mandatory activity; the word "will" signifies intent or obligation; and "should" defines a desired but not required activity. "May" is permissive. "May not" and "no (person or thing) may" mean that the act described is prohibited.

f. Wherever in the contract documents "Project Engineer," "Resident Engineer," "Construction Manager," "Supervisory Authority," or other individual or organization is designated, it is understood that on-site representation for the Contracting Officer is intended. The functions and authorities of such an individual or organization are governed by a letter of authorization.

g. Where throughout the text of "Technical Provisions" of the contract documents reference is made to "contractors," "general contractor," "installing contractor," "other contractors," "another contractor," "each contractor," "subcontractor," "site contractor," "this contractor," "supplier" or words of like import are used, it shall be understood that "contractor" is intended. Where certain special contractors are required to meet certain qualifications, obtain certain permits, or provide certain services particular to a specific skill or license, the word "contractor" prefixed by a specialty designation is intended to mean the specialty "subcontractor," e.g., fire protection subcontractor, mechanical or electrical subcontractor.

h. Wherever in design/build contract documents the words "design/build entity," "design/build," "design/build contractor," "contractor," "general contractor," "prime contractor," "supplier" or words of like import are used, it shall be understood that the design/build entity who is responsible for both design and construction of the facility is intended. Where certain special contractors are required to meet specific contract requirements, meet certain qualifications, obtain certain permits, or provide certain services particular to a specific skill or license, the word "contractor" prefixed by a specialty designation is intended to mean the "specialty subcontractor" (e.g. fire protection subcontractor, mechanical or electrical subcontractor).

i. Wherever in design/build construction contract documents the words "architect-engineer," "A/E," "architect," "architect portion of the design/build entity" or words of like import are used, it shall be understood that the design organizational element of the design/build entity, whether an internal part of a design/build contractor or an architect-engineer engaged by, teamed with or joint


**UNITED STATES POSTAL SERVICE.**

# Facilities Department

ventured with the design/build contractor to prepare the construction plans and specifications, is intended.

j. Where "as directed," "as required," "ordered," "prescribed," "approved," "acceptance," or words of similar nature are used, it must be understood that such words refer to actions to be taken, in writing, by the Contracting Officer unless otherwise stated. The words "necessary," "suitable," "equal," or words of like import must mean necessary or equal in the opinion of the Contracting Officer.

k. "Work" must be deemed to consist of all labor and operations, transportation, hoisting, materials, tools, equipment, services, inspections, investigations, coordination and supervision required and / or reasonably necessary to produce the construction required by the contract documents.

l. "Furnish" means the design, fabrication, purchase and delivery to the job site or other destination as directed by the Contracting Officer.

m. "Install or installation" means the act of physically placing, applying, setting, erecting, anchoring, securing, etc., construction materials, equipment, furnishings, appliances, and similar items specified and furnished at the job site. Installation of specified items must be complete in all respects.

n. "Provide" means to furnish and install construction material, equipment, etc., as defined above.

o. The technical specifications may indicate metric units of measurement as a supplement to U.S. customary units. When indicated thus: 1" (25 mm), the U.S. customary unit is specific and the metric unit is non-specific. When not shown with parentheses, the unit is specific. The metric units correspond to the "International System of Units (SI)" and generally follow ASTM E 380, "Standard for Metric Practice."

**B.602    STANDARD REFERENCES (CLAUSE B-55) (JANUARY 1997)**

a. All publications and other documents (such as manuals, handbooks, codes, standards, and specifications) cited in this contract for the purpose of establishing requirements applicable to equipment, materials, or workmanship are hereby incorporated by reference in the contract as fully as if printed and bound with the specifications of this contract, in accordance with the following:

(1) Wherever reference is made to standard Specifications of the Public Buildings Service, Interim Federal Specifications, Interim Amendments to Federal Specifications, Interim Federal Standards, or Interim Amendments to Federal Standards, the supplier must comply with the requirements set forth in the issue or edition identified in this contract except as modified or as otherwise provided in the specifications.

(2) Wherever reference is made to any document other than those specified in subparagraph a.1 above, the supplier must comply with the requirements set forth in the edition specified in this contract or, if not specified, the latest edition or revision, as well as the latest amendment or supplement in effect on the date of the solicitation except as modified by the specifications of this contract.

b. Federal Specifications, Federal Standards, and Standard Specifications of the Public Buildings Service can be obtained from the Business Service Center at any GSA Regional Office. Inquiries regarding "Commercial Standards," "Product Standards," and "Simplified Practice Recommendations" should be addressed to:

> OFFICE OF PRODUCT STANDARDS
> NATIONAL BUREAU OF STANDARDS
> WASHINGTON DC 23234–0001

Publications of associations referred to in the specifications can be obtained directly from the associations.

c. Upon request, the supplier must make available at the job site, within a reasonable time, a copy of any trade manual or standard incorporated by reference in this contract that governs quality and workmanship.

**B.603    GRATUITIES OR GIFTS (CLAUSE 1-5) (JANUARY 1997)**

a. The Postal Service may terminate this contract for default if, after notice and a hearing, the Postal Service Board of Contract Appeals determines that the supplier or the supplier's agent or other representative:

(1) Offered or gave a gratuity or gift (as defined in 5 CFR 2635) to an officer or employee of the Postal Service; and

(2) Intended by the gratuity or gift to obtain a contract or favorable treatment under a contract.

b. The rights and remedies of the Postal Service provided in this clause are in addition to any other rights and remedies provided by law or under this contract.

**B.604    CONTINGENT FEES (CLAUSE 1-6) (JANUARY 1997)**

a. The supplier warrants that no person or selling agency has been employed or retained to solicit or obtain this contract for a commission, percentage, brokerage, or contingent fee, except bona fide employees or bona fide, established commercial or selling agencies employed by the supplier for the purpose of obtaining business.

b. For breach or violation of this warranty, the Postal Service has the right to annul this contract without liability or to deduct from the contract price or otherwise recover the full amount of the commission, percentage, brokerage fee, or contingent fee.

**B.605    ORGANIZATIONAL CONFLICTS OF INTEREST (CLAUSE 1-8) (JANUARY 1997)**

Note: The following clause will be included in any contract resulting from this solicitation unless an alternative is submitted and negotiated to the satisfaction of the Postal Service.

a. Warranty Against Existing Conflicts of Interest:  The supplier warrants and represents that, to the best of its knowledge and belief, it does not presently have organizational conflicts of interest that would diminish its capacity to provide impartial, technically sound, objective research assistance or advice, or would result in a biased work product, or might result in an unfair competitive advantage, except for advantages flowing from the normal benefits of performing this agreement.

b. Restrictions on Contracting:  The supplier agrees that during the term of this agreement, any extensions thereto, and for a period of two years thereafter, neither the supplier nor its affiliates will perform any of the following:

(1) Compete for any Postal Service contract for production of any product for which the supplier prepared any work statement or specifications or conducted any studies or performed any task under this agreement.

(2) Contract (as the provider of a component or the provider of research or consulting services) with any offeror competing for any Postal Service contract for production of any product for which the supplier prepared any work statements or specifications or conducted any studies or performed any task under this agreement.

(3) Contract (as the provider of a component or the provider of research or consulting services) with the offeror which wins award of a Postal Service contract for production of any product for which the supplier prepared any work statement or specifications or conducted any studies or performed any task under this agreement.


**UNITED STATES**
**POSTAL SERVICE**

# Facilities Department

c. Possible Future Conflicts of Interest: The supplier agrees that, if after award of this agreement, it discovers any organizational conflict of interest that would diminish its capacity to provide impartial, technically sound, objective research assistance or advice, or would result in a biased work product, or might result in an unfair competitive advantage, except advantages flowing from the normal benefits of performing this agreement, the supplier will make an immediate and full disclosure in writing to the Contracting Officer, including a description of the action the supplier has taken or proposes to take to avoid, eliminate, or neutralize this conflict of interest.

d. Nondisclosure of Confidential Material:

(1) The supplier recognizes that, in performing this agreement, it may receive confidential information. To the extent that and for as long as the information is confidential, the supplier agrees to take the steps necessary to prevent its disclosure to any third party without the prior written consent of the Contracting Officer.

(2) The supplier agrees to indoctrinate its personnel who will have access to confidential information as to the confidential nature of the information, and the relationship under which the supplier has possession of this information.

(3) The supplier agrees to limit access to the confidential information obtained, generated, or derived, and to limit participation in the performance of orders under this agreement to those employees whose services are necessary for performing them.

e. Postal Service Remedy: If the supplier breaches or violates any of the warranties, covenants, restrictions, disclosures or nondisclosures set forth under this clause, the Postal Service may terminate this agreement, in addition to any other remedy it may have for damages or injunctive relief.

## B. 700   SUBCONTRACTING

B.701   SUBCONTRACTOR COST OR PRICING DATA (CLAUSE 5-2) (JANUARY 1997)

a. Before awarding any subcontract or pricing any subcontract modification, the supplier must require the subcontractor to submit cost or pricing data whenever cost or pricing data are required by chapter 5 of the USPS Interim Purchasing Guidelines (May 2005).

b. If the subcontractor is required to submit cost or pricing data under paragraph a above, then the supplier must insert the substance of this clause, including this paragraph b, in the subcontract.

B.702   SUBCONTRACTS (CONSTRUCTION) (CLAUSE B-46) (AUGUST 2001)

a. Nothing in this contract may be construed to create any contractual relationship between any subcontractors, and the Postal Service. The divisions or sections of the specifications are not intended to control the contractor in dividing the work among subcontractors or to limit the work performed by any trade.

b. The contractor is responsible to the Postal Service for acts and omissions of its own employees and of subcontractors and their employees. The contractor is also responsible for the coordination of the work of the trades, subcontractors, or suppliers.

c. The Postal Service will not undertake to settle any differences among the contractor, subcontractors, or suppliers.

## B. 800   PROTECTION OF PERSONS AND PROPERTY

B.801   ACCIDENT PREVENTION (CLAUSE B-38) (MARCH 2001)

a. All construction work on this project must be performed in compliance with the Occupational Safety and Health Act of 1970 and with local or state occupational safety and health regulations enforced by an agency of the locality or state under a plan approved by the U.S. Department of Labor, Occupational Safety and Health Administration (OSHA). Where requirements are different or in conflict, the more stringent requirement will apply.

b. The contractor will maintain an accurate record of exposure data and all accidents incidental to work performed under this contract resulting in death, traumatic injury, occupational disease, or damage to property, material, supplies, or equipment. The contractor must submit regular project safety reports, exposure data, and accident reports as prescribed by the Contracting Officer.

c. Health and Safety Plans are required as follows:

(1) Prior to commencing on-site work, the contractor must submit to the Contracting Officer, in triplicate, a Health and Safety Plan designed to provide a system by which hazards on the project site will be controlled to minimize or eliminate occupational injuries or illnesses during performance of the contract.

(2) The Health and Safety Plan must state that all subcontractors and suppliers are required to comply with the contractor's project safety rules and requirements issued under the authority of that program.

(3) The Health and Safety Plan must identify, by name, the contractor's representative responsible for the execution of the project safety program. The contractor's project safety representative must have the express written authority from the contractor to stop work, to abate hazardous conditions or unsafe practices, and to eject any contractor, subcontractor, or vendor employees from the project site for failure to comply with safety requirements.

(4) When conducting work at existing postal facilities, the Health and Safety Plan must include the precautionary measures to be taken to protect postal employees and the public.

d. The authority, responsibilities, and duties of the contractor's project safety representative must be incorporated as part of the written Health & Safety Plan. For projects over $5 million the project safety representative shall have no other responsibilities other than safety. The safety responsibilities include, but are not limited to, conducting subcontractor construction safety program reviews, conducting employee safety orientation training, conducting weekly safety meetings, conducting daily site safety inspections, auditing subcontractor safety compliance, and preparing required periodic and special safety reports.

e. In addition to the general requirements of Clause B-28 Health and Safety Standards, the supplier (architect-engineer, building contractor, or design/build entity) specifically must comply with applicable OSHA requirements concerning Hazard Communications Standards. Details of the supplier's hazard communications program shall be included in the Health & Safety Plan required by "Division 1 General Requirements" found in Section B.1500- Attachments.

B.802   HEALTH AND SAFETY STANDARDS (CLAUSE B-28) (MARCH 2001)

a. In performing this contract, the contractor must:

1. Comply with applicable Occupational Safety and Health Standards promulgated pursuant to the authority of the Occupational Safety and Health Act of 1970 (OSHA).



# UNITED STATES POSTAL SERVICE.

## Facilities Department

2. Comply with any other applicable federal, state, or local regulations governing workplace safety to the extent they do not conflict with a.1 above; however, the more stringent shall apply.

3. Comply with any Postal Service standard unless the OSHA standard contains more rigorous or stringent safety requirements, in which case the OSHA standard governs and takes precedence.

4. Take all other proper precautions to protect the safety and health of the contractor's employees, Postal Service employees, and the public.

b. The contractor must coordinate its use of Postal premises with the installation head or other representative designated by the Contracting Officer. Subjects of this coordination include the designation of work and storage areas; the extent, if any, of use by the contractor of Postal Service tools and equipment; the furnishing by the contractor of appropriate signs and barricades to exclude unauthorized personnel from the work areas and to call attention to hazards and dangers; and other matters relating to the protection of Postal Service employees and property.

c. Materials, supplies, articles, or equipment manufactured or furnished under this contract or order must conform to the Occupational Safety and Health Standards pursuant to the authority of OSHA, and to other safety and health requirements specified in this contract or order. When conducting work on existing facilities, the contractor must provide the Contracting Officer copies of Material Safety Data Sheets (MSDS) for any hazardous material, as defined by OSHA's Hazard Communications Standards, to be used on the job.

d. If no OSHA standard exists, federal or other nationally recognized standards apply. Copies of current Occupational Safety and Health Standards are available from regional and/or area offices of the U.S. Department of Labor, Occupational Safety and Health Administration.

### B.803 · PROTECTION OF THE ENVIRONMENT, EXISTING VEGETATION, STRUCTURES, UTILITIES, & IMPROVEMENTS (CLAUSE B-50) (MARCH 2001)

a. The contractor must perform all work necessary to implement and accomplish a program to prevent environmental pollution during or as a result of construction performed under this contract. As a minimum, the contractor's work must conform to all requirements of applicable federal, state and local law. Requirements of the work must be incorporated in all subcontracts.

b. The contractor must preserve, protect and maintain all existing vegetation (such as trees, shrubs, and grass) and structures on or adjacent to the site of work that are not to be removed. Care must be taken in removing trees authorized by the Contracting Officer for removal, to avoid damage to vegetation that will remain in place. Any trees or other landscape features scarred or damaged by the contractor's equipment or operations must be restored at the contractor's expense. The Contracting Officer decides what method of restoration must be used and whether damaged trees and/or shrubs will be treated or replaced. The contractor shall use guard posts or barriers as necessary to control vehicular traffic passing close to trees and/or shrubs to remain. Areas disturbed, such as temporary roadways or embankments, must be restored to near natural conditions that will permit the growth of vegetation. Disturbed areas must be graded and filled as required, covered with six inches of topsoil and landscaped as per the contract documents.

c. The contractor must protect from damage all existing improvements or utilities at or near the site of the work, the location of which is or should have been known, and must repair or restore any damage to these facilities resulting from failure to comply with the requirements of this contract or to exercise reasonable care in performing the

work. If the contractor fails or refuses to repair such damage promptly, the Contracting Officer may have the necessary work performed and charge the cost to the contractor.

d. No road construction, excavation or embankment construction, including disposal areas, are permitted. The contractor must obtain approval from the Contracting Officer for any temporary roads and embankments not included in project specifications or drawings and restore such areas to original conditions, including appropriate landscaping, upon the completion of work.

e. Monuments, markers and works of art must be protected. Items discovered that have potential historical or archeological interest must be preserved. The contractor must leave the archeological find undisturbed and must immediately report the find to the Contracting Officer so that the proper authority may be notified.

### B.804 ACCESS TO SITE (CLAUSE OB-44) (MARCH 1999)

a. The contractor's access to the site and use of existing roads will be as directed by the Contracting Officer or a designee including issuing vehicle passes for construction and private vehicles.

b. The contractor's attention is directed to Provision 1-3, Contractor Screening Requirements, found elsewhere in this document, regarding the contractor's responsibilities for physical security.

c. Contractor employees shall not carry firearms or other deadly weapons onto any Postal Service construction site or into any facility, including in their personal or construction vehicles. This supercedes any state or local law permitting the carrying of firearms or weapons. Violation of this clause shall be grounds for removal of individuals or contractors from the site or termination for default.

### B.805 USDA QUARANTINED AREAS (CONSTRUCTION) (CLAUSE FB-243) (JUNE 1988)

If the work called for by this contract involves activities in counties quarantined by the Department of Agriculture to prevent the spread of certain plant pests which may be present in the soil, the contractor agrees that all construction equipment and tools to be moved from such counties shall be thoroughly cleaned of all soil residues at the construction site with water under pressure. If this contract involves such a quarantined area, the contractor agrees to comply with the regulations of the Department of Agriculture. The contractor agrees to assure compliance with this obligation by all subcontractors.

### B.806 HANDLING ASBESTOS AND OTHER HAZARDOUS MATERIALS (CLAUSE FB-273) (MARCH 2001)

Prior to the start of the work, the Postal Service will attempt to locate and remove any asbestos insulation, materials containing asbestos, PCB's, lead paint, and other hazardous materials that may be affected by the project. However, notwithstanding performance of this work, the contractor shall fully comply with the following requirements concerning any suspected asbestos and other hazardous materials potentially affected by performance of this work:

(a) The contractor shall assume that all insulation and floor tiles encountered in the performance of the work contains asbestos, unless otherwise advised by the Contracting Officer. Under no circumstances shall the contractor remove, cut, damage, or otherwise disturb any material potentially containing asbestos during the performance of work.

(b) Any questions or ambiguities concerning where asbestos or other hazardous material is located must be brought to the attention of the Contracting Officer immediately.

(c) When asbestos or other hazardous material is identified and requires removal, encapsulation or other protection, such removal, encapsulation or other protection must be performed only by a licensed, independent hazardous material removal contractor approved in writing by the Contracting Officer.


**UNITED STATES POSTAL SERVICE.**

# Facilities Department

**B.807**  *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1*  ELEVATOR WORK-QUALIFICATIONS (CONSTRUCTION) (CLAUSE FB-239) (JUNE 1988)

a. The contractor, or the subcontractor whom the contractor uses for performance of the elevator work, must have had at least three (3) years of successful experience in installing and servicing elevators.

b. In addition, the contractor or its subcontractor must have installed, on at least two prior projects, elevators comparable to those required for this project that have performed satisfactorily under conditions of normal use for a period of not less than one (1) year. To be considered comparable, prior installations must have not less than the same number of elevators operating together in one group as the largest number in any group specified for this project, except that a group of four may be considered comparable to a large group specified for this project.

c. A list of the prior comparable installations by the contractor or its subcontractor, together with the names and addresses of the buildings, the names of the owners or managers, and any other pertinent information required must be submitted promptly upon request of the Postal Service.

d. The names, addresses, experience, and statement of work to be performed by each subcontractor or second-tier subcontractor whom the contractor or the principal subcontractor, as the case may be, will use for performance of minor portions of the installation of elevators must also be submitted promptly upon request of the Postal Service.

e. The Postal Service may reject the proposed elevator subcontractor if it is determined that it has failed to meet the experience requirements, or if it has been found to have an unsatisfactory record of prior elevator installations. In the case of rejection, the contractor must resubmit another name within ten (10) calendar days for renewed consideration.

## B. 900   PAYMENTS

**B.901**   INVOICES (CONSTRUCTION) (CLAUSE B-20) (AUGUST 2001)

a. The supplier's invoices must be submitted before payment can be made.

b. The supplier agrees that submission of an invoice to the Postal Service for payment is a certification that:

(1) Any services being billed for have been performed in accordance with the contract requirements; and

(2) Any supplies for which the Postal Service is being billed have been shipped or delivered in accordance with shipping instructions issued by the Contracting Officer in the quantities shown on the invoice, and that the supplies are in the quantity and of the quality designated in the contract.

c. To ensure proper payment suppliers must furnish all documents required elsewhere in this contract and/or by the Contracting Officer.

**B.902**   PAYMENT (CONSTRUCTION) (CLAUSE B-48) (JUNE 2001)

a. The Postal Service will make progress payments monthly or at more frequent intervals as determined by the contracting officer. Bond costs may be included in the contractor's estimates without proration. Before the first progress payment will be approved, the contractor must prepare a breakdown of the contract price acceptable to the contracting officer. The values in the breakdown will be used for determining progress payments. The contractor's overhead and profit must be prorated through the life of the contract.

b. If the contract price is more than $50,000, material delivered that will be incorporated into the work may be taken into consideration in computing progress payments. Before each payment is made, the contractor must furnish to the contracting officer for on-site or off-site materials proof of the quantity, value and delivery of materials, and deliver title to the materials to the Postal Service (see Clause B-20 for requirements of the invoice). Materials stored "off-site", when the contract price exceeds $50,000, must be stored properly in an insured or bonded warehouse, storage yard, or similar place within 25 miles of the project site or a reasonable distance in excess of 25 miles as approved by the contracting officer.

c. In making progress payments, the contracting officer will ordinarily retain five percent of each progress payments earned. However, if the contracting officer, at any time after 50 percent of the work has been completed, finds that satisfactory progress is being made, the contracting officer may authorize payment in full of all progress payment earned. Also, if the contracting officer considers the amount retained to be in excess of that adequate for the protection of the Postal Service, the contracting officer may release to the contractor all or a portion of the excess whenever the work is substantially complete. On completion and acceptance of each separate building, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made without retention except for warranties, "as-built" drawings, maintenance manuals, certifications, and release of liens.

d. All material and work covered by progress payments will be the sole property of the Postal Service. However, this paragraph d does not (1) relieve the contractor of responsibility for all material and work for which payment has been made or for restoration of any damaged work or (2) waive the right of the Postal Service to require fulfillment of all the contract terms.

e. Before receiving a progress payment or final payment under this contract, the contractor must certify to the contracting officer that payment due suppliers, subcontractors or contractors under contractual arrangements with them has been made from the proceeds of prior payments or will be made in timely fashion from the payment then due the contractor.

f. Upon completion and acceptance of all work, the amount due the contractor under this contract must be paid upon the presentation of a properly executed invoice, after the contractor has furnished the Postal Service with a release of all claims against the Postal Service arising by virtue of this contract, other than claims in stated amounts that must be specifically excepted by the contractor from the operation of the release. If the contractor's claim to amounts payable under the contract has been assigned as provided in the Assignment of Claims clause, a release may also be required of the assignee.

g. The requirements of this clause apply separately to each work order issued under an Indefinite Quantity construction contract.

**B.903**   INTEREST - CONSTRUCTION (CLAUSE B-22) (JUNE 1998)

The Postal Service will pay interest on late payments and unearned prompt payment discounts in accordance with the Prompt Payment Act, 31 U.S.C. 3901 et. seq., as amended by the Prompt Payment Act Amendments of 1988, P.L. 100-496.

PROMPT PAYMENT FOR CONSTRUCTION CONTRACTS
Notwithstanding any other payment terms in this contract, the Postal Service will make invoice payments and contract financing payments under the terms and conditions specified in this clause. Payment is considered as being made on the day the check is dated or an electronic funds transfer is made. All days referred to in this clause are calendar days, unless otherwise specified.

Contractors are encouraged to become familiar with Section 12 of the Contracts Disputes Act of 1978 (41 U.S.C. 611) regarding interest penalties, 31 U.S.C. 3903 (c)(1) regarding interest rate computation,


**UNITED STATES POSTAL SERVICE.**

Facilities Department

---

Section 2 of the Act of August 24, 1935 (40 U.S.C. 2701b, Miller Act) regarding deficient subcontractor performance, and Chapter 39, Title 31 United States Code regarding payment certification.

**B.904    CONSTRUCTION COST BREAKDOWN (CLAUSE B-40) (AUGUST 2000)**

When required by the Contracting Officer, the contractor must submit, within 15 calendar days after receiving the notice to proceed, a construction cost breakdown using the instructions and sample forms provided in Division 1. When accepted by the Contracting Officer, the cost breakdown will be the format used for all pay requests.

**B. 1000  CHANGES/CLAIMS/DISPUTES**

**B.1001   CHANGES (CONSTRUCTION) (CLAUSE B-37) (SEPTEMBER 2002)**

a.  The Contracting Officer may at any time, without notice to any sureties, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes:

    (1)  In the specifications (including drawings and designs);

    (2)  In the method or manner of performance of the work;

    (3)  In the Postal Service furnished facilities, equipment, materials, services, or site;

    (4)  To the delivery or performance schedule; or

    (5)  Directing acceleration in the performance of the work.

b.  Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change will be treated as a change order under this clause only if the supplier gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the supplier regards the order as a change order. This notification must be delivered to the Contracting Officer within 30 days of receipt of the change order.

c.  If any change under this clause causes an increase or decrease in the supplier's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any order, the Contracting Officer will make an equitable adjustment and modify the contract in writing. However, except for claims based on defective specifications, no claim for any change under paragraph (b) above will be allowed for any costs incurred more than 20 days before the supplier gives written notice as required. In the case of defective specifications for which the Postal Service is responsible, the equitable adjustment will include any increased cost reasonably incurred by the supplier in attempting to comply with the defective specifications.

d.  No claim by the supplier for an equitable adjustment will be allowed if asserted after final payment under this contract.

e.  See also Clause B-10, *Pricing of Adjustments* (January 1997).

**B.1002   CHANGE ORDER ACCOUNTING (CLAUSE B-21) (JANUARY 1997)**

The Contracting Officer may require change-order accounting whenever the estimated cost of a change or series of related changes exceeds $100,000. The contractor, for each change or series of related changes, must maintain separate accounts, by job order or other suitable accounting procedure, of all incurred segregable, direct costs (less allocable credits) of work, both changed and not changed, allocable to the change. The contractor will maintain such accounts until the parties agree to an equitable adjustment for the changes ordered by the

Contracting Officer or the matter is finally disposed of in accordance with the "Claims and Disputes" clause.

**B.1003   PRICING OF ADJUSTMENTS (CLAUSE B-10) (JANUARY 1997)**

When costs are a factor in determining any contract price adjustment under the "Changes" clause or any other provision of this contract, Chapter 5 of the *USPS Interim Purchasing Guidelines (May 2005)* in effect on the date of this contract will serve as a guide in negotiating the adjustment.

**B.1004   EQUITABLE ADJUSTMENTS (CONSTRUCTION) (CLAUSE FB-271) (MARCH 1999)**

a.  The contractor's written statement of the monetary extent of any claim for equitable adjustment under this contract must be submitted in the form of a lump sum proposal (unless otherwise requested) with an itemized breakdown of all increases or decreases in the cost of the contractor's and all subcontractors' work, in at least the following detail:

    1.  Material quantities and unit cost

    2.  Labor costs (identified with specific item of material to be placed or operation to be performed)

    3.  Construction Equipment

    4.  Workmen's Compensation and Public Liability Insurance

    5.  Overhead

    6.  Profit

    7.  Employment taxes under FICA, Medicare, and FUTA

b.  The overhead, profit and commission percentages included in the proposal, must not exceed the maximums given at the end of this paragraph, and will be considered to include, but not be limited to, insurance other than that mentioned in this "Equitable Adjustments" clause, bond or bonds, use of small tools, incidental job burdens, and general office expense. No percentages for overhead, profit or commission will be allowed on employment taxes under FICA, Medicare, and FUTA. The percentages for overhead, profit and commission will be negotiated and may vary according to the nature, extent and complexity of the work involved, but not to exceed the maximum percentages shown below. Not more than three percentages will be allowed regardless of the number of tiers of subcontractors; that is, the markup on work subcontracted by a subcontractor will be limited to one overhead percentage and one profit percentage in addition to the prime contractor's commission percentage. On proposals covering both increases and decreases in the amount of the contract, the overhead, profit, and where applicable, commission will be computed on the net change only. On proposals for decreases in the amount of the contract, the overhead, profit, and where applicable commission will be added to the decrease in direct cost.

|  | Overhead | Profit | Commission |
|---|---|---|---|
| To contractor on work performed by other than his own forces | 0% | 0% | 10% |
| To contractor and / or the subcontractors for that portion of work performed with their respective forces | 10% | 10% | 0% |

c.  The contractor must submit a request for time extension (if any) with its proposal.

 **UNITED STATES POSTAL SERVICE.**

# Facilities Department

d.  In considering a proposal, the Postal Service will check estimates in detail, utilizing unit prices where specified or agreed upon, with a view to arriving at an equitable adjustment.

e.  After receipt of a proposal with a detailed breakdown, the Contracting Officer will act promptly thereon, provided, however, that when the necessity to proceed with a change does not allow sufficient time to check a proposal, or in the event of failure to reach agreement on a proposal, the Postal Service may order the contractor to proceed on the basis of price to be determined at the earliest practicable date but not to be more than the increase or less than the decrease proposed.

f.  The contractor must submit all claims for equitable adjustment for differing site conditions in accordance with and subject to the requirements and limitations set forth in the "Differing Site Conditions" clause and in this "Equitable Adjustments" clause. All other claims for equitable adjustment submitted by the contractor under this contract will be subject to the requirements and limitations set forth in this clause.

g.  Upon written request by the Contracting Officer, the contractor must submit a proposal, in accordance with the requirements and limitations set out in paragraphs (a) through (g) of this "Equitable Adjustments" clause, for work involving contemplated changes covered by the request, within the time limit indicated in the request or any extension of such time limit as may be subsequently granted. If, within a reasonable time after receipt of such a proposal, the Contracting Officer orders the contractor to proceed with the performance of the work contemplated, the proposal submitted prior to the order will constitute the contractor's statement of the monetary extent of claim for equitable adjustment.

**B.1005   PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (CLAUSE 5-1) (JANUARY 1997)**

a.  If any price, including profit or fee, negotiated in connection with this contract, or modification to this contract, or any cost reimbursable under this contract, was increased by any significant amount because:

   (1)  The supplier or subcontractor furnished cost or pricing data that were not complete, accurate, and current as of the date of the final agreement on price;

   (2)  A subcontractor or prospective subcontractor furnished the supplier cost or pricing data that were not complete, accurate, and current as of the date of final agreement on price; or

   (3)  Any of these parties furnished data of any description that were not accurate;

then the price or cost will be reduced accordingly and the contract will be modified to reflect the reduction.

b.  Any reduction in the contract price under paragraph a above due to defective data from a prospective subcontractor that was not awarded the subcontract will be limited to the amount, plus applicable overhead and profit markup, by which the actual subcontract, or the actual cost to the supplier if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the supplier (provided that the actual subcontract price was not itself affected by defective cost or pricing data).

**B.1006   DIFFERING SITE CONDITIONS (CLAUSE B-32) (MARCH 1999)**

a.  When the site and subsurface information has been provided by the Postal Service, the contractor must promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of:

   (1)  Subsurface or latent physical conditions at the site differing materially from those indicated in this contract; or

   (2)  Previously unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this contract.

b.  The Contracting Officer must promptly investigate the conditions, and if they are found to differ materially from those indicated or anticipated and will cause a change in the contractor's cost of, or the time required for, performance of any part of the work under this contract, an equitable adjustment must be made and the contract modified in writing accordingly.

c.  No claim by the contractor for an equitable adjustment under this clause will be allowed when the site and subsurface investigation, and foundation design have been provided by the contractor or his agents.

d.  No claim of the contractor under this clause will be allowed unless the contractor has given the written notice required in (a) above.

e.  No claim by the contractor for an equitable adjustment under this clause will be allowed if asserted after final payment has been made under this contract.

**B.1007   CLAIMS AND DISPUTES (CLAUSE B-9) (JANUARY 1997)**

a.  This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601–613) ("the Act").

b.  Except as provided in the Act, all disputes arising under or relating to this contract must be resolved under this clause.

c.  "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. However, a written demand or written assertion by the supplier seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph d.2 below. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount is not acted upon in a reasonable time.

d.

   (1)  A claim by the supplier must be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Postal Service against the supplier is subject to a written decision by the Contracting Officer.

   (2)  For supplier claims exceeding $100,000, the supplier must submit with the claim the following certification:

   "I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the supplier believes the Postal Service is liable, and that I am duly authorized to certify the claim on behalf of the supplier."

   (3)  The certification may be executed by any person duly authorized to bind the supplier with respect to the claim.

e.  For supplier claims of $100,000 or less, the Contracting Officer must, if requested in writing by the supplier, render a decision within 60 days of the request. For supplier-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the supplier of the date by which the decision will be made.

f.  The Contracting Officer's decision is final unless the supplier appeals or files a suit as provided in the Act.


**UNITED STATES**
**POSTAL SERVICE.**

# Facilities Department

g.  When a claim is submitted by or against a supplier, the parties by mutual consent may agree to use an alternative dispute resolution (ADR) process to assist in resolving the claim. A certification as described in d(2) of this clause must be provided for any claim, regardless of dollar amount, before ADR is used.

h.  The Postal Service will pay interest in the amount found due and unpaid from:

(1)  The date the Contracting Officer receives the claim (properly certified, if required); or

(2)  The date payment otherwise would be due, if that date is later, until the date of payment.

i.  Simple interest on claims will be paid at a rate determined in accordance with the Interest clause.

j.  The supplier must proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

**B.1008   ASSIGNMENT OF CLAIMS (CLAUSE B-8) (JANUARY 1997)**

a.  If this contract provides for payments aggregating $10,000 or more, claims for monies due or to become due from the Postal Service under it may be assigned to a bank, trust company, or other financing institution, including any federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any assignment or reassignment must cover all amounts payable and must not be made to more than one party, except that assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in financing this contract. No assignment or reassignment will be recognized as valid and binding upon the Postal Service unless a written notice of the assignment or reassignment, together with a true copy of the instrument of assignment, is filed with:

(1)  The Contracting Officer;

(2)  The surety or sureties upon any bond; and

(3)  The office, if any, designated to make payment, and the Contracting Officer has acknowledged the assignment in writing.

b.  Assignment of this contract or any interest in this contract other than in accordance with the provisions of this clause will be grounds for termination of the contract for default at the option of the Postal Service.

**B.1009   *APPLICABLE IF LISTED IN BLOCK 9, PAGE 1* VALUE ENGINEERING INCENTIVE (CLAUSE 2-22) (JANUARY 1997)**

a.  General. The supplier is encouraged to develop and submit value engineering change proposals (VECPs) voluntarily. The supplier will share in savings realized from an accepted VECP as provided in paragraph h below.

b.  Definitions

(1)  Value Engineering Change Proposal (VECP). A proposal that:

(a)  Requires a change to the instant contract;

(b)  Results in savings to the instant contract; and

(c)  Does not involve a change in:

(i)  Deliverable end items only;

(ii)  Test quantities due solely to results of previous testing under the instant contract; or

(iii)  Contract type only.

(2)  Instant Contract. The contract under which a VECP is submitted. It does not include additional contract quantities.

(3)  Additional Contract Quantity. An increase in quantity after acceptance of a VECP due to contract modification, exercise of an option, or additional orders (except orders under indefinite–delivery contracts within the original maximum quantity limitations).

(4)  Postal Service Costs. Costs to the Postal Service resulting from developing and implementing a VECP, such as net increases in the cost of testing, operations, maintenance, logistics support, or property furnished. Normal administrative costs of processing the VECP are excluded.

(5)  Instant Contract Savings. The estimated cost of performing the instant contract without implementing a VECP minus the sum of (a) the estimated cost of performance after implementing the VECP and (b) Postal Service costs.

(6)  Additional Contract Savings. The estimated cost of performance or delivering additional quantities without the implementation of a VECP minus the sum of (a) the estimated cost of performance after the VECP is implemented and (b) Postal Service cost.

(7)  Supplier's Development and Implementation Costs. Supplier's cost in developing, testing, preparing, and submitting a VECP. Also included are the supplier's cost to make the contractual changes resulting from the Postal Service acceptance of the VECP.

c.  Content. A VECP must include the following:

(1)  A description of the difference between the existing contract requirement and that proposed, the comparative advantages and disadvantages of each, a justification when an item's function or characteristics are being altered, the effect of the change on the end item's performance, and any pertinent objective test data.

(2)  A list and analysis of the contract requirements that must be changed if the VECP is accepted, including any suggested specification revisions.

(3)  A separate, detailed cost estimate for (a) the affected portions of the existing contract requirement and (b) the VECP. The cost reduction associated with the VECP must take into account the supplier's allowable development and implementation costs.

(4)  A description and estimate of costs the Postal Service may incur in implementing the VECP, such as test and evaluation and operating and support costs.

(5)  A prediction of any effects the proposed change would have on Postal Service costs.

(6)  A statement of the time by which a contract modification accepting the VECP must be issued in order to achieve the maximum cost reduction, noting any effect on the contract completion time or delivery schedule.

(7)  Identification of any previous submissions of the VECP to the Postal Service, including the dates submitted, purchasing offices, contract numbers, and actions taken.

d.  Submission. The supplier must submit VECPs to the Contracting Officer.

e.  Postal Service Action

(1)  The Contracting Officer will give the supplier written notification of action taken on a VECP within 60 days after receipt. If additional time is needed, the Contracting Officer will notify the supplier, within the 60–day period, of the expected date of a decision. The Postal Service will process VECPs expeditiously but will not be liable for any delay in acting upon a VECP.



**UNITED STATES POSTAL SERVICE.**

# Facilities Department

    (2)  If a VECP is not accepted, the Contracting Officer will so notify the supplier, explaining the reasons for rejection.

f.  Withdrawal. The supplier may withdraw a VECP, in whole or in part, at any time before its acceptance.

g.  Acceptance

    (1)  Acceptance of a VECP, in whole or in part, will be by execution of a supplemental agreement modifying this contract and citing this clause. If agreement on price (see paragraph h below) is reserved for a later supplemental agreement, and if such agreement cannot be reached, the disagreement is subject to the Claims and Disputes clause of this contract.

    (2)  Until a VECP is accepted by contract modification, the supplier must perform in accordance with the existing contract.

    (3)  The Contracting Officer's decision to accept or reject all or any part of a VECP is final and not subject to the Claims and Disputes clause or otherwise subject to litigation under the Contract Disputes Act of 1978 (41 U.S.C. 601–613).

h.  Sharing. If a VECP is accepted, the supplier will share in the contract savings as follows:

    (1)  Instant Contract Savings. The supplier and the Postal Service will share equally in instant contract savings. Sharing will be accomplished by a modification reducing the contract price by an amount equal to 50 percent of the instant contract savings minus the supplier's allowable VECP development and implementation costs.

    (2)  Additional Contract Savings. Unless this is a construction contract, the supplier will receive 25 percent of additional contract savings. Sharing will be accomplished by negotiating a price for the additional contract quantity that reflects a reduction in price by 75 percent of additional contract savings.

    (3)  Construction Contracts. If this is a construction contract, only instant contract savings will be shared. Sharing will be accomplished in accordance with subparagraph h.1 above.

i.  Data

    (1)  The supplier may restrict the Postal Service's right to use any part of a VECP or the supporting data by marking the following legend on the affected parts: "These data, furnished under the Value Engineering Incentive clause of contract _____, may not be disclosed outside the Postal Service or duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate a value engineering change proposal submitted under the clause. This restriction does not limit the Postal Service's right to use information contained in these data if it has been obtained or is otherwise available from the supplier or from another source without limitation."

    (2)  If a VECP is accepted, the supplier hereby grants the Postal Service unlimited rights in the VECP and supporting data, except that, with respect to data qualifying and submitted as limited rights technical data, the Postal Service will have the rights specified in the contract modification implementing the VECP and will appropriately mark the data (The terms "unlimited rights" and "limited rights" are defined in chapter 9 of the USPS Interim Purchasing Guidelines (May 2005).).

**Additional Paragraph j. (see 2.2.10.h)**

j.  Subcontracts. The supplier must include an appropriate value engineering incentive clause in any firm–fixed–price subcontract of $100,000 or more. In calculating any price adjustment for savings under this contract, the supplier's allowable VECP development and implementation costs include any subcontractor's allowable

development and implementation costs. Subcontract savings are subject to the sharing arrangements in paragraph h of this clause, and will be taken into account in determining the savings under this contract.

## B. 1100 TERMINATIONS

**B.1101  TERMINATION FOR CONVENIENCE (CLAUSE B-11) (JANUARY 1997)**

a.  Performance under this contract may be terminated by the Postal Service in whole or in part whenever the Contracting Officer determines that termination is in the interest of the Postal Service. A termination may be effected by delivery to the supplier of a notice of termination specifying the extent of work terminated, and the effective date of the termination.

b.  Upon receipt of a notice of termination, unless otherwise directed by the Contracting Officer, the supplier must take the following actions:

    (1)  Stop work to the extent specified in the notice.

    (2)  Place no further orders or subcontracts for materials, services, or facilities except as may be necessary for completion of the unterminated work.

    (3)  Terminate all orders and subcontracts to the extent that they relate to the work terminated.

    (4)  Assign to the Postal Service, as directed by the Contracting Officer, all right, title, and interest of the supplier under the orders and subcontracts terminated. The Postal Service has the right, in its discretion, to settle or pay claims arising out of these terminations.

    (5)  Settle all outstanding liabilities and claims arising out of the termination of orders and subcontracts, with the approval or ratification of the Contracting Officer. The Contracting Officer's decision is final for the purposes of this clause.

    (6)  Transfer title to the Postal Service and deliver as directed by the Contracting Officer:

        (a)  Work in process, completed work, and other material produced as a part of or acquired for the work terminated; and

        (b)  The completed or partially completed plans, drawings, information, and other property that, if the contract had been completed, would have been furnished to the Postal Service.

    (7)  Use its best efforts to sell, as directed by the Contracting Officer, any property of the types referred to in subparagraph b.6 above, provided that the supplier may acquire property under the conditions prescribed and at prices approved by the Contracting Officer, and the proceeds of any such transfer will be applied in reduction of any payments to be made by the Postal Service to the supplier, or be credited to the price or cost of the work covered by this contract, or be paid in any manner directed by the Contracting Officer.

    (8)  Complete performance of the work not terminated.

    (9)  Take any action that may be necessary, or that the Contracting Officer may direct, for protecting and preserving any property related to this contract that is in the possession of the supplier and in which the Postal Service has or may acquire an interest.

c.  At any time, the supplier may submit to the Contracting Officer a list, certified as to quantity and quality, of termination inventory not previously disposed of and may request the Postal Service to remove inventory items or enter into a storage agreement covering


**Facilities Department**

them. Not later than 15 days after receiving this request, the Postal Service will accept title to the items and remove them or enter into a storage agreement. The list will be subject to verification by the Contracting Officer upon removal of the items or, if the items are stored, within 45 days after submission of the list.

d.  After termination, the supplier must submit to the Contracting Officer a termination claim in the form and with the certification prescribed by the Contracting Officer. The claim must be submitted promptly, but in no event more than one year after the effective date of termination, unless an extension in writing is granted by the Contracting Officer. However, if the Contracting Officer determines that the facts justify such action, any termination claim may be received and acted upon at any time after the one–year period. Upon failure of the supplier to submit a termination claim within the time allowed, the Contracting Officer may determine, on the basis of the information available, the amount, if any, due the supplier by reason of the termination and will pay that amount.

e.  If the supplier and the Contracting Officer fail to agree on the amount to be paid to the supplier by reason of the termination, the Contracting Officer will determine the amount, if any, due the supplier and pay the supplier the contract price for completed and accepted supplies or services not previously paid for (adjusted for any saving of freight and other charges) and, with respect to all other contract work performed before the effective date of termination, the total of:

    (1)  The cost of such work;

    (2)  The cost of settling and paying claims arising out of the termination of work under subcontracts; and

    (3)  A profit on e.1 above, determined by the Contracting Officer to be fair and reasonable; but if it appears that the supplier would have sustained a loss on the entire contract had it been completed, no profit will be included, and an appropriate adjustment will be made reducing the amount of the settlement to reflect the indicated rate of loss.

f.  The total sum to be paid to the supplier may not exceed the total contract price as reduced by the payments made and as further reduced by the contract price of work not terminated. Except for normal spoilage, and except to the extent that the Postal Service expressly assumed the risk of loss, there will be excluded from the amounts payable to the supplier under paragraph e above, the fair value, as determined by the Contracting Officer, of property destroyed, lost, stolen, or damaged so as to become undeliverable to the Postal Service, or to a buyer.

g.  Any determination of costs will be governed by the cost principles set forth in Chapter 5 of the *USPS Interim Purchasing Guidelines (May 2005)* in effect on the effective date of termination.

h.  The supplier has the right of review under the "Claims and Disputes" clause of any determination made by the Contracting Officer under paragraph d or e above, except that, if the supplier has failed to submit its termination claim within the time provided in paragraph d above and has failed to request an extension of time, there may be no right of review.

i.  In arriving at the amount due the supplier, there must be deducted:

    (1)  All unliquidated advance or other payments to the supplier applicable to the terminated portion of this contract;

    (2)  Any claim that the Postal Service may have against the supplier under this contract; and

    (3)  The agreed price for or the proceeds of sale of materials, supplies, or other things kept by the supplier or sold and not recovered by or credited to the Postal Service.

j.  If the termination is partial, the supplier must file with the Contracting Officer a request in writing for an equitable adjustment of the price specified in the contract relating to the continued portion of the contract.

k.  The Postal Service may, under the terms and conditions it prescribes, make partial payments and payments on account in connection with the terminated portion of this contract whenever the aggregate of these payments is within the amount to which the supplier is entitled.

l.  Unless otherwise provided in this contract, or by statute, the supplier, for a period of three years after final settlement, must preserve and make available to the Postal Service at all reasonable times at the supplier's office, all books, records, documents, and other evidence bearing on the costs and expenses of the supplier under this contract and relating to the work terminated. At the Contracting Officer's approval, photographs, microphotographs, or other authentic reproductions may be maintained instead of the originals.

**B.1102  TERMINATION FOR DEFAULT (CLAUSE B-13) (JANUARY 1997)**

a.

    (1)  The Postal Service may, subject to paragraphs c and d below, by written notice of default to the supplier, terminate this contract in whole or in part if the supplier fails to:

        (a)  Complete the requirements of this contract within the time specified in the contract or any extension;

        (b)  Make progress, so as to endanger performance of this contract (but see paragraph d below); or

        (c)  Perform any of the other provisions of this contract (but see subparagraph a.2 following).

    (2)  The Postal Service's right to terminate this contract under a.1(b) and (c) above may be exercised if the supplier does not cure the failure within ten days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

b.  If the Postal Service terminates this contract in whole or in part, it may acquire similar supplies or services or complete the work, and the supplier will be liable to the Postal Service for any excess costs. However, the supplier must continue the work not terminated.

c.  Except for defaults of subcontractors at any tier, the supplier is not liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the supplier.

d.  If the failure to perform is caused by the default of a subcontractor at any tier, and if the cause of the default is beyond the control of both the supplier and subcontractor, and without the fault or negligence of either, the supplier is not liable for any excess costs for failure to perform, unless the subcontractor supplies or services were obtainable from other sources in sufficient time for the supplier to meet the required delivery schedule.

e.  If this contract is terminated for default, the Postal Service may require the supplier to transfer title and deliver to the Postal Service, as directed by the Contracting Officer, any completed supplies, partially completed supplies, and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights that the supplier has specifically produced or acquired for the terminated portion of this contract. Upon direction of the Contracting Officer, the supplier must also protect and preserve property in its possession in which the Postal Service has an interest.

f.  The Postal Service will pay the contract price for completed items delivered and accepted. The supplier and Contracting Officer may


**UNITED STATES POSTAL SERVICE.**

# Facilities Department

agree on the amount of payment for items delivered and accepted under paragraph e above for the protection and preservation of the property. Failure to agree will be a dispute under the "Claims and Disputes" clause. The Postal Service may withhold from these amounts any sum the Contracting Officer determines to be necessary to protect the Postal Service against loss because of outstanding claims.

g. If, after termination, it is determined that the supplier was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for convenience.

h. The rights and remedies of the Postal Service under this clause are in addition to any other rights and remedies provided by law or under this contract.

## B. 1200 INSPECTION AND ACCEPTANCE

B.1201    INSPECTION AND ACCEPTANCE (CONSTRUCTION) (CLAUSE B-33) (MARCH 1999)

a. Postal Service inspection and testing of materials and workmanship will be made at reasonable times at the site of the work or off the site as the Contracting Officer may direct. The Contracting Officer's decision is conclusive as to whether the material involved conforms to the contract requirements. Off-site inspection or testing does not relieve the contractor of responsibility for damage to or loss of the material prior to acceptance, nor in any way affect the continuing rights of the Postal Service after acceptance of the completed work under the terms of paragraph f of this section.

b. The contractor must, without charge, replace any material or correct any workmanship found by the Postal Service not to conform to the contract requirements, unless the Postal Service consents to accept such material or workmanship with an appropriate adjustment in contract price. The contractor must promptly segregate and remove rejected material from the premises.

c. If the contractor does not promptly replace rejected material or correct rejected workmanship, the Postal Service may, by contract or otherwise, replace or correct it and charge the cost to the contractor.

d.
   (1) For USPS-provided design:  The contractor must furnish (without charge) all facilities, labor, and materials needed to conduct inspections and tests as required by the specifications. The contractor will be charged any additional costs of inspection if material and workmanship are not ready at the time specified by the contractor for inspection.

   (2) For Design/Build contracts:  The design/build entity must furnish without any increase to the GMP or firm-fixed-price, as appropriate, all facilities, labor, and materials necessary to conduct inspections and tests as required by the Contracting Officer.

e. The Postal Service may examine completed work by removing or tearing it out. The contractor must replace or correct any work found not to conform to contract requirements. If work is torn out and found to comply with contract requirements, the Contracting Officer must make an equitable adjustment for the services provided for the inspection and replacement of the work.

f. The Postal Service will inspect the work as soon as practicable after completion. Acceptance by an authorized Postal Service representative is conclusive except in the case of latent defects,

fraud, gross mistakes amounting to fraud, or Postal Service rights under any warranty or guarantee.

g. The Postal Service may terminate this contract for default and seek any remedy allowed by law if the contractor does not maintain an acceptable inspection system or promptly follow Postal Service directions to replace or correct incorrect or defective items.

B.1202    PROJECT CLOSEOUT (CONSTRUCTION) (CLAUSE B-54) (MARCH 1999)

Unless specified for an earlier date elsewhere in this contract, the contractor must process all documents, changes, claim submissions, complete all project closeout items, and submit a final report certifying that this action has been taken not later than six months from the date of facility acceptance.

B.1203    ASBESTOS FREE AND LEAD-BASED PAINT FREE CERTIFICATION (CLAUSE FB-315) (AUGUST 2000)

The contractor must certify that no asbestos containing building materials or lead-based paints (interior or exterior) were used in this project. The contractor must include completed and unaltered asbestos free and lead-based paint certifications as a closeout submittal document as provided in Division 1, Closeout Submittals. The only acceptable alternative for asbestos certification is to conduct a post-construction asbestos survey in accordance with AHERA requirements.

## B. 1300 LABOR POLICIES

B.1301    CONVICT LABOR (CLAUSE 9-1) (JANUARY 1997)

In connection with the work under this contract, the supplier agrees not to employ any person undergoing sentence of imprisonment, except as provided by Public Law 89–176, September 10, 1965 (18 U.S.C. 4082(c)(2)) and Executive Order 11755, December 29, 1973.

B.1302    PROHIBITION AGAINST CONTRACTING WITH FORMER OFFICERS OR PCES EXECUTIVES (CLAUSE 1-11) (JANUARY 1997)

During the performance of this contract, former Postal Officers or Postal Career Executive Service (PCES) executives are prohibited from employment by the contractor as key personnel, experts or consultants, if such individuals, within five years after their retirement from the Postal Service, would be performing substantially the same duties as they performed during their career with the Postal Service.

B.1303    DAVIS BACON ACT (CLAUSE 9-3) (JANUARY 1997)

a. Minimum Wages

   (1) All mechanics and laborers employed in the contract work (other than maintenance work of a recurring, routine nature necessary to keep the building or space in condition to be continuously used at an established capacity and efficiency for its intended purpose) must be paid unconditionally, and not less than once a week, without deduction or rebate (except for deductions permitted by the Copeland Regulations (29 CFR Part 3)), the amounts due at the time of payment computed at rates not less than the aggregate of the basic hourly rates and rates of payments, contributions, or costs for any fringe benefits contained in the wage-determination decision of the Secretary of Labor, attached hereto, regardless of any contractual relationship alleged to exist between the lessor (for construction contracts, use "supplier" instead of "lessor"), or subcontractor and these laborers and mechanics. A copy of the wage-determination decision must be kept posted by the lessor at the site of the work in a prominent place where it can easily be seen by the workers.


**UNITED STATES**
**POSTAL SERVICE.**

# Facilities Department

(2) The lessor may discharge its obligation under this clause to workers in any classification for which the wage–determination decision contains:

    (a) Only a basic hourly rate of pay, by making payment at not less than that rate, except as otherwise provided in the Copeland Regulations (29 CFR Part 3); or

    (b) Both a basic hourly rate of pay and fringe–benefit payments, by paying in cash, by irrevocably contributing to a fund, plan, or program for, or by assuming an enforceable commitment to bear the cost of, bona fide fringe benefits contemplated by 40 U.S.C. 276a, or by a combination of these.

(3) Contributions made, or costs assumed, on other than a weekly basis (but not less often than quarterly) are considered as having been constructively made for a weekly period. When a fringe benefit is expressed in a wage determination in any manner other than as an hourly rate and the lessor pays a cash equivalent or provides an alternative fringe benefit, the lessor must furnish information with the lessor's payrolls showing how the lessor determined that the cost incurred to make the cash payment or to provide the alternative fringe benefit is equal to the cost of the wage–determination fringe benefits. When the lessor provides a fringe benefit different from that contained in the wage determination, the lessor must show how the hourly rate was arrived at. In the event of disagreement as to an equivalent of any fringe benefit, the Contracting Officer must submit the question, together with the Contracting Officer's recommendation, to the Secretary of Labor for final determination.

(4) If the supplier does not make payments to a trustee or other third person, the supplier may consider as payment of wages the costs reasonably anticipated in providing bona fide fringe benefits, but only with the approval of the Secretary of Labor pursuant to a written request by the lessor. The Secretary of Labor may require the lessor to set aside assets in a separate account, to meet the lessor's obligations under any unfunded plan or program.

(5) The Contracting Officer will require that any class of laborers or mechanics not listed in the wage determination but to be employed under the contract will be classified in conformance with the wage determination and report the action taken to:

ADMINISTRATOR OF THE WAGE AND HOUR DIVISION
EMPLOYMENT STANDARDS ADMINISTRATION
US DEPARTMENT OF LABOR
WASHINGTON DC 20210–0001

for approval. The Contracting Officer will approve an additional classification and wage rate and fringe benefits therefore only if:

    (a) The work to be performed by the classification requested is not performed by a classification in the wage determination;

    (b) The classification is utilized in the area by the construction industry; and

    (c) The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination.

(6) If the lessor, the laborers or mechanics to be employed in the classification or their representatives, and the Contracting Officer do not agree on the proposed classification and wage rate and fringe benefits therefore, the Contracting Officer must submit the question, together with the views of the interested

parties and the Contracting Officer's recommendation, to the Wage and Hour Administrator for final determination. The Administrator or an authorized representative will, within 30 days of receipt, approve, modify, or disapprove every proposed additional classification action, or issue a final determination if the parties disagree, and so advise the Contracting Officer or advise that additional time is necessary. The finally approved wage rate (and fringe benefits if appropriate) must be paid to all workers performing work in the classification under the contract from the first day work is performed in the classification. The lessor must post a copy of the final determination of the conformance action with the wage determination at the site of the work. (The Department of Labor information collection and reporting requirements contained in subparagraph a.5 above and in this subparagraph a.6 have been approved by the Office of Management and Budget under OMB control number 1215–0140.)

b. Apprentices and Trainees

(1) Apprentices may be permitted to work only when

    (a) registered, individually, under a bona fide apprenticeship program registered with a state apprenticeship agency recognized by the Bureau of Apprenticeship and Training, U.S. Department of Labor, or, if no such recognized agency exists in a state, under a program registered with the Bureau of Apprenticeship and Training; or

    (b) if not individually registered in the program, certified by the Bureau of Apprenticeship and Training or state agency (as appropriate) to be eligible for probationary employment as an apprentice. Trainees may be permitted to work only if individually registered in a program approved by the Employment and Training Administration, U.S. Department of Labor.

(2) The ratio of apprentices to journeymen or trainees to journeymen in any craft classification must not be greater than that permitted for the lessor's entire work force under the registered apprenticeship or trainee program. Apprentices and trainees must be paid at least the applicable wage rates and fringe benefits specified in the approved apprenticeship or trainee program for the particular apprentice's or trainee's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. If the apprenticeship or trainee program does not specify fringe benefits, apprentices or trainees must be paid the full amount of fringe benefits listed on the wage determination for the applicable classification unless the Administrator of the Wage and Hour Division determines that a different practice prevails. Any employee listed on a payroll at an apprentice or trainee wage rate but not registered, or performing work on the job site in excess of the ratio permitted under the registered program, must be paid the wage rate on the wage determination for the classification or work actually performed.

(3) If the Bureau of Apprenticeship and Training or the state agency recognized by the Bureau (as appropriate) withdraws approval of an apprenticeship program, or if the Employment and Training Administration withdraws approval of a trainee program, the supplier will no longer be permitted to utilize apprentices or trainees (as appropriate) at less than the applicable predetermined rate for the work performed until an acceptable program is approved (See 29 CFR 5.16 for special provisions that apply to training plans approved or recognized by the Department of Labor prior to August 20, 1975.).

(4) The utilization of apprentices, trainees, and journeymen must be in conformity with the equal employment opportunity

 **UNITED STATES POSTAL SERVICE.** Facilities Department

requirements of Executive Order 11246, as amended, and 29 CFR Part 30.

c. Overtime Compensation

   (1) The lessor may not require or permit any laborer or mechanic employed on any work under this contract to work more than 40 hours in any workweek on work subject to the provisions of the Contract Work Hours and Safety Standards Act (40 U.S.C. 327–333), unless the laborer or mechanic receives compensation at a rate not less than one–and–one–half times the laborer's or mechanic's basic rate of pay for all such hours worked in excess of 40 hours.

   (2) For violations for subparagraph c.1 above, the lessor is liable for liquidated damages, which will be computed for each laborer or mechanic at $10 for each day on which the employee was required or permitted to work in violation of subparagraph c.1 above.

   (3) The Contracting Officer may withhold from the lessor sums as may administratively be determined necessary to satisfy any liabilities of the lessor for unpaid wages and liquidated damages pursuant to subparagraph c.2 above.

d. Payroll and Other Records

   (1) For all laborers and mechanics employed in the work covered by this clause, the lessor must maintain payrolls and related basic records and preserve them for a period of three years after contract completion. The records must contain the name, address, and social security number of each employee, the employee's correct classification, rate of pay (including rates of contributions for, or costs assumed to provide, fringe benefits), the daily and weekly number of hours worked, deductions made, and actual wages paid. Whenever the lessor has obtained approval from the Secretary of Labor to assume a commitment to bear the cost of fringe benefits under subparagraph a.4, above, the lessor must maintain records showing the commitment and its approval, communication of the plan or program to the employees affected, and the costs anticipated or incurred under the plan or program. Lessors employing apprentices or trainees under approved programs must maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage rates prescribed in the applicable programs. (The Department of Labor information collection and record keeping requirements in this subparagraph d.1 have been approved by the Office of Management and Budget under OMB control numbers 1215–0140 and 1215–0017).

   (2) The lessor must submit weekly, for each week in which any work covered by this clause is performed, a copy of all payrolls to the Contracting Officer. The lessor is responsible for the submission of copies of payrolls of all subcontractors. The copy must be accompanied by a statement signed by the lessor indicating that the payrolls are correct and complete, that the wage rates contained in them are not less than those determined by the Secretary of Labor, and that the classifications set forth for each laborer or mechanic conform with the work the laborer or mechanic performed. Submission of the Weekly Statement of Compliance (see 29 CFR 5.5(a)(3)(ii)) required under this agreement satisfies this requirement. As required by this clause, the lessor must submit a copy of any approval by the Secretary of Labor (The Department of Labor information collection and reporting requirements in this subparagraph d.2 have been approved by the Office of Management and Budget under OMB control number 1215–0149.).

   (3) The lessor's records required under this clause must be available for inspection by authorized representatives of the Contracting Officer and the Department of Labor, and the lessor must permit the representative to interview employees during working hours on the job.

   (4) The lessor must comply with the Copeland Regulations of the Secretary of Labor (29 CFR Part 3), which are hereby incorporated in this contract by reference.

e. Withholding of Funds. The Contracting Officer may withhold from the lessor under this or any other contract with the lessor so much of the accrued payments or advances as is considered necessary to pay all laborers and mechanics the full amount of wages required by this contract, or any other contract subject to the Davis–Bacon prevailing wage requirements that is held by the lessor.

f. Subcontracts

   (1) If the lessor or any subcontractor fails to pay any laborer or mechanic employed on the site of the work any of the wages required by the contract, the Contracting Officer may, after written notice to the lessor, suspend further payments or advances to the lessor until violations have ceased.

   (2) The lessor agrees to insert this clause, including this paragraph f, in all subcontracts hereunder. The term "lessor" as used in this clause in any subcontract, is deemed to refer to the lower–tier subcontractor.

g. Compliance with Davis–Bacon and Related Acts Requirements. All rulings and interpretations of the Davis–Bacon Act and related acts contained in 29 CFR Parts 1, 3, and 5 are hereby incorporated by reference in this contract.

h. Certification of Eligibility

   (1) By entering into this contract, the lessor certifies that neither it nor any person or firm having an interest in the lessor is ineligible to be awarded contracts by virtue of section 3(a) of the Davis–Bacon Act or 29 CFR 5.12(a)(1).

   (2) No part of this contract will be subcontracted to any person or firm ineligible for contract award by virtue of section 3(a) of the Davis–Bacon Act or 29 CFR 5.12(a)(1).

   (3) The penalty for making false statements is prescribed in the U.S. Criminal Code, 18 U.S.C. 1001.

i. Contract Termination and Debarment. A breach of this Davis–Bacon Act clause may be grounds for termination of the contract and debarment as a supplier and subcontractor as provided in 29 CFR 5.12.

j. Disputes Concerning Labor Standards: Disputes arising out of the labor standards provisions of this contract are not subject to the "Claims and Disputes" clause. They will be resolved in accordance with the procedures of the Department of Labor set forth in 29 CFR Parts 5,6, and 7. Disputes within the meaning of this clause include disputes between the lessor (or any of its subcontractors) and the Postal Service, the U.S. Department of Labor, or the employees or their representatives.

**B.1304    EQUAL OPPORTUNITY (CLAUSE 9-7) (JANUARY 1997)**

a. The Contractor may not discriminate against employees or applicants because of race, color, religion, sex, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, religion, sex, or national origin. This action must include, but not be limited to, employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants, notices provided by the Contracting Officer setting forth the provisions of this clause.



**UNITED STATES**
**POSTAL SERVICE.**

Facilities Department

b. The Contractor must, in all solicitations or advertisements for employees placed by it or on its behalf, state that all qualified applicants will be considered for employment without regard to race, color, religion, sex, or national origin.

c. The Contractor must send to each union or workers' representative with which the Contractor has a collective bargaining agreement or other understanding, a notice, provided by the Contracting Officer, advising the union or workers' representative of the Contractor's commitments under this clause, and must post copies of the notice in conspicuous places available to employees and applicants.

d. The Contractor must comply with all provisions of Executive Order (EO) 11246 of September 24, 1965, as amended, and of the rules, regulations, and relevant orders of the Secretary of Labor.

e. The Contractor must furnish all information and reports required by the Executive Order, and by the rules, regulations, and orders of the Secretary, and must permit access to the Contractor's books, records, and accounts by the Postal Service and the Secretary for purposes of investigation to ascertain compliance with these rules, regulations, and orders.

f. If the Contractor fails to comply with this clause or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part; the Contractor may be declared ineligible for further contracts in accordance with the Executive Order; and other sanctions may be imposed and remedies invoked under the Executive Order, or by rule, regulation, or order of the Secretary, or as otherwise provided by law.

g. The Contractor must insert this clause, including this paragraph (g), in all subcontracts or purchase orders under this contract unless exempted by Secretary of Labor rules, regulations, or orders issued under the Executive Order. The Contractor must take such action with respect to any such subcontract or purchase order as the Postal Service may direct as a means of enforcing the terms and conditions of this clause (including sanctions for noncompliance), provided, however, that if the Contractor becomes involved in, or is threatened with, litigation as a result, the Contractor may request the Postal Service to enter into the litigation to protect the interests of the Postal Service.

h. Disputes under this clause will be governed by the procedures in 41 CFR 60-1.1.

**B.1305** AFFIRMATIVE ACTION COMPLIANCE REQUIREMENTS FOR CONSTRUCTION (CLAUSE 9-8) (JANUARY 1997)

a. Definitions

1. "Covered area" means the geographical area described in the solicitation for this contract.

2. "Director" means Director, Office of Federal Contract Compliance Programs (OFCCP), United States Department of Labor, or any person to whom the Director delegates authority.

3. "Employer identification number" means the federal social security number used on the employer's quarterly federal tax return, U.S. Treasury Department Form 941.

4. "Minority" means-

   (a) American Indian or Alaskan Native (all persons having origins in any of the original peoples of North America and maintaining identifiable tribal affiliations through membership and participation or community identification);

   (b) Asian and Pacific Islander (all persons having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands);

   (c) Black (all persons having origins in any of the black African racial groups not of Hispanic origin); and

   (d) Hispanic (all persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race).

b. If the Contractor, or a subcontractor at any tier, subcontracts a portion of the work involving any construction trade, each such subcontract in excess of $10,000 must include this clause and the Notice containing the goals for minority and female participation stated in the solicitation for this contract.

c. If the Contractor is participating in a Hometown Plan (41 CFR 60-4) approved by the U.S. Department of Labor in a covered area, either individually or through an association, its affirmative action obligations on all work in the plan area (including goals) must comply with the plan for those trades that have unions participating in the plan. Contractors must be able to demonstrate participation in, and compliance with, the provisions of the plan. Each Contractor or subcontractor participating in an approved plan is also required to comply with its obligations under the Equal Opportunity clause, and to make a good-faith effort to achieve each goal under the plan in each trade in which it has employees. The overall good-faith performance by other Contractors or subcontractors toward a goal in an approved plan does not excuse any Contractor's or subcontractor's failure to make good-faith efforts to achieve the plan's goals.

d. The Contractor must implement the affirmative action procedures set forth in paragraph (g) below. The goals stated in the solicitation for this contract are expressed as percentages of the total hours of employment and training of minority and female utilization that the Contractor should reasonably be able to achieve in each construction trade in which it has employees in the covered area. If the Contractor performs construction work in a geographical area located outside of the covered area, it must apply the goals established for the geographical area where that work is actually performed. The Contractor is expected to make substantially uniform progress toward its goals in each craft.

e. Neither the terms and conditions of any collective bargaining agreement, nor the failure by a union with which the Contractor has a collective bargaining agreement to refer minorities or women, will excuse the Contractor's obligations under this clause, Executive Order (EO) 11246, as amended, or the regulations under the Executive order.

f. In order for the nonworking training hours of apprentices and trainees to be counted in meeting the goals, apprentices and trainees must be employed by the Contractor during the training period, and the Contractor must have made a commitment to employ the apprentices and trainees at the completion of their training, subject to the availability of employment opportunities. Trainees must be trained pursuant to training programs approved by the U.S. Department of Labor.

g. The Contractor must take affirmative action to ensure equal employment opportunity. The evaluation of the Contractor's compliance with this clause will be based upon its effort to achieve maximum results from its actions. The Contractor must document these efforts fully and implement affirmative action steps at least as extensive as the following:

1. Ensure a working environment free of harassment, intimidation, and coercion at all sites and in all facilities where the Contractor's employees are assigned to work. The Contractor, if possible, will assign two or more women to each construction project. The Contractor must ensure that foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the Contractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at these sites or facilities.

 **UNITED STATES POSTAL SERVICE.**                                     Facilities Department

2. Establish and maintain a current list of sources for minority and female recruitment. Provide written notification to minority and female recruitment sources and community organizations when the Contractor or its unions have employment opportunities available, and maintain a record of the organizations' responses.

3. Establish and maintain a current file of the names, addresses, and telephone numbers of each minority and female off-the-street applicant, referrals of minorities or females from unions, recruitment sources, or community organizations, and the action taken with respect to each individual. If an individual was sent to the union hiring hall for referral and was not referred back to the Contractor by the union or, if referred back, not employed by the Contractor, this fact must be documented in the file, along with whatever additional actions the Contractor may have taken.

4. Immediately notify the Director when the union or unions with which the Contractor has a collective bargaining agreement have not referred back to the Contractor a minority or woman sent by the Contractor, or when the Contractor has other information that the union referral process has impeded the Contractor's efforts to meet its obligations.

5. Develop on-the-job training opportunities and/or participate in training programs for the area that expressly include minorities and women, including upgrading programs and apprenticeship and trainee programs relevant to the Contractor's employment needs, especially those programs funded or approved by the Department of Labor. The Contractor must provide notice of these programs to the sources complied under subparagraph (2) above.

6. Disseminate the Contractor's equal employment policy by-

   (a) Providing notice of the policy to unions and to training, recruitment, and outreach programs, and requesting their cooperation in assisting the Contractor in meeting its contract obligations;

   (b) Including the policy in any policy manual and in collective bargaining agreements;

   (c) Publicizing the policy in such publications as the company newspaper and annual report;

   (d) Reviewing the policy with all management personnel and with all minority and female employees at least once a year; and

   (e) Posting the policy on bulletin boards accessible to employees at each location where construction work is performed.

7. Review, at least annually, the Contractor's equal employment policy and affirmative action obligations with all employees having responsibility for hiring, assignment, layoff, termination, or other employment decisions. Conduct review of this policy with all on-site supervisory personnel before initiating construction work at a job site. A written record must be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter.

8. Disseminate the Contractor's equal employment policy externally by including it in any advertising in the news media, specifically including minority and female news media. Provide written notification to, and discuss this policy with, other Contractors and subcontractors with which the Contractor does or anticipates doing business.

9. Direct recruitment efforts, both oral and written, to minority, female, and community organizations, to schools with minority and female students, and to minority and female recruitment and training organizations serving the Contractor's recruitment area and employment needs. Not later than one (1) month before the date for acceptance of applications for apprenticeship or training by any recruitment source, send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

10. Encourage present minority and female employees to recruit minority persons and women. When feasible, provide after-school, summer, and vacation employment to minority and female youth both on the site and in other areas of the Contractor's work force.

11. Validate all tests and other selection requirements when required under 41 CFR 60-3.

12. Conduct, at least annually, an inventory and evaluation of all minority and female personnel for promotional opportunities. Encourage these employees to seek or to prepare for, through appropriate training and other activities, opportunities for promotion.

13. Ensure that seniority practices, job classifications, work assignments, and other personnel practices do not have a discriminatory effect by continually monitoring all personnel and employment-related activities to ensure that the Contractor's obligations under this contract are being carried out.

14. Ensure that all facilities and company activities are nonsegregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

15. Maintain a record of solicitations for subcontracts for minority and female construction Contractors and suppliers, including circulation of solicitations to minority and female Contractor associations and other business associations.

16. Conduct a review, at least annually, of all supervisors' adherence to and performance under the Contractor's equal employment policy and affirmative action obligations.

h. The Contractor is encouraged to participate in voluntary associations that may assist in fulfilling one or more of the affirmative action obligations continued in paragraph (g) above. The efforts of a Contractor association, joint Contractor-union, Contractor-community, or similar group of which the Contractor is a member and participant may be asserted as fulfilling one or more of its obligations under paragraph (g) above, provided the Contractor

   1. Actively participates in the group;

   2. Makes every effort to ensure that the group has a positive impact on the employment of minorities and women in the industry;

   3. Ensures that concrete benefits of the program are reflected in the Contractor's minority and female work force participation;

   4. Makes a good-faith effort to meet its individual goals and timetables; and

   5. Can provide access to documentation that demonstrates the effectiveness of actions taken on behalf of the Contractor. The obligation to comply is the Contractor's, and failure of such a group to fulfill an obligation will not be a defense for the Contractor's noncompliance.

i. A single goal for minorities and a separate single goal for women must be established. The Contractor is required to provide equal


**UNITED STATES POSTAL SERVICE.**

# Facilities Department

employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and non-minority. Consequently, the Contractor may be in violation of EO 11246, if a particular group is employed in a substantially disparate manner.

j.  The Contractor may not use goals or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

k.  The Contractor may not enter into any subcontract with any person or firm debarred from Government contracts under EO 11246.

l.  The Contractor must carry out such sanctions and penalties for violation of this clause and of the Equal Opportunity clause, including suspension, termination, and cancellation of existing subcontracts, as may be imposed or ordered under EO 11246, as amended, and its implementing regulations, by the OFCCP. Any failure to carry out these sanctions and penalties as ordered will be a violation of this clause and EO 11246.

m.  The Contractor in fulfilling its obligations under this clause must implement affirmative action procedures at least as extensive as those prescribed in paragraph (g) above, so as to achieve maximum results from its efforts to ensure equal employment opportunity. If the Contractor fails to comply with the requirements of EO 11246, the implementing regulations, or this clause, the Contracting Officer will take action as prescribed in 41 CFR 60-4.8.

n.  The Contractor must designate a responsible official to

1.  Monitor all employment-related activity to ensure that the Contractor's equal employment policy is being carried out;

2.  Submit reports as may be required; and

3.  Keep records that at least include for each employee the name, address, telephone number, construction trade, union affiliation (if any), employee identification number, social security number, race, sex, status (mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay, and locations at which the work was performed. Records must be maintained in an easily understandable and retrievable form; however, to the degree that existing records satisfy this requirement, separate records are not required to be maintained.

o.  Nothing contained in this clause may be construed as a limitation upon the application of other laws that establish different standards of compliance or upon the requirements for the hiring of local or other area residents (for example, those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program).

**B.1306   CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME COMPENSATION (CLAUSE 9-2) (JANUARY 1997)**

a.  Overtime Requirements: No supplier or subcontractor contracting for any part of the contract work may require or permit any laborer or mechanic to work more than 40 hours in any workweek on work subject to the provisions of the Contract Work Hours and Safety Standards Act, unless the laborer or mechanic receives compensation at a rate not less than one-and-one-half times the laborer's or mechanic's basic rate of pay for all such hours worked in excess of 40 hours.

b.  Violation, Liability for Unpaid Wages, and Liquidated Damages: In the event of any violation of paragraph a above, the supplier and any subcontractor responsible for the violation are liable to any affected employee for unpaid wages. The supplier and subcontractor are also liable to the Postal Service for liquidated damages, which will be computed for each laborer or mechanic at

$10 for each day on which the employee was required or permitted to work in violation of paragraph a above.

c.  Withholding for Unpaid Wages and Liquidated Damages: The Contracting Officer may withhold from the supplier, from any moneys payable to the supplier or subcontractor under this or any other contract with the same supplier, or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act held by the same supplier, sums as may administratively be determined necessary to satisfy any liabilities of the supplier or subcontractor for unpaid wages and liquidated damages pursuant to paragraph b above.

d.  Records: The supplier or subcontractor must maintain for three years from the completion of the contract for each laborer and mechanic (including watchmen and guards) working on the contract payroll records which contain the name, address, social security number, and classification(s) of each such employee, hourly rates of wages paid, number of daily and weekly hours worked, deductions made, and actual wages paid. The supplier or subcontractor must make these records available for inspection, copying, or transcription by authorized representatives of the Contracting Officer and the Department of Labor, and must permit such representatives to interview employees during working hours on the job. (The Department of Labor information collection and record keeping requirements in this paragraph d have been approved by the Office of Management and Budget under OMB control numbers 1215-0140 and 1215-0017.)

e.  Subcontracts. The supplier must insert paragraphs a through d of this clause in all subcontracts, and must require their inclusion in all subcontracts at any tier.

**B.1307   EQUAL OPPORTUNITY PREAWARD COMPLIANCE OF SUBCONTRACTS (CLAUSE 9-9) (JANUARY 1998)**

The supplier may not enter into a first-tier subcontract for an estimated or actual amount of $10 million or more without obtaining in writing from the Contracting Officer a clearance that the proposed subcontractor is in compliance with equal opportunity requirements and therefore eligible for award.

**B.1308   AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS (CLAUSE 9-13) (JANUARY 1997)**

a.  The supplier may not discriminate against any employee or applicant because of physical or mental handicap, in regard to any position for which the employee or applicant is qualified. The supplier agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified handicapped individuals without discrimination in all employment practices, such as employment, upgrading, demotion or transfer, recruitment, advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training (including apprenticeship).

b.  The supplier agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Rehabilitation Act of 1973, as amended.

c.  In the event of the supplier's noncompliance with this clause, action may be taken in accordance with the rules and regulations and relevant orders of the Secretary of Labor.

d.  The supplier agrees to post in conspicuous places, available to employees and applicants, notices in a form to be prescribed by the Director, Office of Federal Contract Compliance Programs, provided by or through the Contracting Officer. These notices state the supplier's obligation under the law to take affirmative action to employ and advance in employment qualified handicapped employees and applicants, and the rights of applicants and employees.

 **UNITED STATES**
**POSTAL SERVICE**

# Facilities Department

e. The supplier must notify each union or worker's representative with which it has a collective bargaining agreement or other understanding that the supplier is bound by the terms of section 503 of the Act and is committed to taking affirmative action to employ, and advance in employment, handicapped individuals.

f. The supplier must include this clause in every subcontract or purchase order over $2,500 under this contract unless exempted by rules, regulations, or orders of the Secretary issued pursuant to section 503 of the Act, so its provisions will be binding upon each subcontractor or vendor. The supplier must take such action with respect to any subcontract or purchase order as the Director of the Office of Federal Contract Compliance Programs may direct to enforce these provisions.

**B.1309** AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (CLAUSE 9-14) (JANUARY 1997)

a. The supplier may not discriminate against any employee or applicant because that employee or applicant is a disabled veteran or veteran of the Vietnam era, in regard to any position for which the employee or applicant is qualified. The supplier agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified disabled veterans and veterans of the Vietnam era without discrimination in all employment practices, such as employment, upgrading, demotion or transfer, recruitment, advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training (including apprenticeship).

b. The supplier agrees to list all employment openings which exist at the time of the execution of this contract and those which occur during the performance of this contract, including those not generated by this contract and including those occurring at an establishment of the supplier other than the one where the contract is being performed, but excluding those of independently operated corporate affiliates, at an appropriate local office of the state employment service where the opening occurs. State and local government agencies holding Postal Service contracts of $10,000 or more will also list their openings with the appropriate office of the state employment service.

c. Listing of employment openings with the employment service system will be made at least concurrently with the use of any recruitment source or effort and will involve the normal obligations attaching to the placing of a bona fide job order, including the acceptance of referrals of veterans and nonveterans. The listing of employment openings does not require the hiring of any particular applicant or hiring from any particular group of applicants, and nothing herein is intended to relieve the supplier from any other requirements regarding nondiscrimination in employment.

d. Whenever the supplier becomes contractually bound to the listing provisions of this clause, it must advise the employment service system in each state where it has establishments of the name and location of each hiring location in the state. The supplier may advise the state system when it is no longer bound by this clause.

e. Paragraphs b, c, and d above do not apply to openings the supplier proposes to fill from within its own organization or under a customary and traditional employer/union hiring arrangement. But this exclusion does not apply to a particular opening once the supplier decides to consider applicants outside its own organization or employer/union arrangements for that opening.

f. Definitions

(1) All Employment Openings. This includes all positions except executive and top management, those positions that will be filled from within the supplier's organization, and positions lasting three days or less. This also includes full-time employment, temporary employment of more than three days

duration, and part-time employment. Under the most compelling circumstances, an employment opening may not be suitable for listing, including situations in which the needs of the Postal Service cannot reasonably be otherwise supplied, when listing would be contrary to national security, or when listing would not be in the best interest of the Postal Service.

(2) Appropriate Office of the State Employment Service. This means the local office of the federal/state national system of public employment offices with assigned responsibility for serving the area where the employment opening is to be filled, including the District of Columbia, Guam, the Commonwealth of Puerto Rico, and the Virgin Islands.

(3) Positions That Will be Filled From Within the Supplier's Own Organization. This means employment openings for which no consideration will be given to persons outside the supplier's organization (including any affiliates, subsidiaries and parent companies) and includes any openings which the supplier proposes to fill from regularly established recall lists.

(4) Openings the Supplier Proposes to Fill Under a Customary and Traditional Employer/Union Hiring Arrangement. Employment openings the supplier proposes to fill from union halls as part of the customary and traditional hiring relationship existing between it and representatives of its employees.

g. The supplier agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Vietnam Era Veterans Readjustment Assistance Act of 1972, as amended.

h. In the event of the supplier's noncompliance with this clause, action may be taken in accordance with the rules, regulations, and relevant orders of the Secretary.

i. The supplier agrees to post in conspicuous places, available to employees and applicants, notices in a form to be prescribed by the Director, Office of Federal Contract Compliance Programs, provided by or through the Contracting Officer. These notices state the supplier's obligation under the law to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam era, and the rights of applicants and employees.

j. The supplier must notify each union or workers' representative with which it has a collective bargaining agreement or other understanding that the supplier is bound by the terms of the Act and is committed to taking affirmative action to employ, and advance in employment, qualified disabled veterans and veterans of the Vietnam era.

k. The supplier must include this clause in every subcontract or purchase order of $10,000 or more under this contract unless exempted by rules, regulations, or orders of the Secretary issued pursuant to the Act, so its provisions will be binding upon each subcontractor or vendor. The supplier must take such action with respect to any subcontract or purchase order as the Director of Office of Federal Contract Compliance Programs may direct to enforce these provisions, including action for noncompliance.

**B.1310** COMPLIANCE BY STATES WITH LABOR STANDARDS (CLAUSE 9-4) (JANUARY 1997)

The supplier agrees to comply with the *Contract Work Hours and Safety Standards Act-Overtime Compensation* and *Davis Bacon Act* clauses of this contract, to provide for similar compliance in subcontracts with states or political subdivisions thereof, and to insert the clauses in all subcontracts with private persons or firms.


**UNITED STATES POSTAL SERVICE.**                                    Facilities Department

---

**B.1311** CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-SAFETY STANDARDS (CLAUSE 9-5) (JANUARY 1997)

a.  To the extent that the work includes construction, alteration, repair, painting, or decorating, the Contractor may not require any laborer or mechanic to work in surroundings or under conditions that are unsanitary, hazardous, or dangerous to the laborer's or mechanic's health or safety, as provided under standards promulgated by the Secretary of Labor under the authority of 40 U.S.C. 333 (see 29 CFR 1910 and 1926).

b.  If the Contractor fails to comply with this clause, the Postal Service, at its discretion, may cancel this contract, contract for the balance of the work or term, and charge to the Contractor any additional costs incurred.

c.  The Contractor agrees to insert this clause, including this paragraph (c), in all subcontracts and to require its inclusion in all subcontracts at any tier. The term "Contractor, " as used in this clause in any subcontract, is deemed to refer to the lower-tier subcontractor.

**B.1312** USE OF FORMER POSTAL SERVICE EMPLOYEES (CLAUSE 1-14) (OCTOBER 2001)

During the term of this contract, the supplier must identify any former Postal Service employee it proposes to be engaged, directly or indirectly, in contract performance. Such individuals may not commence performance without the Contracting Officer's prior approval. If the Contracting Officer does not provide such approval, the supplier must replaced the proposed individual with another individual equally qualified to provide the services called for in the contract.

## B. 1400 SUPPLIER RELATIONS

**B.1401**  *APPLICABLE IF CONTRACT EXCEEDS $1,000,000*  SMALL, MINORITY, AND WOMAN-OWNED BUSINESS SUBCONTRACTING REQUIREMENTS (CLAUSE 3-1) (MAY 2001)

a.  All suppliers must submit a subcontracting plan that is specific to this contract, and that separately addresses subcontracting with small, minority, and woman-owned businesses. A plan approved by the Postal Service must be included in and made a part of the contract. Lack of an approved plan may make the supplier ineligible for award. A subcontract is defined as any agreement (other than one involving an employer-employee relationship) entered into by a Postal Service supplier or subcontractor or calling for supplies or services required for performance of the contract or subcontract.

b.  The supplier's subcontracting plan must include the following:

(1)  Goals, in terms of percentages of the total amount of this contract, that the supplier will endeavor to subcontract to small, minority, and woman-owned businesses. The supplier must include all subcontracts that contribute to contract performance and may include a proportionate share of supplies and services that are normally allocated as indirect costs.

(2)  A statement of the:

(a)  Total dollars planned to be subcontracted under this contract; and

(b)  Total of that amount planned to be subcontracted to small, minority, and woman-owned businesses.

(3)  A description of the principal types of supplies and services to be subcontracted under this contract, identifying the types planned for subcontracting to small, minority, and woman-owned businesses.

(4)  A description of the method used to develop the subcontracting goals for this contract.

(5)  A description of the method used to identify potential sources for solicitation purposes and a description of efforts the supplier will make to ensure that small, minority, and woman-owned businesses have an equitable opportunity to compete for subcontracts.

(6)  A statement as to whether the offer included indirect costs in establishing subcontracting goals for this contract and a description of the method used to determine the proportionate share of indirect costs to be incurred with small, minority, and woman-owned businesses.

(7)  The name of the individual employed by the supplier who will administer the subcontracting program and a description of the individual's duties.

(8)  Assurances that the supplier will require all subcontractors receiving subcontracts in excess of $1,000,000 to adopt a plan similar to the plan agreed to by the supplier.

(9)  A description of the types of records the supplier will maintain to demonstrate compliance with the requirements and goals in the plan for this contract. The records must include at least the following:

(a)  Source lists, guides, and other data identifying small, minority. and woman-owned businesses;

(b)  Organizations contacted in an attempt to locate sources that are small, minority, and woman-owned businesses;

(c)  Records on each subcontract solicitation resulting in an award of more than $100,000, indicating whether small, minority, or woman-owned businesses were solicited and if not, why not; and

(d)  Records to support subcontract award data, including the name, address, and business size of each subcontractor.

c.  Reports. The reports on sub-contracting activity must be one of the types described in Clause 3-2, *Participation of Small, Minority, and Woman-owned Businesses.*

**B.1402**  *APPLICABLE IF CONTRACT EXCEEDS $250,000*  PARTICIPATION OF SMALL, MINORITY, AND WOMAN-OWNED BUSINESSES (CLAUSE 3-2) (MAY 2001)

a.  The policy of the Postal Service is to encourage the participation of small, minority, and woman-owned businesses in its purchases of supplies and services to the maximum extent practicable consistent with efficient contract performance. The supplier agrees to follow the same policy in performing this contract.

b.  Subject to the agreement of the supplier and the Postal Service, the supplier will report subcontracting activity on one of the following bases:

(1)  Showing direct subcontracting awards made:

(2)  Showing subcontracting activity that is allocable to this contract using generally accepted accounting practices; or

(3)  A combination of the methods listed above.

c.  The supplier will submit a report to the Contracting Officer with each progress payment request describing all subcontract awards to small, minority, or woman-owned businesses.

---



**UNITED STATES POSTAL SERVICE.**

Facilities Department

B. 1500 ATTACHMENTS

ATTACHMENT     TITLE

01 Dept of Labor Wage Rate Decision ()
02 Dept of Labor Wage Rate Report
03 Performance Bond (Form)
04 Payment Bond (Form)
05 Release of Claims (Form 7303)
06 Subcontracting Plan (Format)
07 Subcontracting Report (Form)
08 Certification (No Asbestos or Lead Paint)
09 Contractor's Proposal
10 Security Requirements Form (occupied buildings only)
11 Safety Handbook
12 Management Plan (Not Applicable)
13 State Sales Tax Exemption Information (Not Applicable)
14 Proposal Cost Breakdown Form (Not Applicable)
15 Offeror's Proposal Return Package (separate package) (Not Applicable)
16 List of Prequalified Contractors (Not Applicable)
17 Subsurface Investigations Report (Not Applicable)
18 Environmental Reports (such as Geotechnical, Archeological) (Not Applicable)
19 Security Requirements Form (occupied buildings only) (Not Applicable)
20 Safety Requirements - Local (occupied buildings) (Not Applicable)
21 Safety and Health Guide For Contractors (Not Applicable)